# EXHIBIT A

## Wayne McCrory, RPBio. Bear biologist

McCrory Wildlife Services Ltd.
208 Laktin Road, New Denver, British Columbia, Canada, V0G 1S1
Phone: 250-358-7796; e-mail: mccrorywildlife@netidea.com

August 5, 2012

Attn. Emily R. Rankin
Mark Aronowitz
Spence Law Firm, LLC
Box 548
15 South Jackson St.
Jackson, WY 83001

### Re: Expert Witness Report Re- Yolanda Evert versus the United States of America, Case No. 11-cv-339-F

Please find enclosed my report with Exhibits (photos) and Attachments including a list of publications authored (and co-authored) in the last 10 years, my curriculum vitae, and rate of compensation for my work. I have not appeared as an expert witness at any trial or deposition in any country in the last 4 years. I reserve the right to supplement or amend my report should new information or evidence become available.

Respectfully,

Wayne P. McCrory, RPBio.
Bear biologist

# A CRITICAL REVIEW OF THE CIRCUMSTANCES

# RELATED TO THE FATALITY OF ERWIN EVERT FROM

# A GRIZZLY BEAR ATTACK ON JUNE 17, 2010

### in

### KITTY CREEK WATERSHED, SHOSHONE NATIONAL FOREST, WYOMING.

August 6, 2012

Prepared for:
Spence Law Firm, LLC
Box 548
15 South Jackson St.
Jackson, WY 83001
U.S.A.



Prepared by:
Wayne McCrory, R.P.Bio.
Bear biologist
McCrory Wildlife Services Ltd.
208 Laktin Road,
New Denver, B.C. V0G 1S1
Canada



## 1.0 SUMMARY OF OPINIONS

The following is a summary of my opinions based on a review of all materials provided to me until August 6, 2012. I reserve the right to supplement or amend my report should new information or evidence become available. All opinions expressed throughout this report are to a reasonable degree of scientific probability.

My opinions are based on a June 14, 2011 habitat survey of the access trail into site #3 in lower Kitty Creek, an investigation of the incident site and circumstances, a comparison of the natural hazard of an encounter with an adult male grizzly bear at site #3 versus the hazard created by the IGBST study team's baiting, snaring and treatment of bear #646, a review of all documents provided, and my 30 years of research experience in bear risk assessments and bear-people conflict management in Western Canada.

Mr. Erwin Evert died on June 17, 2010 from a sudden and very aggressive attack by a 425-pound male grizzly bear (#646) at an IGBST research bear capture site #3 in Kitty Creek, Wyoming. My opinion is that Mr. Evert's death was a direct result of the absence of any formal warning by the IGBST concerning the extreme danger from a grizzly bear attack upon anyone hiking in the area of site #3. The single most egregious lack of warning was the willful removal of the closure/warning signs by the IGBST field crew (Chad Dickinson and Seth Thompson) that had been posted along the decommissioned spur road route below site #3. The capture team willfully removed the signs on the same afternoon prior to Mr. Evert hiking into site #3. Mr. Evert accessed the area by following the obvious trail on a decommissioned spur road left by the access activities of the capture team using horses. Mr. Evert was hiking in a different location from capture site warning signs he had seen on June 9 below site #2 further up Kitty Creek. Had the warning signs remained posted at site #3 on June 17, Mr. Evert would have had the opportunity to be warned as he approached the area where he died. It is my opinion that if the signs had been left up Mr. Evert would not have hiked into the capture site and thus would not have been killed by bear #646.

Conclusively, it is my opinion that the natural risk factor of being killed by an adult male grizzly bear at site #3 was extremely rare, and the artificial risk factor created by the IGBST field crew was extremely high. It is my opinion that the only reason bear #646 killed Mr. Evert in a sudden, swift attack was because of an aggressive behavioral state induced by the combined stress of being live-captured, held (and possibly injured) in a leg-hold snare, chemically immobilized and handled, and then released while still under the influence of a very potent psychotropic drug (Telazol). The overall bear habitat values at site #3 were low and the limited food resources, such as new spring grasses, were not ones that would concentrate natural grizzly bear activity at this site. Bear #646 was purposely lured to site #3 by bait placed by the IGBST capture team. Under natural conditions, bear #646 would likely not have been at site #3. Additionally, this 13-year old male bear did not have a known history of conflicts with people. Male bears tend to be the warier of bear cohorts and generally go out of their way to avoid close contact and conflicts with people except when conditioned to human foods or, in very rare circumstances, when they choose to treat a person as prey or when a person approaches too closely when they are feeding on a large mammal carcass. I concur with the Investigation Team that predation on Mr. Evert was not a causative motivation. None of the other two potentially injurious circumstances (food conditioning and defense of a large mammal carcass) were, in my opinion, applicable to bear

#646 attacking Mr. Evert on June 17, 2010. Only the stressed and drug-induced state of bear #646 was the cause of its aggressive attack.

For several decades in North America, there have been certain fundamental basics regarding the responsibility and duty of agencies that manage the bear-people interface in public recreation wild lands with respect to providing an adequate and accurate level of information to the public concerning bear safety. The IGBST field crew involved in the 2010 grizzly bear capture program in Kitty Creek was well aware of the high level of the danger of their trapping operations to themselves and the public. They were well aware of the need to adequately inform the public of this danger through their general familiarity of scientific and bear management publications, their three authorization orders or permits (USFS - Shoshone National Forest, Wyoming Game and Fish Department (WGFD), and the USFWS Subpermit for handling research grizzly bears issued by the Office of the Grizzly Bear Recovery Coordinator), their manual for bear handlers, a recent bear handlers workshop, and a verbal agreement to inform the cabin owners at Kitty Creek between Andrew Pils (Shoshone National Forest biologist) and IGBST field crew head Chad Dickinson. The Subpermit was also their IGBST operational protocol and stipulated (Item 4) that: "Every possible precaution shall be taken to avoid confrontations between bears and the public, including but not limited to closure or signing of the study sites."

In my opinion, all of the IGBST protocol, agency permitting requirements, and training that provided for public safety was willfully thrown out the door by the IGBST field crew in their 2010 Kitty Creek operations, except for the posting of closure/warning signs near each capture site. Even then, the IGBST field crew exhibited no concern for public safety when they willfully pulled the warning/closure signs below site #3 on June 17, 2010 (3 days before the posted closure date of June 20), leaving an extremely dangerous grizzly bear situation on or immediately adjacent to an obvious hiking or riding route. The removed signs had been the only means for any member of the public to be aware of the extreme hazard presented by bear #646 at Site #3. Also, the field crew did no preventative planning in terms of the final day of their "hitch" on June 17, 2010 with respect to altering their plans to pull the closure signs should they capture a grizzly bear(s). Their minds were made up ahead of time to shut down the capture sites regardless of capturing a grizzly bear and implications of this to public safety.

It is my opinion that in order to justify their willful removal of the closure/warning signs on June 17, 2010, the Kitty Creek capture team used a very flawed method, if their actions and inactions can even be called a method, to ascertain public recreational use in their study area. Prior to this, the IGBST field crew willfully ignored and made absolutely no effort to determine the level of recreational use and activity on Kitty Creek recreation trails, roads, and obvious travel routes so they had no sound basis whatsoever for making the assumption that no one would be hiking or riding in Kitty Creek on June 17. If they had made an effort to determine recreational use they would have found that Mr. Evert and others often hiked in the area, sometimes off the main trail. Instead, on June 17, 2010, they put their own predetermined personal agendas ahead of public safety, as they wanted to end their hitch and not have to return to the area some days later just to remove the closure/warning signs.

It is noteworthy that shortly after the fatal mauling of Mr. Evert in Kitty Creek, in July 2010, the IGBST moved to implement the public information recommendations of the Investigation Team Report concerning public safety around their bear capture operations. I agree with those recommendations and subsequent actions. However, many of the public communication measures implemented after Mr. Evert was killed were already inherent in the IGBST subpermit (Item 4) protocol, various agency permits, the training manual and training sessions for bear capture handlers, and an agreement by Chad Dickinson to talk to the Kitty Creek cabin owners. Much more proactive public communication measures were already being used by some of the other capture teams elsewhere in the Greater Yellowstone Ecosystem prior to the June 17, 2010 incident in Kitty Creek.

It is my concluding opinion that if proper and reasonable communication efforts stipulated in the IGBST subpermit 4 and in the requirements of all three agency orders/permits regarding public safety had been followed by the IGBST field team, Chad Dickinson and Seth Thompson, in their Kitty Creek bear capture operations in May-June 2010, the fatal attack by grizzly bear #646 on Mr. Erwin Evert would never have occurred.

## 2.0 BACKGROUND

In May 2011, I was approached by a representative of the Spence Law Firm and asked if I would be interested in doing an independent review of the fatal mauling by a grizzly bear of Mr. Erwin Evert on June 17, 2010 in the Kitty Creek area of Shoshone National Forest in Wyoming. After reviewing the case documents sent to me, I agreed to write a report of my findings and conclusions for the Spence Law Firm.

## 3.0 RELEVANT QUALIFICATIONS

I am a registered professional biologist in the province of British Columbia, Canada. I have more than 40 years of experience as a biologist (having received an honors bachelor of science degree (zoology) from the University of British Columbia in 1966) with a specialty in bear-human hazard (risk) analysis and the design of bear-people conflict plans for various agencies. In my capacity as a professional biologist, Canadian federal and municipal government agencies looking for solutions to bear management problems seek my expertise. My extensive wildlife and bear work has been published in ten peer-reviewed proceedings or journals and government publications. I have produced over 80 professional reports, some peer-reviewed. Many involved the mapping and analyzing bear habitats, bear hazard assessments, and bear-people conflict mitigation measures for numerous parks and protected areas in British Columbia, Alberta and northern areas of Canada. In this capacity I have extensive experience in the audit and design of bear-people safety management policies and guidelines including public information systems for bear safety. Also in this capacity, I have reviewed numerous bear attack situations and associated causative circumstances. I have also been involved in studies of the measurement of both grizzly bear and human use of hiking trails through the employment of remote cameras and other means. I am familiar with many of the bear-people conflict management policies and plans related to protected areas in western Canada as well as in some of the U.S. National Parks such as Yellowstone.

A list of all professional reports authored or co-authored by me in the previous 10 years is included in the attachments at the end of this report, as is my curriculum vitae.

## 4.0 APPROACH AND MATERIALS REVIEWED

I have attempted to follow the lexicon of terms and concepts for human-bear management in North America as set out by Hopkins et al. 2010 (A proposed lexicon of terms and concepts for human–bear management in North America. *Ursus* 21(2): 154-168).

For my report I used the following approach:

1. A field survey of grizzly bear habitat values in lower Kitty Creek combined with a review of the Kitty Creek bear capture site #3 on June 14, 2011.

2. Interviews on June 14, 2011 with Mara Domingue (daughter of Mr. Evert) and Mr. Lonnie Gambrel, a seasonal resident in the cabin near the trailhead in Kitty Creek.

3. An assessment of the potential risk of a grizzly encounter in lower Kitty Creek during the May-June, 2010 period, comparing the normal background risk of a person having an injurious encounter with an adult male grizzly bear with the risk created by the IGBST grizzly bear capture operations at site #3. For this part of my assessment I have partly relied on information provided in the report of Dr. Marc Cattet.

4. An assessment of all of the relevant permits, policies, manuals, protocols, public communications, and other documents associated with the activities of the IGBST researchers in Kitty Creek in May-June, 2010.

5. A review of all of the circumstances related to the fatality of Erwin Evert on June 17, 2010.

6. A review of all of the following case documents provided:

Shoshone NF FOIA 000001-000055
WYG&F 000001-000253
USFWS FOIA 000001-003365
NPS FOIA 000001-000016
USFS FOIA 000001-000008
USDAFS FOIA 000001-000283
Evert SS Email 000001-000004
Evert Diary 000001-000012
Evert 0000001-0000050
Evert 0003897-0004003
Evert 0004004-0004128
Evert 0004129-0004306
Evert 0004307-0004505
Evert 0004506-0004699
Evert 0004700-0004765
Evert 0004925-0004930
Evert 0004931-0004934
Evert 0004935-0004937

Evert 0004938-0004941
Evert 0004953-0005033
Evert 0003894-0003895
Evert 0005173-0005199
Evert 0005083-0005097
Evert 0005098-0005103
Evert 0005514-0005682
Evert 0004942-0004952
Evert 0005104-0005172
Evert 0005484-0005513
Evert 0005204-0005321
Evert 0005322-0005483
Evert 0005034-0005082
Evert 0005683-0005688
Evert 0005753-0005832
Evert 0005709-0005734
Evert 0005701-0005708
Evert 0005609-0005700
Evert 0005833-0005928
Evert 0005929-0005938
Evert 0005939-0005968
Yellowstone Grizzly Bear Investigations 2006 (Unbatesed)
Yellowstone Grizzly Bear Investigations 2008 (Unbatesed)
Evert 0005969-0006003
Evert 0006004-0006047
Evert 0006048-0006104
Evert 0006105-0006356
Evert 0006357-0006445
Evert 0007401-0007406
Evert 0007411-0007418
Evert 0007419-0007426
Evert 0007427-0007444
Deposition of Yolanda Evert
Deposition of Charles Schwartz
Deposition of Chad Dickinson
Deposition of Chris Servheen
Deposition of Judy O'Dwyer
Deposition of Mark Haroldson
Deposition of Seth Thompson
Deposition of Andy Pils
Deposition of Dennis Alquist
Deposition of Mara Domingue
Deposition of Chuck Neal

## 5.0 THE INCIDENT

On June 17, 2010, 70-year-old Mr. Erwin Evert was found fatally mauled by a bear after
hiking on a decommissioned spur road past IGBST bear capture site #3 in Kitty Creek in

the Shoshone National Forest. An Investigation Team Report (USFWS FOIA 0001-000105) was done and concluded that Mr. Evert had been killed by a 13-year old male grizzly #646 that had been caught in a baited foot snare and subsequently been anesthetized, treated, collared, and left at the site to recover by two members of the IGBST capture team, Chad Dickinson and Seth Thompson. Prior to leaving site #3, the researchers removed the only signs below the site that would have warned Mr. Evert of the danger that lay ahead as he hiked up the decommissioned spur road. More specific details on the actual mauling incident, including my own interpretation of some of extenuating circumstances, are itemized in the next section.

## 6.0 RESULTS OF JUNE 14, 2011 FIELD VISIT TO KITTY CREEK SITE #3 & EXAMINATION OF CIRCUMSTANCES OF THE ATTACK ON MR. EVERT

The purposes of my field survey of lower Kitty Creek and investigation of site #3 were to assess the bear habitat values, to verify the location of the mauling site and better understand the on-the-ground details provided by the Investigation Team Report (USFWS FOIA 0001-000105), and other circumstances. I used this information to compare the risk to the public of an injurious encounter with an adult male grizzly bear on the route into site #3, and at site #3 under natural conditions versus the risk associated with the May-June 2010 capture operations. By doing so, I was able to understand the degree to which the activities of the IGBST field crew created and caused the hazardous circumstances resulting in the attack on Mr. Evert.

My field survey was done on June 14, 2011 between 1330 and 1800 hours, with Emily Rankin and Mark Aronowitz of the Spence Law Firm, along with Mara Domingue and her husband. Mrs. Domingue helped us locate the spur road/trail to site #3 and provided background information on her late father's hiking practices and botany pursuits in the area.

During the field investigation I used the following approach:

1. I did an initial assessment of grizzly bear habitat and associated bear sign along the main Kitty Creek Trail and parallel decommissioned logging road/trail, from the trailhead at the Kitty Creek cabins to the junction with the decommissioned spur road system to site #3. I also continued the survey along the decommissioned spur road system up to site #3. I used the grizzly bear habitat evaluation transect method as outlined in McCrory 2003 (A bear hazard study of recreational facilities in a major grizzly bear travel corridor with management recommendations to minimize conflicts – A GIS Grizzly Bear Encounter Risk Model. Kakwa Provincial Park, B.C. Report to B.C. Parks. 174 pages). Documentation of evidence of grizzly bear use included trees rubbed by bears to mark their territory and leave their scent (mark trees).

2. At Site #3, the two attorneys and I used the photographs and site descriptions provided in the Investigation Team Report (USFWS FOIA 0001-000105) to identify the snare-attachment tree where grizzly bear #646 was left, the initial attack location and where the body of Mr. Evert was found. We flagged these locations with blue ribbons on sticks.

3. I used information from 1 and 2 above and the documents provided at that time to compare the risk to the public of an injurious type encounter with an adult male grizzly bear

on the route into site #3 and at site #3 under natural conditions versus the risk associated with the capture operation on June 17, 2010. Following are the results:

## 6.1 General grizzly bear habitat values and evidence of bear use along the access trail and route to site #3

The decommissioned spur road from the Kitty Creek Trail to site #3 was easy to follow with a well-defined base for the 500 to 550 yards that we followed directly to site #3. It generally followed the spur road, but made some shortcuts where the decommissioned road curved away from a more direct path.

Overall, I found the grizzly bear habitat value for the area between the Kitty Creek cabins and site #3 to be of low all-round seasonal value (McCrory Wildlife-Exhibit 2). Emergent spring grasses and sedges (*Gramidae*) were the main grizzly bear foods observed. There was a small amount of emerging cow-parsnip (*Heracleum lanatum*) and what appeared to be common horsetail (*Equisetum arvense*) along the small stream near the junction of the main Kitty Creek Trail and the spur road/trail to Site #3. There was also a small amount of ungulate use (deer, elk).

A well-used bear mark/rub tree was recorded along the lower Kitty Creek trail (McCrory Wildlife-Exhibit 6), just below the decommissioned spur road to Site #3; another one of low use was also noted lower on the main trail while one other mark trees of low bear use was also noted along the decommissioned spur road to Site #3. The frosted tips on the hairs left on the tree indicated use by grizzly bears and not black bears. According to my research elsewhere (McCrory 2003, op. cit.), mark/rub trees along hiking trails are a good index of use as a grizzly bear travel route. These mark trees suggested a low level of grizzly bear travel through the area. Several recent bear scats were found. This evidence of use, along with the anecdotal report of an adult grizzly bear at the upper Kitty Creek cabin several days previous to our visit, indicates a relatively low grizzly bear use of the area in June under natural conditions.

It should be noted that I only sampled a small area of the drainage, thus there may be more productive grizzly bear habitats elsewhere in the watershed where grizzly bear use would be more concentrated.

## 6.2 Risk of an encounter with an adult male grizzly bear under natural conditions

Adult male grizzly bears in the wild are generally known to be the wariest of the bear cohorts in a bear society. Male grizzly bears very rarely attack people except in defense of a large animal carcass or, in very rare instances, when they treat humans as they would a large mammal they stalk and kill as prey. Male grizzly bears in the wild have also been known to attack hunters around a game carcass killed by the hunter. Under unnatural conditions, male grizzly bears conditioned to human foods and/or habituated to people have also been known to injure humans. Since bear #646 had no evidence of previous capture during its thirteen years, it appears to have been a normal wild bear that stayed out of conflict with people until it was captured at the IGBST site #3 in June 2010.

It is my opinion that under natural conditions, the risk of an injurious encounter with an adult male grizzly bear, such as bear #646 at Kitty Creek site #3, would be extremely rare. More likely than not, the attack by this bear on Mr. Evert on June 17, 2010 cannot in any way be attributed to natural circumstances.

6.3 Review of attack circumstances at site #3

Using the photos from the Investigation Team Report, we identified site #3 and located the snare attachment tree where the field crew had left bear #646 (USFWS FOIA 0001-000105).

The tree, a subalpine fir (*Abies lasiocarpa*) about a 1.5 feet diameter, was about 7 yards west of the well-defined pathway on the decommissioned spur road. The snare tree was distinguishable by the disturbed ground at the base, the indentation into the bark of the tree where the snare cable had been attached about 6 feet above the ground, and the grizzly claw marks that reached about 12 feet up the tree (McCrory Wildlife-Exhibit 5). Other ground disturbance was evident from an enraged snared bear circling the tree as it was fighting the Aldrich cable foot snare. There were several small, bleached bones near the base of the tree consistent with the size of deer bones that were used as bait to lure the bear into the snare. I placed a piece of blue flagging around the snare tree for purpose of identifying it in photos. (This is shown in my McCrory Wildlife-Exhibits 1 and 2.)

All estimated distances for the attack event in the Investigation Team Report (USFWS FOIA 00001-000105) were double-checked and verified to be accurate. It is unfortunate that the investigators did not attempt to locate any field sign as to the possible location of bear #646 just before it attacked Mr. Evert, such as a bear bed, hair, trampled vegetation, or tracks in the dirt. However, Chuck Neal reported that in early July 2010, he identified the area that he believed (based on his extensive experience in bear country) to be where the bear bedded down post-release (Chuck Neal deposition, pgs. 72-73) and where it was likely situated just before it attacked Mr. Evert.

In my opinion, the decommissioned spur road at the time of the Evert incident would have been an obvious and natural hiking route for anyone to access the high country above or to loop back to the cabins in lower Kitty Creek because of the previous daily traffic by the horses used by the IGBST field crew to access the snare sites (3-4 capture team horses each day for 20 days, according to the Deposition of Seth Thompson pgs. 59-60).

Evidence suggests that Mr. Evert likely entered the site #3 area from below by walking up the decommissioned spur road. When Chad Dickinson rode back up to look for Mr. Evert later on the afternoon of June 17, he noted one boot track about mid way up the decommissioned spur road they used for access to site #3 (Deposition of Chad Dickinson, pgs. 85-88). He also told Chuck Schwartz after the incident that he cut a track back up the drainage looking for signs of the hiker. He said he had trouble picking up any sign, but picked up a foot trail on the spur road headed into the trap site and followed it back to the site where he found the victim (USFWS FOIA 000091). Thus, Mr. Evert would have had the opportunity to be warned by at least three warning/closure signs on the spur road below site #3 had the researchers not deliberately removed the signs earlier that afternoon (Deposition of Seth Thompson, pg. 66; Deposition of Chad Dickinson, pgs. 87-88).

Based on matching DNA evidence from hair found on the victim with the hair of bear #646, the Investigation Team concluded that this bear killed Mr. Evert. The bear was also 13 years old (USFWS FOIA 00002). The report indicated that Mr. Evert was first attacked 21 yards north of the snare tree and the attack site was 6 yards from where his body was located (USFWS FOIA 0001-000105). The attack occurred in the clearing across the spur road from the snare tree at Site #3. I found the site of the initial attack was about 5-7 yards directly eastward of the worn trail in the middle of the spur road (McCrory Wildlife-Exhibit 1).

It is very likely that Mr. Evert would not have approached site #3 from below if he had observed the bear lying in the open near the snare tree, where it was left earlier by the IGBST field crew. McCrory Wildlife- Exhibit 3 shows a June 14, 2011 image of the path Mr. Evert would likely have walked on into the clearing at site #3 on June 17, 2010. It is most likely the bear was concealed from view as Mr. Evert walked into site #3 along the same well-used trail in the middle of the spur road. The area immediately around the snare tree is quite open except for a small area of dense fir trees just above (McCrory Wildlife-Exhibit 1). According to Chuck Neal, the bear bed he found at site #3 in early July 2010, "was in a little copse of trees where it could not be seen as one approached the scene" and that Mr. Evert "walked within 10 yards of the bear and never saw the bear. The bear never saw him." (Deposition of Chuck Neal. pgs. 71-73.)

While we do not know the exact positions where Mr. Evert and the bear were when the bear first charged, the attack likely happened in three brief stages: a very close surprise encounter, Mr. Evert's startle reaction and a few seconds to flee a very short distance, then the bear swiftly bringing him down and killing him quickly. Once the bear knocked Mr. Evert down, the photos indicate it continued attacking him from behind as he tried crawling the short distance towards the trees before he died. The coroner estimated he died about 2:00 p.m. (USFWS FOIA 00009). The Investigation Team concluded he died from a bite to the head. Bringing the victim to the ground is typical of some bear attacks (Kaniut, L. 1997. Some Bears Kill. Safari Press Inc. Long Beach, CA. pg. 297), as is killing them with a bite to the head (Herrero, S. 2002. Bear Attacks: Their Causes and Avoidance. Revised edition. Lyons Press; Kaniut, L. 1985. Alaskan Bear Tales. Alaska Northwest Publishing Company, Anchorage).

I concur with the opinion of the Investigation Team that the attack by bear # 646 cannot be attributed to a predation since no part of Mr. Evert's body was consumed (USFWS FOIA 00009). In my opinion, the attack on Mr. Evert could also not be attributed to bear #646 defending of an animal carcass, since the field crew removed most of the bait used to attract bears to the site before they left. Only a small amount was left behind (rumen and residual bones).

In my opinion, bear #646 acted in an attack mode towards Mr. Evert out of a behavioral state that could only have been created by the research activities of the IGBST field crew. This included a combination of having been willfully lured by bait to site #3, then caught and restrained (and possibly injured) in a foot snare, treated with a potent sedative that could, if accidentally applied to a human, cause mind and body dissociation, coma, bizarre behaviour including violence and aggression, and other negative symptoms (Gunther 1994. Yellowstone National Park Bear Management Plan. Under safety protocol for the use of immobilization agents (pgs. 43-44): "Prevention of Accidents" with respect to the accidental

application to a handler of *Ketamine* and *Telazol*). Then, after being released from its holding snare, Bear #646 was left on its own in a still-anesthetized state. Without this treatment by the capture team, bear #646, under natural conditions, would most likely have avoided Mr. Evert if he had encountered the same bear on a hike in Kitty Creek. (See also Report of Marc Cattet, pg. 24). In addition, being in low quality spring habitat it is highly unlikely that the bear would have utilized site #3 except that it was deliberately lured there by the baits used by the IGBST team, including portions of a deer dragged behind a horse, small chunks of meat dispersed over the surrounding area, ungulate rumen (stomach contents) placed on trees, and a smelly pail of bait suspended from the snare tree.

## 7.0 ASSESSMENT OF FACTORS RELATED TO OUTREACH & COMMUNICATION BY THE IGBST MEMBERS CONCERNING PUBLIC SAFETY & THEIR GRIZZLY BEAR CAPTURE OPERATIONS IN KITTY CREEK IN MAY-JUNE, 2010

In this section, I examine all permits, IGBST protocol for public safety, a bear handlers manual, notes from a handlers training, signage, background information, sworn depositions, and other case documents. This was done in order to assess communications with the public by IGBST members around public safety of their 2010 Kitty Creek capture operations.

In general, today and in 2010 and for several decades previous, agencies in North America involved with management of bear-people conflicts and public safety undertake an adequate level of public communication outreach so that hikers, mountain bikers, horseback riders, campers, hunters, fishers, and other backcountry enthusiasts can be well informed of what species of bears to expect and of ways to minimize encounters with bears. In more dangerous situations that are identified by the agencies or brought to their attention, agencies either remove the bear(s) or leave the bear(s) and implement specific measures to inform the public, and guard against the dangers so that the public can avoid serious confrontations, injury, or death. Measures range from posting closure signs to outright temporary or permanent area closures. In these higher risk situations, the extent and type of public outreach by an agency depends on the severity and duration of the bear situation and the public risk identified, the amount of time the agency has to inform the public through different communication venues, and other factors. Generally, the focus of the effort is to proactively maximize public communication so as to reach and alert as many potential recreationists as possible, and local residents when applicable, to the known hazardous situation.

As noted, I have already reached the conclusion that there was an extreme hazard from a grizzly bear attack to any member of the public who came upon trap site #3 during the time period between when bear #646 was left unattended by the IGBST field crew on June 17, 2010 and when it recovered and moved well away from the snare site. The field crew specifically knew that this hazard existed and that loss of life would be the most likely consequence to any member of the public entering the site. Such a dangerous situation was created by the IGBST crew and therefore warranted the maximum of due diligence by them and their supervisory biologists in communicating this danger to the public through all available levels of messaging. Instead, there was a willful avoidance of public communication leading to a dire neglect of public safety. My opinion is based on the following:

7.1 <u>Examination of management of closure signs by the IGBST field crew at the Kitty Creek capture sites in May-June, 2010</u>

During their Kitty Creek operations, the IGBST researchers placed closure signs approximately 100-200 yards below each of their three capture sites, both on trees along the decommissioned spur roads and off of the spur roads. Capture site #1 was set up on the first decommissioned spur road off the Kitty Creek Trail (USFS Trail 756) on May 27/10. It was known as the Kitty Creek Site #1. It was closed down on June 14/10 for lack of activity. Site #3 was set up lower down on the same decommissioned spur road on June 12/10. It was known as the Middle Kitty Creek Site, and in effect, replaced Site #1. Site #2 was set up on June 9 on the next decommissioned spur road further up Kitty Creek and on the same west side and was called Upper Kitty Creek (Investigation Team Report, Table 1, p. 10).

When site #3 was set up on June 12, 5 closure/warning signs were posted on trees 100-200 yard below, 3 on trees adjacent to the decommissioned spur road, and 2 in adjacent but outlying areas. The signs stated in large letters:

**DANGER! BEAR TRAP IN THE AREA. THE AREA BEYOND THIS SIGN IS TEMPORARILY CLOSED.**

The signs also provided a space for date of commencement and date of termination, under **SPECIAL ORDER 97-008 SHOSHONE NATIONAL FOREST** (Investigation Team Report. p. 5, Appendix 15). My technical review and the Deposition of Chad Dickinson (p. 49) below indicates clearly that the closure dates on these signs for site #3 was from 6-11-10 to 6-20-10; i.e. the closure dates ran for 3 days after the field crew pulled the signs on June 17/10.

Available information in the court documents provided was confusing as to what closure dates were posted on the signs at sites #3 and #2. The Investigation Team report states (p. 6) that the signs used on all trap sites after June 9 had the dates: "The closure is in effect from 6/9/10 to 6/18/10". I found this inaccurate since another document showing photographs of Kitty Creek closure signs that were pulled out of the garbage bin at the Wapiti Ranger Station after the Evert incident gives two dates on this type of **DANGER! BEAR TRAP IN AREA** sign. There are 4 photos (#s 5-8) that have the dates 6-11-10 to 6-20-10 (Evert 0006412-0006413). There is then one photo that shows the same type of closure sign **DANGER! BEAR TRAP IN AREA SIGN** with a different start and closure date 6-9-10 to 6-18-10 (Evert 0006414). Since Kitty Creek site #3 was not set up until June 12, the sign with the closure date June 18 referred to by the Investigation Team Report as being used on "all sites" could only have been used at Site #2 (to replace another type of older sign used earlier since the field crew had run out of the regular signs). Thus I concluded that the 4 signs recovered from the garbage bin at the Wapiti Ranger Station with a closure date of June 20/10 were from site #3. The closure date of June 20/10 on site #3 signs was eventually confirmed in the Deposition of Chad Dickinson dated May 11, 2012 (pg. 49).

The work schedule for the Kitty Creek IGBST field crew was going to end on June 17 and the field crew had planned to be finished and pull the snares and signs regardless of whether they captured grizzly bears on the last day or not. (Investigation Team Report, Appendix 7;

Statement of Chad Dickinson. pg. 2; Deposition of Chad Dickinson, pg. 99; Deposition of Seth Thompson, pgs. 61, 104, 119). On June 17, 2010 at approximately 12:30 p.m., after removing the anchor snare from grizzly bear #646, they left the bear at the snare tree at site #3 in a still-anesthetized state when the bear was described as having its head up and swaying and responding to stimulus such as clapping and yelling (Investigation Team Report, Appendix 7; Statement of Chad Dickinson, pg. 2). Even with stimulation by riding their horses round the bear, the bear was not yet what Mr. Thompson considered to be in the recovery class as "ambulatory" (Deposition of Seth Thompson, pgs. 93, 97).

The field crew claimed to have cleaned up animal remains used to lure grizzly bears except for some rumen left far from the bait (Deposition of Chad Dickinson, pg. 81). However, a photo taken by S.A. Scott Bragonier on July 7, 2010, presumably at site #3, provide evidence of other animal remains left on June 17, 2010. The photo indicates what appears to be a leg bone of a deer with a piece of broken rope still attached (Photo 7, Evert 0006419-20; Deposition of Chad Dickinson, pg. 100). Dennis Alquist testified that he saw a bone of a deer or elk leg at one of the snare sites he visited the incident site about two weeks after mauling event (Deposition of Dennis Alquist, pgs. 75-76). When I examined Site #3 on June 14, 2011 I saw animal bones at the base of the snare tree that could have been from an ungulate.

Mr. Dickinson states that he shut down Site #3 and pulled the snares and the closure signs. There was no discussion between him and Seth Thompson on this matter. In retrospect, both he and Seth Thompson commented that due to weather conditions ("spitting snow and cold") that they thought that people would not be out hiking around (Investigation Team Report, Appendix 7; Statement of Chad Dickinson, pg. 2). Dickinson later stated that he believed "there would be no one hiking in that area due to the history of lack of human activity in that area when we were trapping previously" (Deposition of Chad Dickinson, pg. 65) and that, in determining human activity, "other than riding the trails and coming across any people, he did not know what else they could have done" (Deposition of Chad Dickinson, pg. 74).

They then rode down to the main trail and up to site #2, where they found another snared grizzly. After treating this bear (# 628), they left her to recover and repeated the same management actions as they did at site #3: shut down the site by cleaning it up and pulling the snares and closure signs. A major difference with Bear #628 is that the field crew waited until bear #628 was ambulatory.

As noted elsewhere, evidence indicates that some time during this same afternoon activity period while IGBST members were still conducting capture operations, Mr. Evert hiked up the decommissioned spur road to site #3 and was killed by bear #646. If the warning/closure signs had been left up, the evidence indicates that Mr. Evert would have turned back. According to his wife Yolanda, if he had known what the capture team was doing (in reference to site #3 and the decommissioned spur road leading to Site #3), Mr. Evert would "never, ever have gone off the trail" and "if he saw a sign, he would not have gone beyond the ribbon, never". Yolanda testified that when Mr. Evert saw the sign or ribbon a week earlier (on June 9 at site #2) that said "Dangerous Bear. Do not go beyond this sign," Mr. Evert told her "when he saw that sign he went he immediately headed for home. He wasn't going to stay around there." (Deposition of Yolanda Evert, pgs. 137-138).

Mara Domingue reported the same, "He told me he only saw one sign in one location, and he left as soon as he saw the sign, and he came home" (Deposition of Mara Domingue, pg. 77). In response to speaking with Erwin about the "Dangerous Bear" sign, Chuck Neal said: "To me, it was clear that he did not go beyond the sign." Yolanda Evert also cited an example of a previous experience with a Pelican Creek closure (in Yellowstone National Park) and the fact they stayed away from there.

According to my interview with Mara Domingue, her father was trying to find a place to hike away from the signs he encountered at site #2 when he was killed. This was in reference to him having seen closure/warning signs below site #2 on June 9, approximately one week earlier (Investigation Team Report p. 6), and having turned back.

In my opinion, in terms of communication of public safety by the Kitty Creek IGBST members, the single-most serious disregard for public safety was the June 17, 2010 willful removal of the closure signs at both capture sites with the full knowledge that at each site there was a grizzly bear in a state of capture recovery well-known to be highly dangerous to humans. As will be seen from my further analysis, this was only one action of a continuous chain of actions during that spring period in which the IGBST Kitty Creek capture team failed to diligently inform and protect the public from the IGBST's highly dangerous grizzly bear operations.

My opinion that the capture team showed willful disregard for public safety by removing the closure signs is based on my understanding of the following circumstances and facts:

> The Kitty Creek capture team ignored the known extreme risk of danger to the public by failing to do any preventative planning for the June 17, 2010 closures of capture sites as their minds were made up to be finished and pull the closure signs on that final day regardless of whether they captured grizzly bears.

> In pulling down the closure signs the field crew ignored the contents of their own IGBST safety manual and safety reminders given at annual handlers workshops. For example, the IGBST's *A Manual for Handling Bears for Managers and Researchers* (Jonkel 1993) states (pgs. 1-2) "Never make yourself or anyone else available to a bear (emphasis added) and "Before making any decisions or setting any trap, look at all possible outcomes…Is there an opportunity for something to go wrong? Can you see from a safe distance whether or not the site has been disturbed? Could a citizen stumble onto the trap site when a cub is captured? …Could the bear being released from a culvert trap attack me? Ask yourself these kinds of questions, and do some preventative planning." (My emphasis added). In this instance, I could find no record that the IGBST Kitty Creek capture team did any preventative planning for the final day of their hitch on June 17, 2010, with respect to altering their plans to pull the closure signs should they capture a grizzly bear(s). Their minds were made up ahead of time to shut down the capture sites without consideration of public safety. This was despite the fact that the date on the closure signs indicated site #3 would be closed for another three days, until June 20. (See my previous section 7.1a). Site #2, which had the other grizzly bear, had a closure date for June 18, one day after. Additionally, just some months previous to the Evert incident, Chad Dickinson

(along with USFWS Grizzly Bear Recovery Coordinator Chris Servheen) attended a bear handlers workshop at which Fish and Wildlife Service (FWS) advisory veterinarian John Murnane reminded the participants that "grizzlies are potentially explosively violent," to be "wary of the constant erosion of vigilance," to "have a humble attitude; don't let your guard down," and "Lots of responsibility to the public and ourselves" (my emphasis added) [USFWS 001716].

➢ On the day that they pulled the closure signs at site #3, Chad Dickinson and Seth Thompson were both well aware, by their own admission of the danger to the public that existed at site #3, just as they were well aware of the danger to themselves. (Deposition of Seth Thompson, pgs. 92, 96-97, 102, 112-113; Deposition of Chad Dickinson, pgs. 43, 66-67, 102-104). They were well aware that if any member of the public ventured within the range of bear #646 after it was detached from the anchor snare and left at site #3 to recover from the trauma of being snared, drugged, handled, and collared the consequences could be fatal. They were rightfully well trained to use their lethal weapons to save themselves should something go wrong with a grizzly bear at a capture site, but they left the public very vulnerable to harm by removing the only existing safety feature capable of protecting the public.

➢ In willfully pulling down and removing the closure signs, the field crew was fully aware on June 17, 2010, that at least some grizzly bears remain at the snare sites for some time after release and pose a significant danger to anyone riding or hiking into an unsigned capture site. Just because a bear becomes ambulatory, which bear #646 never became in the presence of Chad and Seth, does not mean it leaves the site right away (Deposition from Seth Thompson, pg. 98; Deposition of Chad Dickinson, pgs. 82-83). The report by Marc Cattet indicates that bear #646 was likely still recumbent when Mr. Evert walked into the capture location (Marc Cattet Report, pg. 22). Additionally, cold weather may have delayed the recovery of the bear. At the 2010 Bear Handlers Workshop it was mentioned (pg. 8) "A cold day would slow down metabolization of the telazol, increasing recovery time from an average of 186 minutes to possibly more than 4 hours" (USFWS 001715-001740). Chad Dickinson attended this workshop (USFWS 001715-001740).

➢ The data on how long bears remained at capture sites could also be accessed from the IGBST database from grizzly bears with GPS collars (Deposition of Mark Haroldson, pgs. 54-56).

➢ In failing to do any preventative planning to allow for the need to leave the closure signs up if they captured grizzly bears on the last day, IGBST members failed to protect the public on June 17, 2010. Unfortunately, because of this lack of proper planning, they made an innocent member of the public, Mr. Erwin Evert, "available to a bear" with fatal consequences.

7.2 Review of the approach used by the Kitty Creek field crew to estimate recreational use of the lower Kitty Creek Trail and decommissioned spur road network related to their pulling of the closure signs on June 17, 2010

In my capacity as a long-term researcher of the bear encounter-risk assessment of trails and campsites in various parks, municipalities and public lands in Canada, I have been involved with projects that included the accurate or estimated measurements of human uses of those facilities. This has included the use of remote, automatic cameras; trail counters; trail registries and track counts. This information can be used to assess visitor levels, periods of use, types of use, and hiker group size and has been important in guiding management decisions with respect to closures of recreational areas because of the natural risk of grizzly bear encounters. I am thus well aware of the risks in attempting to use unreliable and inaccurate anecdotal information.

It is my opinion that prior to removing the warning and closure signs on June 17, 2010 the Kitty Creek capture team used a very flawed method, if their actions and inactions can even be called a method, to ascertain public recreational use in their study area. This opinion is based on the following:

> ➤ Seth Thompson admitted that they made no determination, and had no knowledge of which Kitty Creek cabin residents were in the area (Deposition of Seth Thompson, pg. 48). However, they knew there were residents in the area and specifically knew that the Alquists and Mr. Evert were residing in their cabins (Deposition of Seth Thompson, pg. 48, 50; Deposition of Chad Dickinson, pgs. 19-25). Yet they took no steps to determine the cabin residents' use of the trails (Deposition of Seth Thompson, pg. 51).

> ➤ On June 17, 2010, as they pulled the closure signs down at site #3, the two researchers should have been well aware that their daily, constant horse traffic to their two trap sites in Kitty Creek would leave an obvious and well traveled route, telltale access for anyone out hiking or riding to easily follow along the decommissioned spur road to site #3. They should have been aware from their years of backcountry work that some people hike and ride on trails under all kinds of weather conditions. And although they claim to have seen evidence of only two horse groups, they should have been aware as researchers with many years of experience on trails in the backcountry that their method of assessing visitor use was very unreliable and any conclusions drawn from this method would be flawed and could thus lead to fatal consequences. For one thing, it is difficult to see hiker's tracks while on horseback. Also the capture team usually did not go up and down on the main Kitty Creek Trail that most recreationists would use but instead used the main decommissioned road below. In addition, the capture team was generally only in the area from morning to noon, missing a good part of each day when recreationists would be out and about. Thus they could have easily missed seeing people using the trail network. These are all obvious factors that they failed to take into account when they pulled the closure signs. As examples of their flawed monitoring of trail use by the public, they missed seeing Mr. Evert's tracks on the day he observed one of the "Dangerous Bear" closure signs below site #2 (Investigation Team Report, pg. 6). Dennis Alquist also testified in direct contradiction to the to the field team. While the field team testified they never saw anyone on the trails aside from two horse parties (Deposition of Seth Thompson, pg. 106-07), Dennis testified that he and his wife met and talked to the team 400-500

feet from the spur road leading directly to Site #3 and on another occasion saw the capture team near Bates Creek. According to Mr. Alquist the Kitty Creek trail was "a well traveled trail. People travel the trail all the time" and "boy scouts use it all the time" (Deposition of Dennis Alquist, pgs. 20, 52-55, 72, 76-77).

### 7.3 Examination of Kitty Creek capture team activities in May-June, 2010 related to agency permits for their trapping operations

It is my opinion that the Kitty Creek capture team ignored public safety conditions and terms stated in the three authorization permits or closure orders issued to or utilized by the IGBST (USFS - Shoshone National Forest, Wyoming Game and Fish Department (WGFD), and the Subpermit for handling research grizzly bears issued by the Office of the Grizzly Bear Recovery Coordinator), as well as the authorization policy (Northern Rocky Mountain Science Centre Policy for Utilization of Animals in Research. U.S.G.S. Biological Resources Division)

➢ As Chad Dickinson and Seth Thompson left the trap site #3 and pulled down the closure signs, they were aware of the notice at the bottom of the signs that authorized the temporary closure from 6-11-10 to 6-20-10 under Special Order 97-008 of the Shoshone National Forest (See my conclusions on this in my previous section 7.1a). They were aware that the order referred to on the signs states that the action is to provide for protection of the grizzly bear and the public by minimizing human/bear encounters (my emphasis added). By pulling the signs when they did, they were clearly not making an effort to minimize human/bear encounters but rather putting the public directly in harms way. As they pulled down the closure signs, they were aware of the condition of the Wyoming Game and Fish Department (WGFD) permit #33 issued to the IGBST to Chuck Schwartz (Team Leader). The permit required that "all trap sites will be signed to alert the public if they inadvertently approach a baited trap site" (Investigation Team Report, Appendix 2).

➢ As noted previously, the field crew did not clean up all of the bait used to lure bears at site #3 as rumen residue left on trees and ungulate bones. Two people who visited the incident site several weeks after June 17, 2010 recorded evidence of ungulate bones at site #3. One bone structure had a piece of rope that appeared to be from the deer leg that had been dragged behind a horse by the capture team to lure bears in. A year later I also found leg bone remains at the snare tree that appeared to have been left there by the capture team. Thus, technically, site #3 was still baited at the time the signs were pulled down and was thus still capable of luring bears. The capture team should have been aware that the residual animal remains left at the site #3 could attract either bear #646 post-recovery or another grizzly bear.

➢ By removing all warning signs, the IGBST field crew failed to comply with the stated condition under item 8 of the Northern Rocky Mountain Science Centre Policy for Utilization of Animals in Research. This refers to the type of pre- and post surgical care provided, ("surgical" here refers specifically to the anesthetization of grizzly

bears at IGBST capture sites, tooth removal, etc. *See* Appendix 1, same document). The document states "researchers remain at capture sites and monitor the recovery of all grizzly bears until they are once again ambulatory" (Investigation Team Report. Appendix 1. Northern Rocky Mountain Science Centre Policy for Utilization of Animals in Research. U.S.G.S Biological Resources Division). The capture team left bear #646 at site #3 in a state that was not ambulatory.

➢ The USFWS subpermit for handling research grizzly bears issued by Chris Servheen of the Office of the Grizzly Bear Recovery Coordinator to the Leader of the IGBST dated March 10, 2010 stated that (in reference to only authorized persons) "Coverage under this subpermit is provisionary under the following restrictions" that "You will obtain, have in your possession, and conduct your activities in compliance with all appropriate Federal and State required permits and licenses for the take of listed species" (Charles Schwartz Deposition Exhibit 8). Obviously, the capture team failed to comply with this overall directive as noted in my previous comments related to their failure to follow the requirements found in the state and federal permits or authorizations issued to them.

➢ Under Item 4, the USFWS subpermit stated that: **"Every possible precaution** shall be taken to avoid confrontations between bears and the public, including but not limited to closure or signing of the study sites" (Investigation Team Report, Appendix 2). The Kitty Creek capture team did not take **every possible precaution** to avoid confrontations between bears and the public (emphasis added). Every possible precaution would have, at a minimum, included leaving up the closure signs after the bear's capture on June 17, 2010 until the posted legal, expiration date indicated posted of June 20, 2010 (See section 7.1a of my report). Every possible precaution would also have included an adequate, or any, public outreach to inform the public, including local residents, of their trapping operations at Kitty Creek.

7.4 Examination of IGBST overall public safety communication efforts for the May-June 2010 Kitty Creek operation

As noted previously, my opinion is that the pulling the warning and closure signs on June 17, 2010 was just one of a continuous chain of willfully disregarded communications efforts before and during the Kitty Creek trapping operations. Considering the extreme hazard of the IGBST trapping operations in Kitty Creek to the researchers and the public, their lack of actions with regard to informing the public was totally inadequate. Other than the obligatory putting up of temporary closure signs near the trap sites, there was virtually no effort made by Chad Dickinson and Seth Thompson to inform and safeguard the public from the potential of a grizzly bear attack at their snare sites. Thus, removing the closure signs that led to Mr. Evert being killed was only part of the deficient manner in which Chad Dickinson and Seth Thompson failed to protect the public in Kitty Creek. The lack of public communication was intentional and willful, in my opinion. The utter lack of even minimal public communication at obvious places and junctures in their multi-week trapping operation set the stage for the fatal grizzly bear attack on Mr. Evert.

The reasons for my opinion are as follows:

➢ As of June 2010, the Kitty Creek capture team was well aware of the dangers inherent to the public associated with the activities and sites of live capture, sedation with potent psychotropic drugs, handling, and release of grizzly bears. These dangers have been well recognized by the scientific community and management agencies for decades. This information has been well publicized and available to all biologists associated with the IGBST trapping team involved in Kitty Creek in 2010. For example, eminent bear authority Dr. S. Herrero states in his book that bears can be dangerous during the brief period when a bear is recovering from having been drugged ("Bear Attacks: Their Causes and Avoidance" 1985, pg. 49; 2002 edition, pg. 241).

➢ Nearly 20 years ago, *A Manual for Handling Bears for Managers and Researchers* (Jonkel 1993), excerpted and titled *'Existing Protocols for Sign Use'* in Appendix 3 to the Investigation Team Report, was produced in cooperation with Chris Servheen in his capacity as the Grizzly Bear Recovery Coordinator. This manual clearly outlined proactive safety measures that should be implemented for the public surrounding the IGBST bear trapping operations. The stated goal of the manual was: 'to assist and educate future bear handlers and to help reduce the number of bear and human injuries and deaths" with an emphasis on grizzly bears. The knowledge of the dangers of a post-capture bear was well emphasized in this document: "Too many bear researchers have become restless and approached a sleeping grizzly only to be charged, thus endangering not only their life but also the bear's" (USFWS FOIA 1361).

➢ The Kitty Creek capture team was aware of all of the communication levels important to ensure public safety, some of which are outlined in the IGBST's Jonkel manual. Safety precautions recommended in the Jonkel manual (besides the ones I have previously cited) are included in a section titled **Ethics and Professionalism (2,3,4).** Here we find handlers being advised of the following:

• "The first and most important thing to accomplish before setting out is to touch base with the landowners and local state and federal officials..." (pg. 3).

• "The legalities encompassing bear research and management are vague. Government and state employees have the obligation to protect people. The majority of the public assumes that they will be warned if dangerous animals are in the area..." (pgs. 3-4).

• "It all comes down to an issue of 'adequate warning'.... when a researcher or manager can prevent an injury by informing the public, they have a duty to do so...." (pg. 4).

➢ "Bear researchers and managers must make careful decisions and always warn the public when a trap has been placed in the vicinity or when there is a potential for confrontation. Education and communication are the best tools when working with the media and the public." (pg. 4 USFWS FOIA 1361).

Clearly the IGBST capture team in Kitty Creek ignored most of these protocols, with the exception of placing the closure signs below the trap sites, albeit for a shorter time than was indicated on the end dates posted sites #2 and #3 (see my section 7.1a). They did talk to state and federal officials but only talked to one cabin resident and even then did not provide adequate information (Deposition of Seth Thompson, pgs. 38-40; Deposition of Chad Dickinson, pg. 21-27; Deposition of Dennis Alquist, pgs. 62-65). They did not go out of their way to prevent an injury by fulfilling their "duty" to inform the public. With respect to the use of the word "duty," we need to keep in mind that this manual was commissioned and endorsed by the Office of the Grizzly Bear Recovery Coordinator and all IGBST members at the time it was produced. Everyone was made aware that there was a clear duty to protect the public; it was not just an arbitrary thing with public safety being thrown out the door when it posed an inconvenience to the capture team's logistical agenda to end their hitch and go home, as it did on June 17, 2010.

7.5 <u>Examination of other deficiency factors regarding public communications related to the hazardous operations of the Kitty Creek bear capture team</u>

My opinion is that there were other factors leading to public communication deficiencies by the IGBST Kitty Creek Capture Team including but are not limited to the following:

> All information for public safety outreach was readily available to IGBST personnel. In the past, the Coordinator (Dr. C. Servheen) and IGBST scientists for Kitty Creek would have attended grizzly bear-people conflict symposiums sponsored by the International Conference on Bear Research and Management where communication strategies around safety protocols were discussed.

> IGBST personnel also periodically attended workshops for bear capture handlers at which public safety is emphasized. For example the following was noted from the bear handlers workshop on March 13-14, 2008: "Jonkel – make sure to keep landowner and adjacent residents in the loop" (USFWS FOIA 1728). On March 3, 2010, just 3.5 months prior to the Evert incident, Chris Servheen and Chad Dickinson attended a bear handler's workshop where the need for safety for the public was discussed (USFWS 001715-001740).

> There has been some testimony regarding a concern for specifically disclosing trap sites. However, the IGBST acknowledges that there was no concern in June 2010 of generally disclosing trapping efforts, rather only specifically disclosing the location of trap sites (Deposition of Seth Thompson, pg. 59; Deposition of Mark Haroldson, pgs. 53-54). This principle was confirmed after the Evert incident when the Investigation Team on July 16, 2010 recommended (Item 6) "considering informing the public through joint land management agency/wildlife management agency press releases (either local or ecosystem-wide) or other means that grizzly bear trapping for research and monitoring is occurring. In these information efforts, it should be noted that warning signs will be placed in the vicinity of trapping operations and that these warning signs should be obeyed"(USFWS FOIA 0001-000105; Exhibit 4). This recommendation was implemented by the IGBST (USFWS FOIA 0001-000105; Exhibit 6).

➢ At the local communication level, there were also no informational warning signs regarding the Kitty Creek trapping operations posted at two very obvious public access points: the Kitty Creek Trailhead (Trail #756) and the Highway 14-16-20 turn-off and parking area at the start of Forest Service Road #448. In other words, recreationists would not find about the closed areas and dangers around the trap sites until they went up one of the decommissioned spur roads and were in close proximity to a trapping site. It is to be noted that after the Evert incident the Investigation Team on July 16, 2010 recommended that signs be distributed appropriately at possible access routes to the capture sites (USFWS FOIA 0001-000105; Exhibit 4). This recommendation was implemented by the IGBST (Exhibit 6). This included the placing of signs with respect to "General drainage or area research trapping/baiting announcement" on trails, roads, or other access routes leading into the area where trapping/baiting is occurring. For back country locations "all signs will remain in place until the end of trapping operations if no bears have been captured and handled the last day of the operation, or signs will remain in place for at least 24 hours after any bear has been captured and until the trapping crew determines that the bear has left the vicinity of the trap site, via telemetry."

➢ Mr. Andrew Pils, a USFS Service Wildlife Biologist (Shoshone National Forest), recounted a discussion on May 6, 2010, and prior to the Kitty Creek operations with Chad Dickinson in which Mr. Pils asked Mr. Dickinson to talk to recreation resident owners (in Kitty Creek) and inform them of their (trapping) activities. Mr. Pils has testified that Chad said he would do that (Deposition of Andy Pils at page 28; Deposition Exhibit #26 is a June 23/10 letter titled: *Summary of USFS, WGFD and IGBST Coordination Efforts on North Fork Bear Research Trapping Operations During 2010*). According to Mark Haroldson, immediate supervisor of Chad Dickinson and Seth Thompson, he expected IGBST field personnel to comply with any special requests made by the Shoshone National Forest before beginning capture operations (Deposition of Mark Haroldson, pg. 36). However, the field crew made no effort to contact and inform the local residents, tourism lodges/camps, and the nearby Wyoming Boy Scout Camp. During the time period when the researchers were conducting trapping operations there were 150 boy scouts in the area. The Wyoming Boy Scouts Camp is located several miles from the where the bear mauled Mr. Evert (Cody Wyoming Network, June 19, 2010). Communication with people was left to chance encounters with the field crew during the short amount of time spent coming and going to the snare sites and, even then, they failed to warn people.

➢ In May or June, Mr. Dickinson and Mr. Thompson rode within 10-20 feet of Mr. Evert who was in front of his cabin at Kitty Creek and only waved at him (Deposition of Chad Dickinson, pgs. 27-28). The capture team avoided an obvious opportunity to stop and communicate what they were doing to a local resident. Apparently this happened one other time (Deposition of Seth Thompson, pgs. 47-50).

According to Yolanda Evert, with respect to the capture team and the death of her husband at site #3: "all they needed to do was say they were trapping bears up there.

He would have never gone up there. He would have gone all these other places. He thought it was safe. He didn't know what they were doing. Even though he saw the trailer and it was a government trailer with -- I mean who would know that it was dangerous to go in there if there was no sign." (Deposition of Yolanda Evert, pgs. 148-150). As well, she testified, "Nobody said anything to us. It would have been simple. Chad or Seth could have stopped and told us what they were doing. He never would have gone up there. The trail was opened. There was no sign that they were doing any kind of bear research anywhere around there" (Deposition of Yolanda Evert, pgs. 170-171).

➢ According to Kitty Creek resident Dennis Alquist, when he and his wife met the capture team on one of the trails in Kitty Creek some time near the end of May, when Mr. Alquist asked where they were studying bears a member of the capture team responded "way back up there" (Deposition of Dennis Alquist pgs. 52-53). Despite the fact that the Alquists were hiking within an easy 15-20 minute walk of snare site #3, the capture team gave them no verbal warnings.

In my opinion, if the capture team had made the effort to communicate with the residents at Kitty Creek and other users such as the boy scouts and local lodges they would have been able to determine more clearly what recreational interests and uses occurred in Kitty Creek at this time.  They would have likely learned that Mr. Evert liked to hike all over the drainage. They would have learned from Dennis Alquist that there were hikers and riders going up Kitty Creek the whole month of May and June and that the Kitty Creek trail system was "well traveled" (Deposition of Dennis Alquist pg. 87).

Respectfully Submitted,

Wayne McCrory, R.P.Bio.
Professional Wildlife Biologist
(Bear Biologist)





## McCRORY WILDLIFE-EXHIBITS

**McCrory Wildlife-EXHIBIT 1**. McCrory Wildlife Services June 14, 2011, site visit of June 17, 2010 attack at site #3, looking uphill from spur road below. Tree flagged with blue ribbon on far left is snare tree where grizzly bear #646 was left on June 17, 2010 while recovering from sedation and handling. Person on right is pointing to the estimated site where Mr. Evert was first attacked by bear #646. Line of blue flagging (right) is estimation of the short distance Mr. Evert crawled while being attacked from behind before being killed.



**McCrory Wildlife-EXHIBIT 2**. McCrory Wildlife Services June 14, 2011, site visit of June 17, 2010 attack at site #3, looking uphill from spur road below. Person on left is at flagged snare tree; person on right is at the estimated attack site. A third person is standing in the clump of trees just above the snare tree to demonstrate how difficult it would have been for Mr. Evert to see bear #646 as he approached from below if it had been in the surrounding forest.

The semi-open grassy woodlands are typical of the low quality grizzly bear habitat observed along the lower Kitty Creek trail corridor approaching the decommissioned spur road leading directly to site #3. To a reasonable degree of probability, it is unlikely that grizzly bear #646 would have been located at site #3 when Mr. Evert hiked up the trail on the decommissioned spur road on June 17, 2010 without having been intentionally lured there by bait, sedated, handled and left to recover by the IGBST field crew.



**McCrory Wildlife-EXHIBIT 3**. McCrory Wildlife Services June 14, 2011, site visit of June 17, 2010 attack at site #3, looking uphill from the spur road below. Person in photo is hiking on trail approximately where Mr. Evert would have entered the clearing at site #3 after hiking past the location along the spur road

100-200 yards below where the warning/closure signs had recently been removed. Again, attack site indicated by blue flagging on right of photo.



**McCrory Wildlife-EXHIBIT 4**. McCrory Wildlife Services June 14, 2011, site visit of June 17, 2010 attack at site #3 looking uphill from spur road below. Person in photo is showing height at which claw marks from male grizzly bear #646 were indented in the bark of the snare tree.



**McCrory Wildlife-EXHIBIT 5**. Small horse group met riding on lower Kitty Creek Trail on June 14, 2011. The IGBST field crew willfully ignored and made absolutely no effort to determine the level of recreational use and activity on Kitty Creek recreation trails, roads, and other obvious travel routes. The IGBST field crew exhibited no concern for public safety when they willfully pulled the warning/closure signs below site #3 on June 17, 2010, leaving an extremely dangerous grizzly bear situation on or immediately adjacent to an obvious hiking or riding route.  The removed signs had been the only means for any member of the public to be aware of the extreme hazard presented by bear #646 at Site #3.



**McCrory Wildlife-EXHIBIT 6**. Grizzly bear mark/rub tree, one of two found on the lower Kitty Creek Trail during my June 14, 2011 field survey. Person is pointing to grizzly bear hair stuck on the tree.



**McCRORY WILDLIFE - ATTACHMENTS**

**ATTACHMENT 1.** Expert Witness Case Work in Previous Four Years.

None.

**ATTACHMENT 2.** Statement of Compensation for Study and Testimony

My fee is $130 per hour for professional services, ½ fee for travel, plus all expenses.

**ATTACHMENT 3.** List of all professional reports 2002-2012 authored or co-authored by Wayne McCrory. [Note: Not all reports are publicly available due to client ownership and confidentiality.]

Paquet, M.M. and W. P. McCrory. 2012. Bear-people conflict prevention plan including assessment of grizzly bear and black bear hazards for the Upper Slocan Valley. BC Bear Smart program. (*In Press*. Will be available on-line September 15, 2012 at www.vws.org).

McCrory, W. 2012. Proposed movement corridors for black bears related to the Partington Creek Neighbourhood Plan & riparian areas regulation (RAR) setbacks in the City of Coquitlam, BC. Report for Community Planning and Development Department, City of Coquitlam. 28 pp.

McCrory, W. 2012. Cumulative effects assessment of a potential Enbridge-related oil tanker spill on the rare and unique gene pool of the white bear subspecies (*Ursus americanus kermodei*) on Gribbell Island, British Columbia. Report submitted to Joint Review Panel. *In Press.*

McCrory, W. 2012. Spirit Bears Under Siege. The case for the protection of Gribbell Island – Mother Island of the White Bear. *In Press.*

McCrory, W. 2011. Bear viewing plan for the Mussel and Poison Cove Estuaries in Fiordland Conservancy. Report to BC Parks and Kitasoo/Xai'xais First Nation.

McCrory, W. 2010. September 2009 bear viewing assessment for Phillips River, BC. Report for Sonora Resort, Campbell River, BC. 48 pp.

McCrory, 2010. An independent & cumulative effects review of Taseko Mine's environmental impact assessment documents: Proposed Prosperity Mine at Fish Lake {Terrestrial Wildlife Component]. CEAR reference number 09-05-44811.

Craighead, L. and W. P. McCrory. 2010. A preliminary core conservation review of the dryland grizzly bear of the Chilcotin Ranges in British Columbia. Report to Friends of Nemaiah Valley, Valhalla Wilderness Society and Xeni Gwet'in First Nation Government.

McCrory, W.P. 2010. Draft review of implications of climate change to habitats for some wildlife species and wild horses in the Xeni Gwet'in Caretaker Area, Chilcotin, BC. Contribution to Xeni Gwet'in adaptation to climate change review.

McCrory, W. and M. Williams. 2009. Assessment of opportunities for spring bear viewing & nature tours – Phillips River Estuary, BC. Report for Sonora Resort, Campbell River, BC. 48 pp.

McCrory, W.P. and P. Paquet. 2009. Proposed bear viewing strategy for the K'ztim-a-deen (Khutzeymateen) Grizzly Bear Sanctuary & K'tzim-a-deen Inlet Conservancies, British Columbia. Report for the K'tzim-a-deen Management Committee & Planning Process, Prince Rupert, B.C.

McCrory, W. 2009. Assessment of trails for the Xeni Gwet'in tourism project - wildlife and cultural/heritage values & wild horse tourism areas.

McCrory, W.P. 2009. Evaluation of potential bear-viewing areas for the Mussel and Poison Cove Estuaries in Fiordland Conservancy. August 29-September 5, 2009.

McCrory, W. 2009. Notes & outline & ideas for background review of bear viewing plan/strategy for the Mussel River and Poison Cove area, Fiordlands Conservancy. Report for BC Parks and Kitasoo First Nation.

McCrory, W. 2009. 2008 black bear risk assessment & management recommendations for public recreation trails – The Lower Seymour Conservation Reserve (LSCR). Report to Metro Vancouver Watershed Division.

McCrory, W. 2009. 2008 black bear risk assessment & management recommendations for Lynn Headwaters Regional Park - hiking network between Grouse Mountain Resort and Goat Mountain/Ridge. Report to Metro Vancouver Parks Department.

McCrory, W. 2009. 2008 notes on preliminary black bear risk assessment & management recommendations for restricted access areas – Metro Vancouver Watershed Division.

McCrory, W. and M. Williams. 2008. Bear viewing opportunities – Phillips River Watershed, BC. Report for Kwiakah First Nation, Campbell River, BC. 19 pp.

McCrory, W. 2008. 2007- 2008 black bear risk assessment - Minnekhada  Regional Park. Report for Metro Vancouver Parks.

McCrory, W. 2008. 2007- 2008 black bear risk assessment – Kanaka Creek Regional Park. Report for Metro Vancouver Parks.

McCrory, W. 2008. Black bear risk assessment and management recommendations for Metro Vancouver Regional Parks.

McCrory, W. and M. Williams. 2007. Bear viewing opportunities in the Phillips River Watershed, BC. Report for Sonora Resort Ltd., Campbell River, BC. 17 pp.

Paquet, M.M. and W.P. McCrory. 2007. Bear hazard assessment – City of Coquitlam. Application for Bear Smart community status: Phase 1.

McCrory, W. 2007. Black bear habitat and corridor map project, Resort Municipality of Whistler (RMOW). Draft.

McCrory, W. 2006. Bear hazard assessment and problem analysis. Phase I application for Bear Smart Community Status. District Municipalities of North & West Vancouver, City of North Vancouver, B.C.

McCrory, W. 2005. Bear hazard assessment - problem analysis report & proposed bear-people conflict prevention plan, Britannia Bay Properties Ltd., British Columbia.

McCrory, W. and B. Cross. 2005. A preliminary review of potential impacts of snowmobile recreation on grizzly bear winter denning habitats and wolverine winter natal/maternal denning habitats in S.E. Kakwa Provincial Park, B.C. with GIS grizzly bear and wolverine den habitat models. Report to B.C. Parks. 31 pp.

McCrory, W.P. 2005. Proposed bear-people conflict prevention plan for Resort Municipality of Whistler.

McCrory, W.P., and Paquet, M.M. 2005. Bear hazard & problem analysis report & proposed bear-people conflict prevention plan, District of Squamish, British Columbia.

McCrory, W. 2005. Background tourism feasibility study – wild species viewing & guidelines. Xeni Gwet'in First Nation, Chilcotin, B.C.

McCrory, W. 2005. Proposed access management plan for Xeni Gwet'in First Nation Caretaker Area, Chilcotin, B.C.

McCrory, W. 2005. Roads to Nowhere. Technical review of ecological damage & proposed restoration related to B.C. Ministry of Forests control actions – 2003 Chilko Wildfire, B.C. Re: bulldozed fireguards & access roads & peat meadow damage. Report to Friends of Nemaiah Valley, Victoria, B.C.

McCrory, W.P. 2004. Preliminary bear hazard assessment of Resort Municipality of Whistler (RMOW). Submitted to RMOW. 107 pp.

McCrory, W.P. 2004. Bear habitat ground-truthing surveys of Resort Municipality of Whistler, August 14 – 23/04 by McCrory Wildlife Services Ltd. for Terrestrial Ecosystem Mapping classification and seasonal bear habitat rankings. Draft to Whistler Community Habitat Resources Project (CHRP).

McCrory, W.P., M. Williams, B. Cross, L. Craighead, P. Paquet, A. Craighead and T. Merrill. 2004. Grizzly bear, wildlife and human use of a major protected wildlife corridor in the Canadian Rockies, Kakwa Provincial Park, B.C. Draft progress report to Valhalla Wilderness Society and Y2Y Wilburforce Science Symposium. *Draft & In Press.*

McCrory, W.P., P. Paquet, and B. Cross. 2003. Assessing conservation values for gray wolf and Sitka deer - BC central coast rainforest. Report to the Valhalla Wilderness Society, New Denver, B.C.

McCrory, W.P. 2003. A bear hazard study of recreational facilities in a major grizzly bear travel corridor with management recommendations to minimize conflicts – A GIS Grizzly Bear Encounter Risk Model. Kakwa Provincial Park, B.C. Report to B.C. Parks. 174 pp.

McCrory, W.P. 2003. Preliminary review and hazard assessment related to grizzly bear – hunter conflicts in the Muskwa-Kechika Management Area, Northeast BC. Report submitted
to BC Wildlife Branch, Ministry of Water, Land and Air Protection, Victoria, BC.

McCrory, W.P. 2003. Ecological connectivity – 2003. Multi-year study of grizzly/wildlife movements & application to GIS corridor model design – Kakwa grizzly bear – wildlife corridor pilot study. Research proposal submitted to Wilburforce Foundation, Y2Y Conservation Initiative.

McCrory, W. 2003. Preliminary bear hazard evaluation. E.C. Manning and Skagit Valley Provincial Parks & Cascade Recreation Area. Report to B.C. Parks, Okanagan District, Penticton, B.C.

McCrory, W.P. 2002. Bear-People Conflict Prevention Plan (2002-2007). Manning and Skagit Provincial Parks and Cascade Recreation Area, B.C. Report to BC Parks, Summerland, B.C. 144 pp.

McCrory, W.P. 2002. Black bear hazard & habitat assessment, Diamond Head Area – Garibaldi Provincial Park, B.C. Incorporating a Geographic Information System (GIS) Decision-Support Model. Report to B.C. Parks, Brackendale, B.C. 117 pp.

McCrory, W.P. 2002. Preliminary conservation assessment of the Rainshadow Wild Horse Ecosystem, Brittany Triangle, British Columbia, Canada. A review of grizzly and black bears, other wildlife, feral horses and wild salmon. Report to Friends of Nemaiah Valley (FONV), Victoria, B.C.

**ATTACHMENT 4.** CURRICULUM VITAE OF WAYNE P. McCRORY, REGISTERED PROFESSIONAL BIOLOGIST.



## CURRICULUM VITAE

### Wayne P. McCrory, Registered Professional Biologist (R.P.Bio.)
### President, McCrory Wildlife Services Ltd.

208 Laktin Road, New Denver, British Columbia, Canada V0G 1S1
Phone (250) 358-7796 / Fax: (250) 358-7950 / E-mail: waynem@vws.org,
mccrorywildlife@xplornet.com

### August 3, 2012 (Last up-date)

EDUCATION

B.Sc. Honours Zoology, University of British Columbia, 1966. Course emphasis: Wildlife management. Honors thesis on sub-speciation of mountain goats (published), thesis advisor was Dr. Ian McTaggart-Cowan.

PROFESSIONAL LICENCE

Registered Professional Biologist (R.P.Bio.), British Columbia. Member #168

EXPERTISE

Primarily a specialist in black bear and grizzly bear ecology, conservation, safety, bear risk assessments, bear-people conflict prevention plans, design and management of bear-viewing tourism programs, bear safety and bear aversion training, bear problem analysis and other aspects. However, a broad range of experience in wildlife research involving numerous birds and mammals including design of GIS habitat map projects, conservation area design, travel corridors/connectivity and environmental impacts/cumulative effects assessments. Teaches bear safety and bear safety courses.

PROFESSIONAL SOCIETIES

➢ Member, College of Applied Biology (Registered Professional Biologist (R.P.Bio.)

➢ Member and certified guide and trainer with the BC Commercial Bear Viewing Association (CBVA)

➢ Member of, and contributor to, the International Association for Bear Research and Management, also known as the International Bear Association (IBA). With members from some 50 countries, the organization supports the scientific management of bears through research and distribution of information, and sponsors international conferences on all aspects of bear biology, ecology and management. Have presented at numerous international conferences and have had peer-reviewed scientific papers published in the journal *Ursus*, the IBA's annual journal.

## EXPERTISE SUMMARY

A broad ecological background including extensive experience in:

> ➢ Bear hazard assessments
> ➢ Management guidelines/plans for parks and conservation areas
> ➢ Mammal habitat inventories
> ➢ Waterfowl/bird surveys
> ➢ Caribou inventories
> ➢ Forestry-wildlife research
> ➢ Environmental impact assessments
> ➢ Conservation biology assessments, including GIS corridor modeling
> ➢ Population inventory and assessments, population management
> ➢ Species at risk assessments
> ➢ Wildlife viewing programs
> ➢ Trail routing and tourism studies

## Highlights:

➢ 35 years experience in bear ecology, habitat mapping and bear safety and conservation issues, specifically bear hazard assessments and management guidelines for government agencies such as BC Parks, Parks Canada, and municipalities. Have worked for parks agencies across western Canada and the Yukon/NWT. (Publications list which follows demonstrates the range of locations and studies completed.)

➢ Served 3 years on the B.C. Ministry of Environment's Grizzly Bear Scientific Advisory Committee (GBSAC).

➢ More recently, carried out 6 bear hazard assessments for municipal governments and park agencies in southwestern B.C.

➢ Helped to establish, and have worked with, the Valhalla Wilderness Society for the past 30 years. Valhalla has protected of 1.25 million acres of public lands for bears. President of the Valhalla Foundation, which has protected private lands with high ecological values. Have been instrumental in the protection of numerous conservation areas and parks, including Valhalla Provincial Park, the Khutzemateen Grizzly Sanctuary, the Goat Range Provincial Park and the Spirit Bear Conservation Area.

- ➤ Hired as advisor and guide to bear films and documentaries (list below).
- ➤ Developed and led guided group outings as part of my "Safer Travel in Bear Country" program (approx. 1,000 people taken through this training program).
- ➤ Produced, or contributed significantly to, over 80 professional research/management reports as well as 7 published research papers (list follows).

## VOLUNTARY WORK

- ➤ Director, Valhalla Wilderness Society
- ➤ President, Valhalla Foundation for Ecology and Social Justice
- ➤ Board Member, Get Bear Smart Society in Whistler

In addition, provide scientific expertise on bear management issues for a broad range of nonprofit groups, and act as a peer reviewer for conservation organizations' scientific reports. I have recently provided support for: the David Suzuki Foundation, the Western Canada Wilderness Committee, West Coast Environmental Law, Ecojustice, the Sierra Club, Environmental Investigation Agency (London, England), Friends of Nemaiah Valley, Friends of Ecological Reserves, Rainforest Action Network, Defenders of Wildlife, Jumbo Wild, West Kootenay EcoCentre, Great Bear Foundation, Raincoast Conservation Society, Bear Watch, North Shore Black Bear Network, Northern Lights Wildlife Rehabilitation Centre, the Xeni-Gwetin First Nation, Williams Lake Indian Band, Federation of Mountain Clubs of BC, Sierra Club (Alberta) and The Land Conservancy of BC.

## FILM PROJECTS AND DOCUMENTARIES

Frequently work as a scientific advisor, bear guide, and/or on-camera personality for nature documentaries on bears, parks and conservation issues. A partial list of productions I have been involved with:

Productions featuring Wayne McCrory and his conservation work:

- ➤ *Champions of the Wild (Wayne McCrory: Spirit Bears and Grizzlies)* (Omni Film Productions for Knowledge Network)
- ➤ *The Grizzly Man From New Denver: Wayne McCrory* (The Leading Edge: Innovation in BC. Knowledge Network)
- ➤ *Lucy, The Bear Detective* (Dogs With Jobs. Featuring Wayne McCrory and Lucy, his bear research dog. Knowledge Network)
- ➤ *Goat Range Provincial Park* – Great Canadian Parks (Good Earth Productions)
- ➤ *Island of the Ghost Bear* (Nature: BBC TV)
- ➤ *The Garden of the Grizzlies* (Global Family: TVO--TV Ontario)
- ➤ *Great Canadian Parks: Khutzeymateen* (Good Earth Productions for Knowledge Network)
- ➤ *Land of the Spirit Bear* (Spirit Bear Youth Coalition)

- ➢ *Great Canadian Parks: Spirit Bear* (Good Earth Productions for Knowledge Network)
- ➢ *Great Canadian Parks: Kitlope* (Good Earth Productions for Knowledge Network)
- ➢ *Ushuaia Nature: Des origines aux mondes perdus* (in French. Production on rare animals featuring Wayne McCrory's work on Spirit Bears. TFI – France Television Network)
- ➢ *The Green Inlet – Spirit Bear* (Good Earth Productions)
- ➢ *L'ours Kermode: La Semaine Verte* (in French. French CBC)
- ➢ *Wild Horses, Unconquered People* (Omni Film Productions Ltd.)
- ➢ *Tiere die Geschichte schrieben: Das Pferd* (in German. Includes Wayne McCrory's work protecting Wild Horses. Matthey Film Productions)
- ➢ *The Nature of Things: Khutzemateen* (CBC)
- ➢ *The Nature of Things: The Salmon Forest* (CBC)
- ➢ *The Nature of Things: Grizzly Bears: Losing Ground* (CBC)
- ➢ *The Fifth Estate: Khutzeymateen* (CBC)
- ➢ *Wild Things: British Columbia's Wild West Coast* (Wild Exposure Preservation Productions)
- ➢ *Spirit Bear* (Cross-Country Canada. CBC)
- ➢ Numerous television news reports and talk shows

Provided scientific information and/or acted as bear safety guide:

- ➢ *Caught in the Moment: Grizzlies* (Tigress Productions, UK)
- ➢ *Princess Royal Island* (Great Bear Foundation)
- ➢ *Spirit Bears* (NHK: Japan Broadcasting Corp.)
- ➢ *A Future for the Grizzly?* (The Grizzly Project)
- ➢ *Island of the Spirit Bear* (Raincoast Conservation Society)
- ➢ *The Science of Survival: Grizzly Bear Management in British Columbia* (Electric Bamboo Productions)
- ➢ *The Last Mustangs* (Patrice Halley)
- ➢ *Big Bear Week* (BBC)
- ➢ *Skeena Journal: Khutzemateen* (CBC)
- ➢ *NRDC Spirit Bear Campaign* (Natural Resources Defence Council, USA)
- ➢ *Save the Great Spirit Bear Rainforest* (Corky Productions)
- ➢ *Canadian Coastal Rainforest – the Spirit Bear* (in Japanese. Ikimono Chikyu Kiko Productions)
- ➢ *Cap sur les terres vierges du grizzli* (In French. Les Productions Espace Vert XII inc.)
- ➢ *Canada's Vanishing Grizzly* (Friends of Ecological Reserves)
- ➢ *Trigger Happy* (Environmental Investigation Agency, UK)
- ➢ *White Grizzly* (Discovery Channel)

## PROFESSIONAL STUDIES AND PUBLICATIONS:

*Scientific publications in proceedings, refereed journals, or government publications*

Bergdahl, J. W. McCrory, P. Paquet and B. Cross. 2000. Conservation assessment and reserve proposal for British Columbia's white black bears (*Ursus americanus kermodei*). Abstract. Proceedings of the 7th western black bear workshop. Coos Bay, Oregon. P. 102.

McCrory, W. and E. Mallam. 1991.  An update on using bear hazard evaluation as a means to minimize conflicts between people and bears in recreation situations.  Proceedings of the Grizzly Management Workshop, Revelstoke, B.C. pp: 57-62

McCrory, W., S. Herrero, G. Jones, and E. Mallam.  1990.  The role of the B.C. provincial park system in grizzly bear preservation.  Proceedings of the 8th International Conference on Bear Research & Management, Victoria, B.C.  6 pp.

McCrory, W.P., S. Herrero and G. Jones. 1987.  Program to minimize conflicts between grizzly bears and people in British Columbia provincial parks.  Paper presented at Bear - People Conflicts Symposium, Yellowknife, N.W. T.  April 1987.

McCrory, W., S. Herrero. and P. Whitfield. 1986.  Using grizzly habitat information to reduce human-grizzly bear conflicts in Kokanee Glacier and Valhalla Provincial Parks, BC. In Proc. - Grizzly Bear Habitat Symposium: 24-30. Contreras, G.P. and K.E. Evans (compilers). U.S.D.A. Forest Service Gen. Tech. Rep. INT-207.

Herrero, S., W. McCrory and B. Pelchat.  1983.  The application of grizzly bear habitat evaluation to trail and campsite locations in Kananaskis Provincial Park, Alberta. International Conference on Bear Research and Management: 6:187-193

McCrory, W.P. 1979. An inventory of the mountain goats of Glacier and Mount Revelstoke National Parks, British Columbia. With the assistance of park wardens. Edited by M. Ballantyne. Parks Canada Report, Western Region.

McCrory, W., D. A. Blood, D. Portman and D. Harwood. 1977. Mountain goat surveys in Yoho National Park, British Columbia. Proc. First Int. Mountain Goat Symp.:69-73.

Cowan, Ian McT. and Wayne McCrory. 1970. Variation in the mountain goat *Oreamnos americanus* (*Blainville*). Journ. of Mammalogy 51, No. 1: 60-73.

W.P. McCrory. 1965. Preliminary report on study of natural licks used by mountain goats and bighorn sheep in Jasper National Park. Canadian Wildlife Service Report. 55 pp.

*Research/Management Reports (some peer reviewed) to August 2012*

Paquet, M.M. and W. P. McCrory. 2012. Bear-people conflict prevention plan including assessment of grizzly bear and black bear hazards for the Upper Slocan Valley. BC Bear Smart program. *(In Press.* Will be available on-line September 15, 2012 at www.vws.org).

McCrory, W. 2012. Proposed movement corridors for black bears related to the Partington Creek Neighbourhood Plan & riparian areas regulation (RAR) setbacks in the City of Coquitlam, BC. Report for Community Planning and Development Department, City of Coquitlam. 28 pp.

McCrory, W. 2012. Cumulative effects assessment of a potential Enbridge-related oil tanker spill on the rare and unique gene pool of the white bear subspecies *(Ursus americanus kermodei)* on Gribbell Island, British Columbia. Report submitted to Joint Review Panel. *In Press.*

McCrory, W. 2012. Spirit Bears Under Siege. The case for the protection of Gribbell Island – Mother Island of the White Bear. *In Press.*

McCrory, W. 2011. Bear viewing plan for the Mussel and Poison Cove Estuaries in Fiordland Conservancy. Report to BC Parks and Kitasoo/Xai'xais First Nation.

McCrory, W. 2010. September 2009 bear viewing assessment for Phillips River, BC. Report for Sonora Resort, Campbell River, BC. 48 pp.

McCrory, 2010. An independent & cumulative effects review of Taseko Mine's environmental impact assessment documents: Proposed Prosperity Mine at Fish Lake {Terrestrial Wildlife Component]. CEAR reference number 09-05-44811.

Craighead, L. and W. P. McCrory. 2010. A preliminary core conservation review of the dryland grizzly bear of the Chilcotin Ranges in British Columbia. Report to Friends of Nemaiah Valley, Valhalla Wilderness Society and Xeni Gwet'in First Nation Government.

McCrory, W.P. 2010. Draft review of implications of climate change to habitats for some wildlife species and wild horses in the Xeni Gwet'in Caretaker Area, Chilcotin, BC. Contribution to Xeni Gwet'in adaptation to climate change review.

McCrory, W. and M. Williams. 2009. Assessment of opportunities for spring bear viewing & nature tours – Phillips River Estuary, BC. Report for Sonora Resort, Campbell River, BC. 48 pp.

McCrory, W.P. and P. Paquet. 2009. Proposed bear viewing strategy for the K'ztim-a-deen (Khutzeymateen) Grizzly Bear Sanctuary & K'tzim-a-deen Inlet Conservancies, British Columbia. Report for the K'tzim-a-deen Management Committee & Planning Process, Prince Rupert, B.C.

McCrory, W. 2009. Assessment of trails for the Xeni Gwet'in tourism project - wildlife and cultural/heritage values & wild horse tourism areas.

McCrory, W.P. 2009. Evaluation of potential bear-viewing areas for the Mussel and Poison Cove Estuaries in Fiordland Conservancy. August 29-September 5, 2009.

McCrory, W. 2009. Notes & outline & ideas for background review of bear viewing plan/strategy for the Mussel River and Poison Cove area, Fiordlands Conservancy. Report for BC Parks and Kitasoo First Nation.

McCrory, W. 2009. 2008 black bear risk assessment & management recommendations for public recreation trails – The Lower Seymour Conservation Reserve (LSCR). Report to Metro Vancouver Watershed Division.

McCrory, W. 2009. 2008 black bear risk assessment & management recommendations for Lynn Headwaters Regional Park - hiking network between Grouse Mountain Resort and Goat Mountain/Ridge. Report to Metro Vancouver Parks Department.

McCrory, W. 2009. 2008 notes on preliminary black bear risk assessment & management recommendations for restricted access areas -- Metro Vancouver Watershed Division.

McCrory, W. and M. Williams. 2008. Bear viewing opportunities – Phillips River Watershed, BC. Report for Kwiakah First Nation, Campbell River, BC. 19 pp.

McCrory, W. 2008. 2007- 2008 black bear risk assessment - Minnekhada  Regional Park. Report for Metro Vancouver Parks.

McCrory, W. 2008. 2007- 2008 black bear risk assessment – Kanaka Creek Regional Park. Report for Metro Vancouver Parks.

McCrory, W. 2008. Black bear risk assessment and management recommendations for Metro Vancouver Regional Parks.

McCrory, W. and M. Williams. 2007. Bear viewing opportunities in the Phillips River Watershed, BC. Report for Sonora Resort Ltd., Campbell River, BC. 17 pp.

Paquet, M.M. and W.P. McCrory. 2007. Bear hazard assessment – City of Coquitlam. Application for Bear Smart community status: Phase 1.

McCrory, W. 2007. Black bear habitat and corridor map project, Resort Municipality of Whistler (RMOW). Draft.

McCrory, W. 2006. Bear hazard assessment and problem analysis. Phase I application for Bear Smart Community Status. District Municipalities of North & West Vancouver, City of North Vancouver, B.C.

McCrory, W. 2005. Bear hazard assessment - problem analysis report & proposed bear-people conflict prevention plan, Britannia Bay Properties Ltd., British Columbia.

McCrory, W. and B. Cross. 2005. A preliminary review of potential impacts of snowmobile recreation on grizzly bear winter denning habitats and wolverine winter natal/maternal denning habitats in S.E. Kakwa Provincial Park, B.C. with GIS grizzly bear and wolverine den habitat models. Report to B.C. Parks. 31 pp.

McCrory, W.P. 2005. Proposed bear-people conflict prevention plan for Resort Municipality of Whistler.

McCrory, W.P., and Paquet, M.M. 2005. Bear hazard & problem analysis report & proposed bear-people conflict prevention plan, District of Squamish, British Columbia.

McCrory, W. 2005. Background tourism feasibility study – wild species viewing & guidelines. Xeni Gwet'in First Nation, Chilcotin, B.C.

McCrory, W. 2005. Proposed access management plan for Xeni Gwet'in First Nation Caretaker Area, Chilcotin, B.C.

McCrory, W. 2005. Roads to Nowhere. Technical review of ecological damage & proposed restoration related to B.C. Ministry of Forests control actions – 2003 Chilko Wildfire, B.C. Re: bulldozed fireguards & access roads & peat meadow damage. Report to Friends of Nemaiah Valley, Victoria, B.C.

McCrory, W.P. 2004. Preliminary bear hazard assessment of Resort Municipality of Whistler (RMOW). Submitted to RMOW. 107 pp.

McCrory, W.P. 2004. Bear habitat ground-truthing surveys of Resort Municipality of Whistler, August 14 – 23/04 by McCrory Wildlife Services Ltd. for Terrestrial Ecosystem Mapping classification and seasonal bear habitat rankings. Draft to Whistler Community Habitat Resources Project (CHRP).

McCrory, W.P., M. Williams, B. Cross, L. Craighead, P. Paquet, A. Craighead and T. Merrill. 2004. Grizzly bear, wildlife and human use of a major protected wildlife corridor in the Canadian Rockies, Kakwa Provincial Park, B.C. Draft progress report to Valhalla Wilderness Society and Y2Y Wilburforce Science Symposium. *Draft & In Press.*

McCrory, W.P., P. Paquet, and B. Cross. 2003. Assessing conservation values for gray wolf and Sitka deer - BC central coast rainforest. Report to the Valhalla Wilderness Society, New Denver, B.C.

McCrory, W.P. 2003. A bear hazard study of recreational facilities in a major grizzly bear travel corridor with management recommendations to minimize conflicts – A GIS Grizzly Bear Encounter Risk Model. Kakwa Provincial Park, B.C. Report to B.C. Parks. 174 pp.

McCrory, W.P. 2003. Preliminary review and hazard assessment related to grizzly bear – hunter conflicts in the Muskwa-Kechika Management Area, Northeast BC. Report submitted
to BC Wildlife Branch, Ministry of Water, Land and Air Protection, Victoria, BC.

McCrory, W.P. 2003. Ecological connectivity – 2003. Multi-year study of grizzly/wildlife movements & application to GIS corridor model design – Kakwa grizzly bear – wildlife corridor pilot study. Research proposal submitted to Wilburforce Foundation, Y2Y Conservation Initiative.

McCrory, W. 2003. Preliminary bear hazard evaluation. E.C. Manning and Skagit Valley Provincial Parks & Cascade Recreation Area. Report to B.C. Parks, Okanagan District, Penticton, B.C.

McCrory, W.P. 2002. Bear-People Conflict Prevention Plan (2002-2007). Manning and Skagit Provincial Parks and Cascade Recreation Area, B.C. Report to BC Parks, Summerland, B.C. 144 pp.

McCrory, W.P. 2002. Black bear hazard & habitat assessment, Diamond Head Area – Garibaldi Provincial Park, B.C. Incorporating a Geographic Information System (GIS) Decision-Support Model. Report to B.C. Parks, Brackendale, B.C. 117 pp.

McCrory, W.P. 2002. Preliminary conservation assessment of the Rainshadow Wild Horse Ecosystem, Brittany Triangle, British Columbia, Canada. A review of grizzly and black bears, other wildlife, feral horses and wild salmon. Report to Friends of Nemaiah Valley (FONV), Victoria, B.C.

McCrory, W.P. and B. Cross. 2001. Trails, Hiking Routes, Roads, Campsites and Other Facilities in Southeast Kakwa Provincial Park, B.C. Composite map to B.C. Parks. Colour DEM, 1:37,600 scale, plus tables with trail descriptors. Updated in 2004.

McCrory, W.P. 2001. Background review for a bear hazard study and bear-people conflict prevention plan for E.C. Manning and Skagit Valley Provincial Parks and Cascade Recreation Area. Report to BC Parks, Summerland, B.C. 55 pp.

McCrory, W.P., J. Bergdahl, P. Paquet and B. Cross. 2001. A conservation area design for protection of the white black bear (*Ursus americanus kermodei*) on the central coast of British Columbia. Report to Valhalla Wilderness Society, New Denver, B.C. *In Press.*

Ruttan, R.A. and W.P. McCrory. 2001. A background review of the black bear (*Ursus americanus*) in the boreal forest: denning habits and resource extraction.

McCrory, W.P. 2000. A review of the bear-people management program for Kokanee Glacier Provincial Park, BC. Report to BC Parks, Nelson, BC. 88 pp.

McCrory, W.P., C. McTavish and P. Paquet. 1999. Grizzly bear background research document. 1993-1996 for GIS bear encounter risk model, Yoho National Park, British Columbia. A background report for the GIS Decision-Support Model for the Lake O'Hara/McArthur Valley Socio-ecological study. Parks Canada. 96 pp. plus appendices.

McTavish, C. and W. McCrory, 1998. Grizzly/black bear habitat assessment. Stoltmann Wilderness. Elaho River Drainage, British Columbia, Canada. Report to Western Canada Wilderness Committee, Vancouver, B.C.

McCrory. W.P. 1998. Bear habitat and hazard assessment. Duffey Lake Provincial Park, British Columbia. Report to BC Parks, Brackendale, BC. 29 pp plus appendices.

McCrory, W. 1998. A preliminary bear habitat and hazard assessment, Kakwa Lake area. Kakwa Recreation and Protected Area, British Columbia. Report to B.C. Parks, include. GIS bear habitat map. 35 pp.

McCrory, W. 1998b. Progress notes - Bear habitat assessments (Aug. 16-25/98) re- study design for a GIS bear encounter risk model for Kakwa Recreation and Protected Area, British Columbia. Report to B.C. Parks and Habitat Conservation Trust Fund. 12 pp. plus tables.

McCrory, W. and T. Leja.  1998. Preliminary bear hazard assessment, proposed Summit Meadow Ridge Trail, Mt. Revelstoke National Park, B.C. Report to Parks Canada Warden Service, Revelstoke, B.C.

S. MacDougall, W. McCrory and S. Herrero. 1997. A study of grizzly (*Ursus arctos*) and black bear (*U. americanus*) food habits and habitat use, and a bear hazard assessment of the Rabbitkettle Lake area of Nahanni National Park Reserve, Northwest Territories. Parks Canada. 157 pp.

McCrory, W. 1997. Bear conflict prevention plan for Akamina Kishinena Provincial Park, B.C. (1997-2001). Report to B.C. Parks, Wasa, B.C.

McCrory, W. 1997a. Preliminary evaluation of bear habitats in Moose Creek and comments on the potential impacts of the proposed magnetite mine development. Progress report to Parks Canada - Yoho/Lake Louise/Kootenay.

McCrory, W. and E. Mallam. 1997b. Grizzly bear habitats and trail hazard assessment for Ottertail fire road and Goodsir Pass Trail-Goodsir Flats. Progress report to Parks Canada - Yoho/Lake Louise/Kootenay.

McCrory, W. and E. Mallam. 1995a. Revised grizzly bear capability for Wells Gray Provincial Park, biophysical map. Report to BC Parks, Kamloops, B.C. 40 pp.

McCrory, W. and E. Mallam. 1995b. Preliminary bear hazard assessment of Wells Gray Provincial Park. Report to BC Parks, Kamloops, B.C. 20 pp.

McCrory, W. and E. Mallam. 1995. Year two progress report. Grizzly bear habitats and trail hazard assessment - for Lake O'Hara/McArthur Valley socio-ecological study.  32 pp.

McCrory, W. and E. Mallam. 1994. Bear hazard assessment and management recommendations. The Odaray Prospect-McArthur Pass area (Lake O'Hara) and the McArthur Creek Valley. Report to Yoho National Park, Heritage Resource Conservation Service. 102 pp.

McCrory, W. and E. Mallam. 1994. Assessment of bear habitats and hazards. Liard River Hot Springs Provincial Park, British Columbia. Report to BC Parks, Fort St. John, BC.

McCrory, W. and E. Mallam. 1994. Bear hazard assessment and recommendations. Cougar Valley and Balu Pass Trails, Glacier National Park, B.C. Report for Parks Canada Warden Service, Revelstoke, B.C.

McCrory, W. 1994. Values of a fully protected Kitlope Ecosystem for bears. Report to Nanakila Institute, Kitimaat Village, B.C. Draft.

McCrory, W., G. Copeland and E. Mallam. 1993. A proposed management framework for the Khutzeymateen grizzly sanctuary, B.C. Report to Valhalla Wilderness Society, Friends of Ecological Reserves and World Wildlife Fund. Draft. 32 pp.

McCrory, W. and E. Mallam. 1992. Grizzly bear resource management report, Kokanee Glacier Park and Recreation Area. Report to B.C. Parks. 32 pp.

McCrory, W. and E. Mallam. 1992. Grizzly bear habitat/hazard assessment of recreation trails in Marten Creek and Idaho Lookout area. Report to Ministry of Forests, Castlegar, B.C.

McCrory, W., E. Mallam and G. Copeland. 1991. A proposal for a white grizzly wilderness park in the Goat Range of British Columbia. Report to Valhalla Wilderness Society.

McCrory, W. and E. Mallam. 1990. Preliminary bear hazard evaluation for Bowron Lake Provincial Park, B.C. Report to BC Parks, Prince George, B.C. 73 pp.

McCrory, W. and E. Mallam. 1990 Bear hazard evaluation in Monashee Provincial Park, B.C. Report to B.C. Parks, Kamloops, B.C. 22pp.

McCrory, W. and E. Mallam. 1990. Bear hazard evaluation in areas of Mt. Robson Provincial Park, B.C. Report to B.C. Parks, Prince George, B.C. 20 pp.

McCrory, W. and E. Mallam. 1990. Bear hazard evaluation in Monkman Provincial Park, B.C. Report to B.C. Parks, Prince George B.C. 19 pp.

McCrory, W.P., S. Herrero and G. Jones. 1989. A program to minimize conflicts between grizzly Bears and people in British Columbia Provincial Parks. Bear-People Conflicts -- Proc. of a Symposium on Management Strategies. Northwest Territories Dept. of Renew. Res.: 93-98.

McCrory, W.P., and E. Mallam. 1989. Bear-people management plan for the Atnarko River, Tweedsmuir Provincial Park, B.C. Report to B.C. Parks, Prince George, B.C. Parts I & II.

McCrory, W. and E. Mallam. 1989. Bear Management Plan, West Kootenay District, BC Parks (1989-1994). Part 1 and Part 11 (Background document).

McCrory, W.P. and E. Mallam. 1988. Grizzly bear viewing and bear-salmon interpretive potential along the Atnarko River, Tweedsmuir Provincial Park. Report to B.C. Parks, Victoria, B.C. December 1988.

McCrory, W.P. and E. Mallam. 1988 Ecological, preservation and public appreciation values and potential logging impacts in the proposed Khutzeymateen grizzly sanctuary, B.C. Final report to Friends of Ecological Reserves, World Wildlife Fund and other sponsors. 93 pp.

McCrory, W.P. and E. Mallam. 1987. Grizzly bear hazard evaluation - Elk Lakes Park and Recreation Area, Mt. Assiniboine Park and Purcell Wilderness Conservancy, B.C. B.C. Parks Division, Kamloops, B.C.

McCrory, W., S. Herrero and E. Mallam. 1987. Preservation and management of the grizzly bear in BC Provincial Parks - The Urgent Challenge. Report to BC Parks Division, Victoria, BC. 187 pp.

McCrory, W. and E. Mallam. 1985. An assessment of grizzly and black bear habitat in Hamber Provincial Park, B.C. with recommendations to reduce human-bear conflicts. Report to B.C. Parks. 57 pp.

McCrory, W.P. 1985 Grizzly bear habitat and out door recreation in Kokanee Glacier Provincial Park, B.C. Conflicts and recommendations. Volume 1. B.C. Parks Division. 118 p.

McCrory, W.P. 1984. An evaluation of grizzly bear habitat capability and use and recreation developments in Valhalla Provincial Park, B.C. Parks Division. 153 pp.

Syncrude Canada Ltd. 1973. Migratory waterfowl and the Syncrude Tar Sands Lease: A report. Environmental Research Monograph 1973-3. [Renewable Resources Consulting Services Ltd., W. McCrory researcher].

McCrory, W. 1979. An inventory of the mountain goats of Glacier and Mount Revelstoke National Parks, British Columbia. Parks Canada Rep., Western Region. Glacier National Park, Revelstoke, BC. 200 pp. typescript.

McCrory, W.P. and D.A. Blood. 1978. An inventory of the mammals of Yoho National Park, British Columbia. Parks Canada, W.R.O., Calgary, Alta. Assisted by Park Wardens and Naturalists. 269 pp.

McCrory, W. 1965. Variation in the mountain goat (*Oreamnos americanus*). B.Sc Honors Zoology Thesis. University of British Columbia. 44 pp.