ORIGINAL



CHRISTOPHER A. CROFTS
United States Attorney
NICHOLAS VASSALLO
C. LEVI MARTIN
Assistant United States Attorneys
Post Office Box 668
Cheyenne, WY 82003-0668
Telephone: 307-772-2124
Facsimile: 307-772-2123

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| YOLANDA EVERT, individually and as the Qualified Wrongful Death Representative Of Erwin Evert, deceased, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 11-CV-339-F |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
## MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

The United States, by and through the United States Attorney for the District of Wyoming and Assistant United States Attorneys C. Levi Martin and Nicholas Vassallo, hereby submits this brief in support of its motion to dismiss. FED.R.CIV.P. 12(b)(1).

## INTRODUCTION

This action, which arises out of a June 2010 fatal encounter with a grizzly bear, is brought against the United States under the Federal Tort Claims Act (FTCA). Plaintiff claims federal employees were negligent in their grizzly bear trapping operations in the Shoshone National Forest resulting in Mr. Evert's death. (Compl. ¶¶ 59-82). However, the alleged actions/inactions of the federal employees fall within the discretionary function exception to the FTCA. Therefore, this case should be dismissed for lack of subject matter jurisdiction.

## STANDARD OF REVIEW

A challenge to the Court's jurisdiction under the FTCA should be brought as a motion to dismiss under Rule 12(b)(1). *Zumwalt v. United States*, 928 F.2d 951, 952 (10th Cir. 1991). A party challenging jurisdiction under "Rule 12(b)(1) may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends[.]" *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1296 (10th Cir. 2003) (citation and internal quotations omitted). In such instances, "the court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts . . . [, and] reference to evidence outside the pleadings does not convert the motion to dismiss to a Rule 56 motion for summary judgment." *Id.* (citation and internal quotations omitted).

## ARGUMENT

## I.     The FTCA is a limited waiver of sovereign immunity.

In 1948, with passage of the FTCA, Congress "waived sovereign immunity from suit for certain specified torts of federal employees." *Dalehite v. United States*, 346 U.S. 15, 17 (1953).

1

Specifically, the waiver of immunity provides as follows:

> Subject to the provisions of chapter 171 of this title [Tort Claims Procedure], the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. [28 U.S.C. § 1346(b).]

However, this limited waiver of immunity is subject to several exceptions, including one governing discretionary functions:

> The provisions of this chapter and section 1346(b) of this title shall not apply to—
>
> (a) Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused. [28 U.S.C. § 2680(a).]

This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984).

In *Berkovitz v. United States*, 486 U.S. 531 (1988), the Supreme Court announced the standard governing application of the discretionary function exception. For the exception to apply, a court must make two findings. First, there must be a finding that the challenged conduct "involves an element of judgment or choice." *Id.* at 536. This finding cannot be made if "a

2

federal statute, regulation, or policy *specifically prescribes* a course of action for an employee to follow." *Id.* at 536 (emphasis added). Second, if the challenged conduct involves discretionary judgment, there must be a finding as to "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.*

The discretionary function exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 537, citing *Dalehite*, 346 U.S. at 36. "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *United States v. Gaubert*, 499 U.S. 315, 324 (1991). The discretionary function exception's purpose is designed to meet Congress' desire to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Berkovitz*, 486 U.S. at 536-537 (quoting *Varig Airlines*, 467 U.S. at 814).

In determining whether the discretionary function exception applies in a case, a plaintiff's allegations of negligence cannot be considered. *See Flynn v. United States*, 902 F.2d 1524, 1530 (l0th Cir. 1990) (citation omitted) ("The discretionary function applies even when the discretionary acts themselves constitute negligence"). By its own language, the discretionary function exception applies "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). While the United States certainly contends that the federal employees exercised their discretion properly, it is worth remembering in evaluating plaintiff's claim that even if the Court considers it negligently performed, the United States would still be immunized from liability.

*See Elder v. United States*, 312 F.3d 1172, 1176 (10th Cir. 2002), citing *Aragon v. United States*, 146 F.3d 819, 822 (10th Cir. 1998)).

Finally, if the discretionary function exception applies, subject matter jurisdiction cannot exist. Accordingly, in order to proceed, plaintiffs must "prove that their claims are not based upon actions immunized from liability under the FTCA's discretionary function exception, 28 U.S.C. § 2680(a)." *Elder*, 312 F.3d at 1176 (citing *Aragon*, 146 F.3d at 823). Plaintiffs must meet this jurisdictional prerequisite to suit as part of their overall burden to establish subject matter jurisdiction. *Id.*

## II. There is no federal statute, regulation, or policy that specifically prescribed a required course of action.

Plaintiff's claim is a failure to warn claim. *See* (Compl. ¶¶ 66-73). Plaintiff alleged the "claim is not based upon the exercise or performance, or the failure to exercise or perform a discretionary function or duty[.]" (Compl. ¶ 18). Plaintiff then cited four different sources for the proposition that the federal employees had mandatory duties: (1) a Shoshone National Forest order (Compl. ¶22; *see also* (Ex. A (Schwartz Depo., Ex. 4 Appx. 2))); (2) a Wyoming Game and Fish (WGF) research permit (Compl. ¶ 23; *see also* (Ex. B (Schwartz Depo., Ex. 7))); (3) a United States Fish & Wildlife Service (FWS) permit (Compl. ¶¶ 25-26); *see also* (Ex. C (Schwartz Depo., Ex. 8))); and (4) a field manual (Compl. ¶¶ 27-28;[1] *see also* (Ex. D)). However, to the extent any of these documents could be considered as even relating to actions or

---

[1] In the complaint, plaintiff incorrectly refers to the quoted portions as being from the Interagency Grizzly Bear Study Team (IGBST) guidelines. The edited quotes actually come from a field manual. *See* JAMES JONKEL, *A Manual for Handling Bears for Managers and Researchers* 3-4 (1993) (hereinafter Jonkel manual).

4

inactions of federal employees, none are sufficiently specific in "'prescrib[ing] a course of action for an employee to follow[.]'" *Elder*, 312 F.3d at 1176, quoting *Berkovitz*, 486 U.S. at 536.

## A.     The Shoshone National Forest order.

Plaintiff alleged "the Shoshone National Forest instituted a closure order for grizzly bear trapping and collaring areas to minimize human/bear encounters [which] mandated that closure areas be marked on the ground with closure signs." (Compl. ¶ 22). For a multitude of reasons, plaintiff cannot rely upon this order to defeat immunity.

As a threshold matter, plaintiff's apparent interpretation of the Shoshone order as imposing a duty on the United States is without basis. Even a cursory reading of that order reveals its purpose as criminalizing[2] the act of being present at an active grizzly bear trap site. The Shoshone order states, in relevant part:

> Pursuant to 36 CFR, Section 261.50(a), the following act is prohibited on the area described in this order within the Shoshone National Forest.
>
> 1. It is prohibited for any person to go into or be upon any of the grizzly bear trapping and collaring areas. 36 CFR 261.53(a) 36 CFR 261.53(e)
>
> The areas closed by this order are located on the Shoshone National Forest and will be marked on the ground with closure signs. Areas are not shown on maps due to the sensitive nature of this threatened species. [(Ex. A).]

---

[2]  *See* 36 C.F.R. § 261.1b: "**Penalty**. Any violation of the prohibitions of this part (261) shall be punished by a fine of not more than $500 or imprisonment for not more than six months or both pursuant to title 16 U.S.C., section 551, unless otherwise provided."

The plain language[3] of the order demonstrates an intent to provide notice to the public of: (1) the act prohibited ("to go into or be upon any of the grizzly bear trapping and collaring areas"); and (2) how to identify "the areas closed by [the] order". (*Id.*); *see also* (Ex. E (Pils Depo. 30:17-30:25) (describing the order as the "legal means" by which to close an area for trapping)). There is no legal or logical basis for plaintiff's misguided interpretation of the Shoshone order as imposing a duty on any federal employee.

Even assuming the closure order could be read to impose a duty on some unnamed federal employee to sign an area during the period the area is closed for grizzly bear trapping, that duty was fulfilled. There has been no allegation that the United States Geological Survey (USGS) team failed to sign the area while they were conducting their grizzly bear trapping operations. Indeed, the genesis of plaintiff's claim is that the closure signs which were present throughout the trapping operations were then removed. (*See* Compl. ¶ 49 ("the crew *removed* all warning signs at Site #3) (emphasis added); (Dkt. #19 (Answer at ¶ 49 ("The United States admits that, on June 17, 2010, as Mr. Dickinson and Mr. Thompson left Site #3, they removed all closure signs.")). By operation of the order itself, an area is only closed when there are closure signs on the ground.[4] *See* Ex. A (areas closed will be marked with closure signs). Accordingly, the closure order was no longer in effect for that area because the signs were gone.

---

[3]  *See Southern Utah Wilderness Alliance v. Bureau of Land Management, et. al,* 620 F.3d 1227, 1238 (10th Cir. 2010) (courts will look to the plain language and context of an agency order to construe its meaning) (citation omitted).

[4]  Plaintiff may attempt to argue that because the signs had stated the area would be closed until 6-20-2010, then the area was required to be signed until that date. However, there is no basis for that argument to be found in the order, nor will plaintiff be able to identify any other source

However, the dearth of specificity in the order as to how to sign is most fatal to plaintiff's position that some mandatory duty exists.  The order provides absolutely no direction.  It does not say who (or what agency) will sign the area, how many signs must be used, how large the signs must be, what the signs must say, how far from (or close to) the trap site the signs need to be, if the signs must go up in advance of trapping, or whether the signs must remain posted after trapping has concluded (and if so, for how long).  (*See* Ex. A).

This lack of specificity means discretion remained because there is no specific direction as to how this alleged duty was to be performed.  *See Aragon*, 146 F.3d at 825 (although Air Force manual required that toxic waste discharge be "stringently controlled," it did not "prescribe specific, mandatory waste water disposal methods or treatment procedures"); *Merando v. United States*, 517 F.3d 160, 173 (3d Cir. 2008) (discretion remained because although hazardous tree "plan required personnel to scan for hazardous trees as they drove the Park's roads, there [wa]s no statute, regulation, or policy dictating the specifics of that requirement"); *Autery v. United States*, 992 F.2d 1523, 1529 and n.11 (11th Cir. 1993) (tree inspection policies lacked specificity in that they "did not compel park employees to inspect certain trees on certain days or remove a particular number of trees per week . . . fact that park officials had information regarding the potential danger of black locust trees did not remove their discretion"); and *Snyder v. United States*, 504 F.Supp.2d 136, 141 (S.D. Miss. 2007), *aff'd* 296 Fed. Appx. 399 (5th Cir. 2008) (requirement that "refuse, in any form, should not be disposed of

---

which removed the discretion from the USGS team as far as when they could remove closure signs and reopen areas to the public.

where it may pollute surface or underground waters which are eventually to be used as drinking water" did not remove discretion because the requirement was not sufficiently specific).

To the extent the Shoshone order could be construed as requiring the United States to do anything, the United States fulfilled that requirement.  Closure signs were present at Site #3 while they were actively trapping and there is no support for the theory that more was required. Accordingly, plaintiff cannot rely upon the Shoshone order as a basis to defeat the discretionary function exception.

## B.    The WGF research permit.

As a threshold matter, the USGS was not even required to obtain a permit from Wyoming to conduct its research on grizzly bears.  Although states have primary responsibility over wildlife within their borders, specific federal legislation can preempt it.  *See Strahan v. Coxe*, 127 F.3d 155, 167-68 (1st Cir. 1997) (state laws in conflict with the Endangered Species Act will not survive the Supremacy Clause); *see also Wyoming v. United States*, 279 F.3d 1214 (10th Cir. 2002) (FWS within its authority to refuse to allow the state of Wyoming to vaccinate elk on National Elk Refuge).

Throughout the entire period of time at issue in this case, grizzly bears in the Greater Yellowstone Ecosystem were protected under the Endangered Species Act (ESA) 16 U.S.C. 1531-1544.  *See* 75 Fed. Reg. 14496 (March 26, 2010).  The FWS has jurisdiction over freshwater and terrestrial species under the ESA,[5] thereby making it the agency with the permitting authority for research.  *See* 50 C.F.R. §§ 13.1-13.50 (general ESA permitting

---

[5]  *See* 50 C.F.R. § 402.01.

process); 50 C.F.R. § 17.31-17.32 (permit conditions for threatened species). The United States is unaware of any authority which would allow the state of Wyoming (or any other state) to unilaterally add requirements and conditions to a FWS research permit given to another federal agency. Accordingly, although the USGS team received a permit from the WGF as a part of its collaborative efforts with the states in pursuit of grizzly bear recovery,[6] the WGF lacks authority to add requirements to the USGS's grizzly bear research activities.

Even assuming a state could impose additional obligations on a federal agency in possession of a federal permit for handling a federally protected threatened species on federal land, the USGS team's actions were commensurate with the expectations contained in the WGF permit. In the complaint, plaintiff alleges negligence based upon the following quote from the WGF permit: "All trap sites shall occur on public lands and will be signed to alert the public if they inadvertently approach a baited trap site." (Compl. ¶24, ¶ 68). As discussed above, the incident site was "signed to alert the public if they inadvertently approach a baited trap site[,]"[7] but as the baited trap site was removed, so were the signs. When the USGS team left Site #3, they pulled the traps, removed the remaining obvious bait, and took down the signs. *See* (Ex. F (Haroldson Depo., Ex. 33 at 13)). There was simply no longer a "baited trap site" in existence.

Plaintiff may argue that because some remnants of bait may have remained, the area was still a baited trap site. This argument must fail for two reasons. First, the argument would ignore

---

[6] *See* http://www.nrmsc.usgs.gov/research/igbst-home.htm ("interagency approach ensures consistency in data collection and allows for combining limited resources to address information needs").

[7] (Ex. B).

the facts that traps were removed and the signs were pulled. (*Id.*). Therefore, it was no longer a "trap" site. The USGS team had no intent on returning to that drainage in 2010. (*Id.*). The site was closed. (*Id.*). Second, the WGF permit suffers from the same fatal flaw as the Shoshone National forest order—lack of specificity. The phrase a "baited trap site . . . will be signed" does not prescribe a specific course of action to be taken after the site is shut down and the traps removed. *See Garcia v. United States Air Force*, 533 F.3d 1170, 1177 (10th Cir. 2008) (United States immune from liability for damages allegedly incurred by poorly constructed roof when there were no specific, mandatory policies governing the periodic inspection of roof either during construction or afterwards); *see also*, *supra*, *Aragon*, 146 F.3d at 825; *Merando*, 517 F.3d at 173; *Autery*, 992 F.2d at 1529 and n.11; and *Snyder*, 504 F.Supp.2d at 141 (all cases discussing the specificity required for determining a prescribed course of action for an employee to follow).

"Statements made at this level of generality do not satisfy *Gaubert's* and *Berkovitz's* specific prescription requirement. Were the law otherwise, the discretionary function exception would be a dead letter." *Shansky v. United States*, 164 F.3d 688, 691 (1st Cir. 1999). Plaintiff cannot rely upon the WGF permit as a basis to defeat the discretionary function exception.

## C.    The FWS permit.

In alleging the USGS team was not performing a discretionary function, plaintiff relies upon the following language found in the FWS permit: "Every possible precaution shall be taken to avoid confrontations between bears and the public, including, but not limited to closure or signing of the study sites." (Compl. ¶ 26, citing Ex. C at 005090). First, the stated goal described in plaintiff's selected quote is immediately and substantially mitigated by the next

sentence. "Study sites, including capture locations, are not to be disclosed to the public to ensure human safety and to prevent dangers to bears." (*Id.*). Next, as discussed in both sections II.A. and II.B., *supra*, the study sites were closed and signed while trapping activities were being conducted.

More significantly, however, the broad aspirational language contained in the FWS permit reinforces the United States' position that there was an expectation that discretionary judgments be made in determining how to implement the stated goal. *See Shansky,* 164 F.3d at 691 ("broadly worded expression of a general policy goal . . . suggests that the [agency] and its functionaries will have to make discretionary judgments about how to apply concretely the aspirational goal embedded in the statement"); *Tippett v. United States*, 108 F.3d 1194, 1197 (10th Cir. 1997) (policy providing that "[t]he saving of human life will take precedence over all other management actions" is "too general to remove the discretion" from park employees' conduct); *Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995) (although "the said policy guidelines certainly outline general policy goals regarding visitor safety, the means by which [agency] employees meet these goals necessarily involves an exercise of discretion"); *Autery*, 992 F.2d at 1529 ("a general guideline is insufficient to deprive the federal government of the protection of the discretionary function exception").

It cannot be seriously contended that the United States had a mandatory duty to take "every possible precaution." (Ex. C at 005090). Taking that statement to its literal extreme would produce ridiculous results. The law and logic dictate a finding that the USGS team retained discretion in implementing the FWS permit's stated goal of avoiding confrontation

11

between the bears and public. *See Elder*, 312 F.3d at 1177-78 (manual does not remove discretion even though it "conveys the message that safety must be a priority"); *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1540 (10th Cir. 1992) (general health and safety provisions not considered specific and mandatory directives); *Blackburn v. United States*, 100 F.3d 1426, 1430-31 (9th Cir. 1996), cited with approval in *Elder*, 312 F.3d 1172 (involving the same analysis of the same NPS manual at issue in *Elder*); *Varig Airlines*, 467 U.S. 797, 104 S.Ct. 2755 (despite statutory duty to promote the safety of American air transportation, decisions surrounding implementation of that policy, including spot checking program, were protected by the discretionary function exception). Accordingly, the plaintiff cannot rely upon the FWS permit as a basis to defeat the discretionary function exception.

**D.    The Jonkel manual.**

Contrary to plaintiff's allegation that this field manual imposes obligations upon the United States (*see* Compl. ¶¶ 27, 28, 68), it actually provides the best evidence that grizzly bear trapping necessarily requires discretion to adaptively manage each situation separately. In the preface, author Jamie Jonkel states:

> Several words of caution for this publication are appropriate. This manual was primarily written as a reference for game wardens, park rangers, biologists, and others who find themselves in the position of capturing and handling bears. The techniques, methods, and drugs discussed within will undoubtedly advance and change over time. When specific problems arise, advice beyond the manual is recommended. Because of the unique nature of each capture and handling situation, the author and agencies involved in the printing of this manual refuse to assume any legal responsibilities that may result from the capturing and handling of bears by others. [Ex. D at 001232.]

In the introduction, Mr. Jonkel further states:

> The main goal of this manual is to assist and educate future bear handlers and to help reduce the number of bear and human injuries and deaths. This manual is not designed to replace hands-on experience. The only way to learn how to capture and handle bears properly is through an apprenticeship with experienced professionals!
>
> . . .
>
> This manual was written to provide individuals in bear management or research with a clear and concise field reference that has an emphasis on proper techniques. Hard and fast rules are impossible, and every person will do things differently. The techniques discussed in this manual are offered only as a reference and an aid to understanding the problems and dangers involved in bear research and management. There are other trapping and handling methods and procedures used by bear handlers that are safe and reliable. If you find a safer, more efficient technique, by all means use it. [*Id.* at 1243.]

Given the language quoted above, it is not possible, in good faith, to assert Jonkel's manual is intended to impose mandatory duties on grizzly bear trappers generally, let alone the United States specifically. *See Garcia*, 533 F.3d at 1177 (mere "field guide" whose purpose "is to provide ready reference for establishing and conducting a roof management program" does not impose mandatory duty on the United States).

Additionally, plaintiff's selectively edited quotation[8] from another section of the Jonkel manual omitted text addressing important discretionary function principles. The full quotation in the Jonkel manual reads:

> The legalities encompassing bear research and management are vague. Government and state employees have the obligation to protect people. The majority of the public assumes that they will be warned if dangerous animals are in the area, and that efforts will

---

[8] Compl. ¶28.

13

be made to capture and move or dispose of any animals posing a threat.

It is difficult to define the mandatory duty of a bear researcher or manager. Whenever in doubt, the agency's attorney should be consulted. It all comes down to an issue of "adequate warning." When a researcher or manager can prevent an injury by informing the public, they have the duty to do so. If a collared bear is moving through a campground, for example, the public should be informed of the danger.

Future court suits involving bears, the public, bear managers, and researchers are inevitable. Therefore, it is important to document every aspect of every management situation and trapping episode. Bear researchers and managers must make careful decisions and always warn the public when a trap has been placed in the vicinity or when there is a potential for a confrontation. Education and communication are the best tools when working with the media and the public. [(Ex. D at 001245-46).]

When read in its entirety, it is clear that the Jonkel manual describes mere "objectives and principles" and therefore cannot be construed as abrogating sovereign immunity. *See OSI, Inc. v. United States*, 285 F.3d 947, 952 (11th Cir. 2002) ("agency manual which provides only objectives and principles for a government agent to follow does not create a mandatory directive which overcomes the discretionary function exception"); *Elder*, 312 F.3d at 1177-78 (manual does not remove discretion even though it "conveys the message that safety must be a priority"); *Daigle*, 972 F.2d at 1540 (general health and safety provisions not considered specific and mandatory directives); *Blackburn*, 100 F.3d at 1431 (9th Cir. 1996), cited with approval in *Elder*, 312 F.3d 1172 (involving the same analysis of the same NPS manual at issue in *Elder*); *Tippett*, 108 F.3d at 1197 (policy providing that "[t]he saving of human life will take precedence over all other management actions" is "too general to remove the discretion" from park employees'

conduct); *Varig Airlines*, 467 U.S. 797, 104 S.Ct. 2755 (despite statutory duty to promote the safety of American air transportation, decisions surrounding implementation of that policy, including spot checking program, were protected by the discretionary function exception).

Plaintiff's other edited quote from the Jonkel manual is similarly unavailing. In a paragraph from the Jonkel manual discussing the importance of cooperation with local agencies (not in the context of public safety), plaintiff plucked the following phrase: "[t]he first and most important thing to accomplish before setting out is to touch base with the landowners and local state and federal officials." (Compl. ¶27, quoting Jonkel manual at 001245). First, this guidance does not even apply to the Everts because they were not the "landowners."[9] The United States owns the land, and there can be no dispute that the USGS team did discuss their planned trapping activities with the United States Forest Service (USFS). More importantly, however, the phrase "to touch base with" is entirely lacking in the requisite specificity to establish a mandatory directive, and therefore cannot be used to defeat the discretionary function exception to liability. *See, supra, Garcia*, 533 F.3d 1170; *Aragon*, 146 F.3d at 825; *Merando*, 517 F.3d at 173; *Autery*, 992 F.2d at 1529 and n.11; and *Snyder*, 504 F.Supp.2d at 141 (all cases discussing the specificity required for determining a prescribed course of action for an employee to follow).

A full and fair reading of the Jonkel manual demonstrates it is merely a reference. It does not include any mandatory directive(s). Further, it is non-specific; describing objectives and principles. Accordingly, plaintiff cannot rely upon the Jonkel manual as a basis to defeat the discretionary function exception.

---

[9]   *See* Compl. ¶ 33 (Everts' interest limited to having a permitted cabin on USFS land).

**E.    Animal Care and Use Committee (ACUC) submission.**

Although not identified by name anywhere in the complaint, plaintiff may attempt to argue that a document the USGS submitted to its internal animal care committee regarding animal welfare somehow imposed a mandatory duty on the United States for public safety. *See* (Ex. G (Schwartz Depo., Ex. 3, Appx. 1)). In the complaint, plaintiff alleges the USGS team "negligently failed to supervise and monitor the recovering grizzly bear until ambulatory as required by its own mandatory policies and protocols." (Compl. ¶74). Plaintiff's reliance on USGS's animal welfare submission is misplaced.

First, the purpose of the document has nothing to do with public safety. The ACUC form asks "[w]hat type of pre and post-surgical care will be provided?" The USGS response was:

> Researchers remain at capture sites and monitor the recovery of all grizzly bears until they are once again ambulatory. *We do this primarily to assure ourselves as to the condition of the bear handled, and secondarily to protect an individual whose abilities have been compromised by anesthetic.* On occasion we have had to protect recovering bears from other free ranging bears that have ventured into trap sites. This is accomplished by either hazing free ranging bears with non-lethal deterrents or transporting the anesthetized bear away from the original trap site. [(Ex. G at 00027 (emphasis added)).]

Accordingly, how the USGS intended to handle an animal for that animal's own welfare has nothing to do with a claim that the USGS team did not follow a directive relevant to human safety. *See Cleveland v. United States*, 546 F.Supp.2d 732, 754-55 (N.D. Cal. 2008) (discretion not removed for purposes of FTCA because "Health and Safety Code Handbook is plainly not a safety plan directed at protecting the safety of the general public, as it largely concerns Forest Service employee safety").

At most, the form submitted to the USGS's ACUC provides a general framework for their employees' decision making, but does not preclude the exercise of that discretion. Dr. Schwartz testified that the document they submit to their ACUC

> is a form or a document which is filled out to comply with the ACUC laws to get permission to capture and handle animals. This does not establish protocols specifically for the handling. It covers the general situations under which the animals will be captured and handled, the general drugging protocols, the kinds of issues that need to be looked at relative to animal welfare. But it doesn't establish policy about exactly what should and should not be done. [Ex. H Schwartz Depo. at 67:24-68:7].

Not every statement, written or unwritten, falls within the *Berkovitz* holding. *See Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (Social Security Act Claims Manual not a regulation, has no legal force, and is not binding); *Lyng v. Payne*, 476 U.S. 926, 937 (1986) (not all agency publications are binding); *Miller v. United States*, 163 F.3d 591 (9th Cir. 1998) (Guidelines in USFS Forest Plan and CFR were discretionary); *Hibble v. U.S.*, 133 F.3d 915 (4th Cir.), cert denied, 525 U.S. 827 (1998) (specific Army pamphlet plaintiff relied on, requiring either immediate repair of hazardous condition, or barriers or warnings, was actually a "guide" and not a mandatory directive); *Tracor/MBA, Inc. v. United States*, 933 F.2d 663 (8th Cir. 1991) (internal government safety checklist only a guideline); *Kahan v. U.S.,* No. 96-01168BMK (D. HI Apr. 27, 1999) (National Park Service manual, NPS-50, set forth guidelines to be considered by park officials in the performance of their jobs, rather than specific rules to be followed).

Indeed, the facts of this case exemplify why the USGS's process for handling bears requires discretion because of potentially conflicting ACUC concepts. Although, as discussed above, the USGS strives to stay with each grizzly bear until ambulatory in order to protect the

bear from other bears, the USGS also strives to check each trap site before noon so the animals

do not overheat. The ACUC form asked "[h]ow often are the traps checked or animals

handled?" (Ex. G 00020). The USGS response was:

> All traps are checked daily, before noon during research trapping
> operations. Length of traplines and number of sets are adjusted so
> that traps can be checked, and animals cleared from traps before
> the high ambient air temperatures might present a problem for
> captured animals. [(*Id.*).]

It is undisputed that the USGS team left site #3 at approximately 12:30 p.m. (Ex. H at 118:6-

118:8). Accordingly, Dr. Schwartz provided the following answer in response to a question of

how the USGS team was expected to choose between those two animal welfare concepts:

> The ACUC protocol, as I said earlier, general guidelines, it's a
> general description. Certainly twelve o'clock is not a hard-and-fast
> rule as far as thou shalt check all traps by twelve noon. Clearly, if
> there are circumstances that preclude you from getting to a trap site
> prior to twelve noon, check it afterwards. The intent of this is to
> say that we make every effort we can to check our traps early in
> the morning, again, for the welfare of the animal. The fact that
> those guys remained with that bear to ensure its welfare was a
> higher priority, in my mind, and obviously I believe it was a higher
> priority in their mind, but they also had to consider the fact that
> they did have additional sites to check. And so the timing of their
> departure is reasonable and appropriate, in my mind. [Ex. H at
> 118:12-119:1)].

Accordingly, when read in context with other sections of the form, it is clear that USGS's form

submission to its ACUC was not intended to impose a mandatory duty on USGS employees.

**III.    The challenged actions are the type of conduct that the discretionary function
exception was designed to shield.**

"When established governmental policy, as expressed or implied by statute, regulation, or

agency guidelines, allows a Government agent to exercise discretion, it must be presumed that

the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324. To avoid dismissal, it is incumbent upon the plaintiff to "allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Id.* at 324-25. Further, "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are *susceptible* to policy analysis." *Id.* at 325 (emphasis added).

There is an abundance of case law throughout the federal circuits, including the Tenth Circuit, holding that decisions relating to the manner in which hazards on public lands are addressed – e.g. determining what (if any) warnings to provide, or to what extent access should be permitted or restricted – are susceptible to policy analysis and thus shielded by the discretionary function exception. For example, in *Elder*, suit was brought for the wrongful death of a 12-year-old boy who slipped on slick algae while attempting to cross a small stream at the Middle Emerald Pools at Zion National Park and plunged more than 100 feet to his death onto rocks below. See *Elder*, 312 F.3d at 1174. The Park Service was keenly aware of the danger posed by this slick algae, considering that at least two previous deaths had occurred in the same manner and at this same spot as a result of slipping on the algae. *See id.* at 1175. Moreover, the slick algae, was a danger known to the Park Service personnel but relatively unknowable to park visitors. *See id.* at 1183 (the decedent's stepmother testified that "the algae blended with the rocks and was 'not real noticeable'"). Nevertheless, the Tenth Circuit held that the Park Service's decision not to warn of this particular danger or take measures to block off access to

19

the area where this algae was present was protected by the discretionary function exception as it involved balancing safety, the preservation of the natural environment and visitor's enjoyment of that environment, as well as cost. *See id.* at 1181-84.

Similarly, in *Tippett*, a snowmobiler was seriously injured after being kicked by an aggressive moose that was blocking the trail. 108 F.3d 1194. Prior to the incident, the moose had charged other snowmobiles and knocked two passengers to the ground. *See id.* at 1196. A park ranger was notified of the moose's aggressive behavior and responded to the area. When the plaintiff and his group approached the moose in the course of their departure, the ranger, instead of blocking access to this particular route until the moose was placated or removed (which is what the plaintiff argued should have happened), directed them to pass the moose. As the plaintiff attempted to go around the moose, the animal charged his vehicle and kicked him in the helmet, causing a broken neck. *See id.* Although the aggressive moose would certainly qualify as an immediate, known risk, specific in time and location, the Tenth Circuit held that the park ranger's response to the hazard posed by the moose was protected by the discretionary function exception because it flowed from the policy guidelines developed for considering when to close roads to the public and how to manage injured animals. *See id.* at 1199. *See also Kiehn v. United States*, 984 F.2d 1100, 1105 (10th Cir. 1993) (decision not to place warning signs alerting climbers to unstable condition of sandstone rock formations in "remote areas of a national monument inherently requires a balancing of public policy objectives, such as resource allocation, visitor safety and scenic preservation"); *Zumwalt*, 928 F.2d at 955 (decision not to place trail markings warning of entrance to cave in designated wilderness area grounded in

policy decision to maintain trail in wilderness state); *Johnson v. United States*, 949 F.2d 332, 336-38 (10th Cir. 1991) (decision not provide additional warnings regarding the potential danger of mountain climbing based on public policy considerations such as manpower and economic resources).

Whether to remove closure signs from an area inside of a National Forest, after research activities have concluded, involves consideration of the same public policies—safety, public access, scenic preservation, and resource allocation. As discussed above, the FWS permit described the objective of avoiding "confrontations between bears and the public" as a public safety policy consideration. (Ex. C at 005090). Congress has also declared that:

> it is the policy of the United States that . . . the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use. [43 U.S.C. § 1701(a)(8).]

*See also* 16 U.S.C. § 528 ("national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes").

Accordingly, a decision to again allow the public to access that area of the Shoshone National forest was susceptible to analysis of competing policy considerations—safety versus access.[10] Further, it is undisputed that the USGS team was permanently leaving the Shoshone

---

[10] It is irrelevant, for purposes of discretionary function analysis, whether or not the USGS team actually engaged in balancing these two policy considerations because a decision need only be "susceptible" to policy analysis. *See Elder*, 313 F.3d at 1182 ("Application of the second prong does not require proof of the thought processes of the pertinent decision makers. On the

River drainage and had no intent on returning in 2010. (Ex. F at 13). Accordingly, a decision to remove closure signs from national forest trees was susceptible to the analysis of two additional policy considerations—protecting the "natural condition of the land" and the potential cost associated with returning to the site several days later all the way from Bozeman, MT. *See Varig*, 467 U.S. at 820 (judicial second-guessing of how "best [to] accommodate[] the goal of . . . safety and the reality of finite agency resources" is precisely the type of decision making "the discretionary function exception was designed to prevent").

"Nothing in the record rebuts the presumption that under circumstances such as this, the government's actions and decisions were grounded in policy." *Kiehn*, 984 F.2d at 1108 n. 12 (citing *Gaubert*, 499 U.S. at 324-25, 111 S.Ct. at 1274-75). Accordingly, the United States is immune from suit.

Plaintiff may also attempt to argue that the USGS team should have contacted the cabin residence owners and that failure to do so is not grounded in policy.[11] Such an argument would be equally unavailing. First, plaintiff will not be able to identify a statute, regulation, or policy specifically prescribing a mandatory duty to make contact with each cabin owner. Further, the discretion afforded to the USGS and their trappers as to whether to provide notice to the public (and how much) is grounded in both social and economic policies.

---

contrary, courts should not inquire into the actual state of mind or decision making process of federal officials charged with performing discretionary functions." ) (internal quotations and citation omitted).

[11] *Allen v. United States*, 816 F.2d 1417, 1422, n.5 (10th Cir. 1987) (the applicability of the discretionary function exception is not impacted by "whether the alleged failure to warn was a matter of 'deliberate choice,' or a mere oversight") (citations omitted).

As discussed at the deposition of Mr. Haroldson, USGS grizzly bear trap team supervisor, the public's knowledge of grizzly bear trapping can attract unwanted human presence to active trap sites, despite warnings. *See* (Ex. I (Haroldson Depo. at 49:10-51:2)). In addition to the danger presented to those present at an active site, unauthorized human presence has also hindered the USGS's ability to accomplish its mission. For example, on one occasion, someone vandalized the trap, making it inoperable. (Ex. I at 50:12-50:23). On another occasion someone shot a remote camera off of a tree at a grizzly bear trap site. (Ex. I at 49:21-49:25); *see also* (Ex. J (Declaration of Mark Haroldson ¶¶ 6 & 7) (with attached photos)); (Ex. K (Dickinson Depo. at 95:7-95:12) (experiencing "individuals disregard signs and go into trap sites on quite a few occasions.")).

Accordingly, when deciding on whether to inform the public about grizzly bear trapping efforts (and how much), the USGS team is required to balance public safety, grizzly bear welfare, and the need to economically and efficiently accomplish the mission of obtaining necessary scientific data from grizzly bears. This need for balancing the important policy considerations has been expressly acknowledged in the FWS permit itself. *See* Ex. C at 005090 ("Study sites, including capture locations, are not to be disclosed to the public to ensure human safety and to prevent dangers to bears."). As Mr. Haroldson aptly noted, "[y]ou want to inform the public if they're getting close to one of the areas where they were conducting these operations, but you don't necessarily want to have a neon sign out there where you're going to attract people to the site that might not have known about it or gone there otherwise." (Ex. I at 53:2-53:18).

Finally, plaintiff also alleged that the United States was negligent in its choice of anesthetic. (Compl. ¶¶ 74, 75). It is hard to imagine another function wherein discretion is more appropriate. Regardless, plaintiff will again be unable to identify a statute, regulation, or policy specifically prescribing a mandatory duty to use a certain anesthetic or when an administration of an analgesic is required. Further, as Mr. Haroldson's declaration makes clear, decisions regarding drugs used in the field are made "in consultation with the Study Team Leader, myself, our veterinarian, and trap crew leaders." (Ex. J ¶2). Specific to Telazol (the drug of choice for anesthetizing grizzly bears), the USGS considered trapper safety when selecting it for use.

> Telazol has a long history (since 1986 in the Yellowstone ecosystem) of successful use and has consistently demonstrated itself to be a safe anesthetic for both study animals and researchers. Anesthesia with Telazol in bears has very predictable symptoms indicating both inductions and recovery. Also, the potential for "explosive" or "remarkable" recovery is low. This is especially important for backcountry trapping where the trappers are unable to secure themselves inside of a vehicle. Further, our trappers have had extensive training and experience with the use of Telazol and are quite capable of recognizing the predictable signs of a recovering grizzly bear. [(Ex. J ¶3)]

Further, Telezol was chosen after considering another policy—welfare of the grizzly bear. "Telazol has a high therapeutic index, meaning that it has a low potential for adverse effects from an unintended overdose." (Ex. J ¶4). "Other drug 'cocktails', some of which combine Telazol with other agents are being used to anesthetize grizzly bears. However, the characteristics associated with the use of these combinations are still being described and have only recently begun appearing in the published literature." (Ex. J ¶5). After having thoughtfully

considered the dual policy considerations of trapper safety and bear welfare, Telazol is still made available to grizzly bear trappers. (Ex. J ¶5).

Plaintiff cannot provide "facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 324-25. Accordingly, the United States is immune from suit.

## CONCLUSION

For the foregoing reasons, the United States is immune by virtue of the discretionary function exception to the FTCA. Accordingly, the Court should dismiss this case for lack of subject matter jurisdiction. FED.R.CIV.P. 12(b)(1).

Respectfully submitted this 19th day of September, 2012.

CHRISTOPHER A. CROFTS
United States Attorney

By:

C. LEVI MARTIN
NICHOLAS VASSALLO
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a true and correct copy of the foregoing *Memorandum in Support of Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction* has been served upon the following by the method(s) indicated below on September 19th, 2012.

Emily R. Rankin & Mark Aronowitz
The Spence Firm
P.O. Box 548
Jackson, WY 83001
307-733-5248
*Attorney for Plaintiff*

[X] By U.S. Mail - postage prepaid
[ ] By Hand Delivery
[ ] By Overnight Courier
[ ] By Electronic Filing/Email

Monica Sandoval

Office of the United States Attorney