ORIGINAL

CHRISTOPHER A. CROFTS
United States Attorney
NICHOLAS VASSALLO
C. LEVI MARTIN
Assistant United States Attorneys
Post Office Box 668
Cheyenne, WY 82003-0668
Telephone: 307-772-2124
Facsimile: 307-772-2123

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| YOLANDA EVERT, individually and as the Qualified Wrongful Death Representative Of Erwin Evert, deceased, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES OF AMERICA, )<br><br>Defendant. ) | No. 11-CV-339-F |

---

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BASED UPON WYOMING'S RECREATIONAL USE ACT

---

The United States, by and through the United States Attorney for the District of Wyoming and Assistant United States Attorneys C. Levi Martin and Nicholas Vassallo, hereby submits this brief in support of its motion for summary judgment pursuant to FED.R.CIV.P. 56.

### Introduction

On December 30, 2011, the United States moved to dismiss this case pursuant to FED.R.CIV.P. 12(b)(6) based upon the immunity provisions from Wyoming's Recreational Use

Statute (WRUA). (Dkt. # 11 & 12). This Court, being required to "accept as true all well-pleaded facts,"[1] denied the United States' motion at that stage of the proceedings. *See* Dkt. #18 (Order at 11 ("exception to the WRUA remains available to the Plaintiff at this stage of the proceedings")). The parties have now engaged in extensive discovery and the United States has marshaled evidence which makes it appropriate to raise the issue with this Court again. As discussed in detail below, there is no genuine issue of material fact in dispute which would preclude immunity to the United States under the provisions of the WRUA. (WYO. STAT. ANN. §§ 34-19-101 through 107). Accordingly, the United States is entitled to judgment in its favor as a matter of law.

### Facts

Erwin and Yolanda Evert purchased their cabin in the Kitty Creek drainage (seven miles from the east entrance to Yellowstone National Park)[2] in 1971. (Attach. 1 (Evert Depo. 10:15-10:18)). They came to Wyoming yearly to botanize and hike. (Attach. 2 (Evert Depo., Ex. 34 (Yolanda Evert, *Along Kitty Creek* at 136 (2002)))). Throughout those years, Mr. Evert and his daughter (Mara Domingue) "encountered bears many, many, many, many, many times." (Attach. 3 (Domingue Depo. 46:9-47:1)). Since the early 1990's, grizzly bears became so prevalent that it was not unusual for the Everts to see "ten or twelve grizzlies over the summer during the day along the North Fork road and around [their cabin area]." (Attach. 2 at 57; *see*

---

[1]  Dkt. # 18 (Order denying United States' Motion to Dismiss at 5), quoting *Moss v. Kopp*, 559 F.3d 1155, 1159 (10th Cir. 2010).

[2]  Compl. ¶ 29.

*also, id.* at 185-91 ("Additional Bear Tales"); Attach. 1 at 72:9-74:3 (stating that of all the places the Everts visited in the Greater Yellowstone area, only in the Shoshone National Forest does Mrs. Evert remember seeing warning signs about being in grizzly bear country)). Given the high prevalence of grizzly bears in the area, the United States Geological Service (USGS) [3] had trapped for grizzly bears near the site of the incident in years past. (Attach. 5 (Thompson Depo. 27:17-28:1); Attach. 6 (Haroldson Depo. 15:25-16:5)). Despite the overwhelming presence of grizzly bears, Mr. Evert never used bear bells, never owned or carried bear spray, and never owned or carried a gun while hiking. (Attach. 1 at 33:19-35:17; *see also* Attach. 7 (Neal Depo. 37:15-41:20)).

In May of 2010, Chad Dickinson and Seth Thompson from the USGS began the most recent grizzly bear trapping operations in the North Fork of the Shoshone River drainage. The USGS team planned to initially set culvert traps[4] at nearby road sites known as "Blackwater" and "Five Mile" for one hitch,[5] and then return with horses to snare trap up in the Kitty Creek drainage. (Attach. 8 (Pils Declaration ¶4); Attach. 9 (Dickinson Depo., Ex. 26 at Bates 000040)).

---

[3]  The USGS is a member of the Interagency Grizzly Bear Study Team (IGBST) which is tasked with the long term research and monitoring of the grizzly bear in the Greater Yellowstone ecosystem. (Attach. 4 (Schwartz Depo. 22:21-23:1; 27:5-27:16)).

[4]  A culvert trap is a round metal container (like a culvert used to move water under roadways) converted into a trap with either an expanded wire or metal plating put over the back end and a trap door in the front. (Attach. 4 at 9:19-10:1).

[5]  The USGS team conducted their grizzly bear trapping operations in ten day stints known as "hitches" with four days off in between. (Attach. 5 at 30:17-30:20).

3

As a part of the initial planning process, a wildlife biologist for the Shoshone National Forest (Andrew Pils) indicated a concern with potential human presence at the Blackwater site because the planned trap site was adjacent to a public road, at the beginning of which there is a lodge, and the fact that the area is frequently used for "dude rides" by the lodge. (Attach. 8 at ¶5; *see also* Attach. 9 at Bates 000040).  However, a consensus was reached that if the USGS team informed the Blackwater lodge people of the USGS's activities and used the signage that is usually used for trap sites, the concern would be mitigated. (Attach. 8 at ¶5; *see also* Attach. 9 at Bates 000040).  Because of his concerns with the site, Mr. Pils sought out and received confirmation from the USGS team that they had indeed contacted the Blackwater lodge personnel. (Attach. 8 at ¶5; *see also* Attach. 9 at Bates 000040).  The USGS team "pulled" the Blackwater site shortly after setting it, partly due to the observed human activity there. (Attach. 9 at Bates 000040).

Mr. Pils had much less concern with the Kitty Creek sites because he understood the Kitty Creek cabins and Forest Service trail 756 did not historically have much use in May and early June, and the trap sites themselves were planned to be more than a mile hike from the cabins and off Forest Service trail 756 by approximately one quarter of a mile or more.[6] (Attach. 8 at ¶6).  However, Mr. Pils decided to discuss the issue with the Special Use Permit Administrator (Anita Harper) anyway.  (*Id.*).  According to Mr. Pils, he requested that Chad Dickinson informally speak with the cabin owners about the USGS's activities.  (*Id.*).  Chad

---

[6] Mrs. Evert confirmed that even on the day of the incident the only people at the cabins were the Everts and a single guest at another cabin. (Attach. 1 at 173:1-173:3; 175:17-175:20).

Dickinson does not remember Mr. Pils having ever made that request and Mr. Pils never sought confirmation from the USGS as to whether they had done so. (Attach. 10 (Dickinson Depo. 15:13-16:25); *see also* Attach 8 at ¶6).

The USGS team began their trapping efforts in the Kitty Creek drainage on May 27, 2010. (Attach. 5 at 23:23-24:1). During this hitch, the USGS team was conducting one trap site in the Kitty Creek drainage (known as Site #1) and, for a portion of that same period, also trapping at the Five Mile site. (Attach. 5 at 28:11-29:13).

The route to Site #1 is not a direct one from the Kitty Creek cabin area. (Attach. 11 (Bragonier Decl. at ¶3)); *see also* Attach. 11, Ex. A (topographical maps of Kitty Creek drainage)). At the south end of the Kitty Creek cabins there is locked gate blocking vehicle travel to what was once Forest Service Road 448. (Attach 11 at ¶3). Road 448 and associated spur roads were used in the 1980's by a small logging operation. (*Id.*). In 1999, the section of road 448 behind the Kitty Creek cabins, and all its spurs were closed, obliterated, and reseeded. (*Id.*). The purpose of this road closure and road obliteration was to provide better habitat for the area which saw extensive Grizzly bear use. (*Id.*). The Forest Service now maintains just one trail in the Kitty Creek drainage (Forest Service trail 756) which starts at the aforementioned locked gate. (Attach. 11 at ¶4; *see also* Attach. 11, Ex. B (3-D maps of Kitty Creek)).

In order to find Site #1, one would be required to travel approximately one mile on Forest Service trail 756 or the decommissioned road, then abruptly turn west on a decommissioned and obliterated spur, up a steep hill, and continuing for approximately one mile. (Attach. 11 at ¶¶3,5). The spur off the trail/decommissioned road did not lead to anything of general or

specific interest; rather, it had historically been used for the logging operation in the 1980's. (Attach. 11 at ¶¶3, 5). As impediments to use, there are boulders, dirt berms, trees growing, and deadfall in the middle of this spur. (Attach. 11 at ¶5, *see also* Attach. 11, Ex. C (photos 7-10); Attach. 1 at 171:22-171:24 (the Forest Service "decommissioned 448, and they churned it up and it was kind of rocky and they put a gate there so you can't go up there")).

On May 31, the USGS team came across Dennis and Mary Ann Alquist (cabin owners that only came up on weekends and some holidays). (Attach. 10 at 19:15-19:22; *see also* Attach. 12 (Alquist Depo. at 27:11-27:18)). Mr. Dickinson does not recall the exact wording used, but does remember advising the Alquists that they were either "researching or trapping" grizzly bears. (Attach. 10 at 22:3-22:5).[7] Mr. Alquist testified the USGS team advised him they were "studying bears." (Attach. 12 at 53:4-53:22).

After having no success capturing any grizzly bears at Site #1, on June 9, the USGS team created a second site, known as Site #2. (Attach. 10 at 44:23-45:1). In order to get to what was Site #2, one would have to go from the cabins approximately two miles on the Forest Service trail 756 or the decommissioned road, then take another abrupt turn to the west on another decommissioned and obliterated spur, up a hill, and continuing for approximately two tenths of a mile. (Attach. 11 at ¶6; *see also* Attach. 11, Exs. A & B).

---

[7]   There is a dispute as to where this discussion took place. Mr. Dickinson testified the discussion occurred by the Alquist cabin. (Attach. 10 at 22:22-22:23). Mr. Alquist testified it took place on the "old logging road" (the decommissioned road) which parallels Forest Service trail 756. (Attach. 12 at 50:25-52:10). However, even assuming the encounter on May 31 actually took place on the decommissioned road, that would be insufficient to overcome the USGS team's other observations of extremely limited human activity in the area during their three weeks of trapping.

Between May 31 and June 12, the USGS team encountered the Alquists two more times. (Attach. 12 at 54:23-55:12; Attach. 10 at 19:23-24:12). Mr. Alquist testified that on one occasion the USGS team had told him they were having either good luck or bad luck (he could not remember specifically), but that was, according to Mr. Alquist, all they discussed. (Attach. 12 at 58:5-58:18). This encounter was, according to Mr. Alquist, perhaps a little further than 200 yards from the Alquists' cabin. (Attach. 12 at 54:23-55:12). As to the third encounter, Mr. Alquist testified he only remembered he was driving in his vehicle (either on his way to or away from his cabin), he pulled over, and asked how the USGS team was doing. (Attach. 12 at 59:8-59:13; 61:12-61:21).

The USGS team also saw Mr. Evert walking by his cabin on one occasion. (Attach. 10 at 27:5-28:2; Attach. 5 at 48:13-50:9). Mr. Thompson testified: "[I was] expecting to make contact and to speak to [Mr. Evert], and when [Mr. Evert] looked up, I waved at him, he waved back and then continued to look on the ground and continued to walk in the direction he was headed." (Attach. 5 at 49:24-50:2). Mrs. Evert acknowledged she and Mr. Evert saw the USGS team passing by their cabin many times as they were traveling both in and out. (Attach. 1 at 112:20-114:18). Yet, neither of the Everts stopped the USGS team to ask them what they were doing.

The only other human encounters the USGS team had near Forest Service trail 756 during their three weeks in the area were two dude rides. (Attach. 5 at 52:6-53:25; Attach. 10 at 37:11-40:18). Mr. Thompson testified they saw the first horse party (consisting of two riders) at the start of the trail and the riders indicated "they were sticking to the main trail." (Attach. 5 at 52:10-52:21). The other encounter consisted of five to six people on horses who apparently

already knew that the USGS team was trapping in the area. (Attach. 5 at 52:6-53:25; Attach. 10 at 37:11-40:18). The USGS team was satisfied the dude rides were sticking to the trail, so they decided no further warning or admonition was needed regarding the USGS trap sites. (Attach. 5 at 54:14-55:24).

On either June 9 or June 10, Mr. Evert encountered Site #2. (Attach. 7 at 45:4-46:3). Mr. Evert reported to his long time friend Chuck Neal, a self-professed bear expert,[8] that earlier in the day he had seen a sign saying "Dangerous Bear."[9] (Attach. 7 at 48:3-50:4). Mr. Evert asked Mr. Neal what he thought the team was doing. (Attach. 7 at 46:7-46:18). Mr. Neal warned Mr. Evert the team was likely either "hair snare trapping or live trapping" and that in either case it would "involve some kind of smelly bait, some kind of odoriferous bait designed to attract to bears, and just to stay away from there." (Attach. 7 at 47:11-47:17).

On June 12, the USGS team, with the assistance of WGF trappers, created Site #3.[10] (Attach. 5 at 66:12-67:3). As with the other two sites, the USGS team placed multiple signs in a perimeter around the trap area. The signs at Site #3 read: "DANGER! BEAR TRAP IN THE

---

[8]  Mr. Neal published a book about his grizzly bear encounters. *See* Attach. 13 (Neal Depo., Ex. 46 (CHUCK NEAL, *Grizzlies in the Mist* (2003))). Mr. Evert had read Mr. Neal's book. (Attach. 7 at 37:9-37:12).

[9]  It is presumed that Mr. Evert was at Site #2 because Site #2 is the only location where some of the signs read "Dangerous Bear." (Attach. 5 at 147:14-147:17); *see also* (Attach. 14 (Dickinson Depo., Ex. 27 at Bates 6414(photo no. 10))).

[10]  The USGS team requested the assistance of the WGF team because the USGS team intended to use a "pail set"—a type of snare set which the WGF team used regularly. (Attach. 5 at 73:2-73:20).

AREA. THE AREA BEHIND THIS SIGN IS TEMPORARILY CLOSED. THE CLOSURE IS

EFFECTIVE FROM 6-11-10 to 6-20-10." (Attach. 10 at 48:2-48:4; Attach. 14 at Bates 6412).

As Mr. Dickinson explained, even though the USGS team had planned to complete their hitch on

June 17 and pull the trap sites that day, the USGS team routinely post-dated the closure on the

signs in case they had bear activity but no captures and decided to stay in an area longer than

originally anticipated. (Attach. 10 at 49:15-50:14). Site #3 was off of the same spur as Site #1,

however it was approximately one-half of a mile from Forest Service trail 756. (Attach. 11 at ¶7

& Attach. 11, Ex. A). Mr. Thompson explained that Site #3 was chosen after they had seen a

grizzly bear within 100 yards of that site one day when leaving Site #1. (Attach. 5 at 61:6-

61:12).

On June 15, the Everts traveled to Montana so that Mr. Evert could attempt to sell his

plant book to various merchants and governmental agencies. (Attach. 1 at 102:6-102:8) One of

the locations Mr. Evert chose was the USGS building in Bozeman, MT. *See* Attach. 15

(O'Dwyer Depo. at 9:23-10-1).

On the day before the incident (June 16) and while attempting to sell his book at that

USGS office, Mr. Evert inquired of the USGS Administrative officer, Judy O'Dwyer, whether

the IGBST[11] was in the same office and whether they were conducting any trapping operations.

(Attach. 15 at 11:2-12:1). Mr. Evert was advised that the IGBST was in that office and that they

---

[11]   Mr. Neal testified that Mr. Evert knew what the acronym "IGBST" meant from conversations
they had together. (Attach. 7 at 50:16-51:8).

were indeed conducting trapping operations. (*Id.*). Mr. Evert did not ask any further questions on the subject and the conversation returned to his plant book. (*Id.*).

On June 17, the day of the incident, at approximately 7:30 a.m., the USGS team arrived at the parking area where they parked their truck and horse trailer. (Attach. 10 at 52:2-52:7). It was approximately 34 degrees Fahrenheit with winds blowing up to 29 miles per hour. *See* (Attach. 16 (Historical Weather Data for June 17, 2010, Eagle Wyoming); *see also* Attach. 11 at ¶11). The USGS team trailed all four horses up Kitty Creek because their hitch was over that day and they intended on pulling the sites and returning to Bozeman, MT.[12] (Attach. 10 at 53:1-53:10; *see also* Attach. 18 (Haroldson Depo., Ex. 33 at 13)). The USGS team had no plans to be back in the North Fork drainage in 2010. (Attach. 18 at 13).

The Everts awoke sometime between seven and eight a.m. that morning, had breakfast, and watched the USGS team ride past their cabin up the Kitty Creek drainage. (Attach. 1 at 153:21-154:10). Mr. Evert spoke with his daughter by telephone and told her he was planning on taking a hike and was hoping to see the team so he could "stop [them] and ask what they were doing." (Attach. 3 at 72:21-73:2). Mrs. Evert also testified that Mr. Evert intended on going on his hike up Kitty Creek[13] and that hoped to see the team so he could "ask them what they're up

---

[12] On June 17, only Sites #3 and 2 remained. On June 14, 2010, the USGS team pulled Site #1, including the snares, bait and signs. *See* Attach. 17 (Thompson Depo., Ex. 13 at Bates 4903).

[13] Mr. Neal described a favorite circuit that Mr. Evert took in the Kitty Creek drainage (one which he had been on with Mr. Evert a number of times) and which includes the Forest Service trail 756. (Attach. 7 at 19:23-22:23); *see also* (Attach 19 (Neal Depo., Ex. 47 (Mr. Evert's circuit as known, and drawn, by Neal))). Mrs. Evert and their daughter Mara Domingue also acknowledged this route Mr. Evert would take on Kitty Creek, but would not agree he traveled it

to." (Attach. 1 at 160:24-161:6). After that phone call, Mrs. Evert described Mr. Evert as "getting all excited about putting on this coat and this wool hat, because it was snowing out. And he wanted to put this scarf around his neck so he wouldn't get cold. He said, 'I'll wear my gloves too.'" (Attach. 1 at 159:18-159:21).

Between noon and 1 p.m., either while Mr. Evert was getting ready to go, or shortly thereafter,[14] Mrs. Evert had a conversation with Robert Beaver, the North Fork Cabin Owners Association President. The purpose of the call was association business, but it then turned to a discussion of Mr. Evert's plans to contact the USGS team. (Attach. 20 at ¶4). Mr. Beaver advised Mrs. Evert that Mr. Evert should not go up there if he had seen a sign stating "warning-dangerous bear activity."[15] (Attach. 20 at ¶ 5). Mr. Beaver counseled her that "Erwin should call the Forest Service to find out what was going on." (Id.).[16]

At approximately that same time, the USGS team was completing the research on bear #646 at Site #3, and in accordance with their plans to return home to Bozeman, they proceeded

---

routinely. (Attach. 1 at 95:22-96:2; Attach. 3 at 81:5-82:13). For purposes of this motion, whether Mr. Evert's "circuit" was routine or not is immaterial.

[14] Robert Beaver remembers the conversation taking place while Mr. Evert was preparing to go talk with the USGS team (Attach. 20 (Evert Depo., Ex. 42 (Beaver Decl. at ¶3))), and Mrs. Evert testified it was just shortly after Mr. Evert had left. (Attach. 1 at 164:12- 164:20). For purposes of this motion, the timing of the conversation is not material.

[15] Mrs. Evert does not remember Mr. Beaver providing that warning, but testified he "might have." (Attach. 1 at 167:19-167:23).

[16] Again, Mrs. Evert does not recall specifically what it was that Mr. Beaver advised, but admitted "he might have said something like that." (Attach. 1 at 167:24-169:8).

to pull the site. (Attach. 18 at 13).    Further, the USGS team had no plans to return to that drainage in 2010. (*Id.*). The USGS team removed the snares, the remaining obvious bait, and the closure signs. (*Id.*).

Mr. Dickinson made the decision to remove the closure signs after considering their observation of extremely limited use in the area throughout the three week period and the extreme unlikelihood that anyone would be in that exact location in the near future. (Attach. 18 at 14). As discussed above, throughout their three weeks of operating, the USGS team observed nobody on foot on the trail or decommissioned road (other than possibly the Alquists on two occasions), and they saw no obvious signs of foot travel. (*Id.*). Further, they encountered only two horse parties who advised they would not be leaving the trail. (Attach. 5 at 54:14-55:24). The weather was poor. Mr. Dickinson described it as "cold and windy with intermittent snow showers of varying intensity." (Attach. 18 at 14). According to the historical weather data station approximately 3.16 miles away,[17] it was still under 40 degrees Fahrenheit with wind gusts now up to 34 miles per hour. (Attach. 16). In sum, the USGS team simply could not conceive that on that day "anyone would be hiking in th[o]se conditions and th[at] area, especially that far back, off the trail, and where there had been multiple closure and warning signs posted for the previous several days." (Attach. 18 at 14).

---

[17] *See* Attach. 11 at ¶11.

Further, bear #646 was predictably recovering from the effects of anesthesia.[18] While the USGS team was pulling the site, Mr. Dickinson recalled, "throughout the entire time we were preparing to leave, we observed increasing signs of recovery, including swaying of the head laterally and tongue lolling, his focus on us with his head up, and his pushing up on his front legs in an attempt to stand." (Attach. 18 at 14). Mr. Thompson testified to essentially the same events.

> [A]s the bear, as we're watching the bear from horseback, we're seeing -- initially, you see early signs of recovery, that's the swinging of the head and the tongue lolling, as we described. Over time, that becomes the bear having control of its head and not swaying its head, no tongue lolling anymore. Also, at that time, the bear will be able to focus on you, and I described that, as well.

(Attach. 5 at 97:24-98:5).

Importantly, it was now after noon and the USGS team had not yet been able to check Site #2.[19] Accordingly, the USGS team had to make a decision. They were "satisfied bear #646 would soon fully recover and [they] knew [they] needed to check the other trap site [Site #2], so

---

[18] Dr. Chuck Schwartz, the IGBST team lead in 2010, testified that the observations made of bear #646 by the USGS team were the "classic" signs of a recovering bear after having been administered Telazol. (Attach. 4 at 116:16-117:4).

[19] USGS trappers strive to check all sites by noon every day for the welfare of the animal. *See* (Attach. 4 at 118:13-119:1 ("Certainly twelve o'clock is not a hard-and-fast rule as far as thou shalt check all traps by twelve noon. Clearly, if there are circumstances that preclude you from getting to a trap site prior to twelve noon, check it afterwards. The intent of this is to say that we make every effort we can to check our traps early in the morning, again, for the welfare of the animal. The fact that those guys remained with [bear #646] to ensure its welfare was a higher priority, in my mind, and obviously I believe it was a higher priority in their mind, but they also had to consider the fact that they did have additional sites to check. And so the timing of their departure is reasonable and appropriate, in my mind.")).

13

[they] decided it was appropriate to leave the site before bear #646 was fully ambulatory." (Attach. 18 at 13).

Shortly thereafter, Mr. Evert entered the former trap site and was killed by bear #646. Plaintiff now seeks damages for Mr. Evert's death.

### Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002), citing FED.R.CIV.P. 56(c). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial." *Id.* In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001), citing *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000),

citing *Adler*, 144 F.3d at 671. The movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Id.* Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986); *Spaulding*, 279 F.3d at 904, citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party cannot rest merely upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256; accord *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001). Instead, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000), quoting *Adler*, 144 F.3d at 671. The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

### Statutory Framework

The Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), provides for a limited waiver of sovereign immunity. The United States can only be liable under "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Thus, when state law provides immunity to a private person under a given set of circumstances, immunity is equally applicable to the United States under the same or similar circumstances. *See Ewell v. United*

*States*, 776 F.2d 246, 249 (10th Cir. 1985) ("immunities created by state law which are available to private persons will immunize the federal government"); *Flynn v. United States*, 902 F.2d 1524, 1527-30 (10th Cir. 1990) (applying Utah's Good Samaritan Act to immunize United States); *Banks v. United States*, 623 F. Supp. 2d 751, 752 (S.D. Miss. 2009) ("[w]here the FTCA applies, the United States can assert the same defenses available to private citizens").

Wyoming state law provides immunity to private landowners who allow people to recreate on their premises free of charge. *See* WYO. STAT. ANN. §§ 34-19-101 through 107. This Wyoming immunity statute states that:

> [e]xcept as specifically recognized by or provided in W.S. 34-19-105, an owner of land who either directly or indirectly invites or permits without charge any person to use the land for recreational purposes or a lessee of state lands does not thereby:
>
> > (i)     Extend any assurance that the premises are safe for any purpose;
> >
> > (ii)    Confer upon the person using the land the legal status of an invitee or licensee to whom a duty of care is owed;
> >
> > (iii)   Assume responsibility for or incur liability for any injury to person or property caused by an act of omission of the person using the land.

WYO. STAT. ANN. § 34-19-103. Further, "[e]xcept as specifically recognized by or provided in W.S. 34-19-105, an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure or activity on such premises to persons entering for recreational purposes." WYO. STAT. ANN. § 34-19-102. The exception, as referenced in both WYO. STAT. ANN. § 34-19-102

16

and -103, precludes immunity when a plaintiff can demonstrate a "willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity[.]" WYO. STAT. ANN. § 34-19-105(a)(i).

Plaintiff has been provided with extensive discovery materials in this case and discovery is now closed. At this stage, plaintiff may no longer rely on the bald allegations made in the complaint. The evidence, even when viewed in the light most favorable to plaintiff, demonstrates that the exception to immunity under WYO. STAT. ANN. § 34-19-105 does not apply.[20] Accordingly, the United States is immune from suit.

### Argument

### I.  There is no evidence of "willful" misconduct.

Wyoming's recreational use act does not specifically define the terms "willful" or "malicious."[21] However, plaintiff cannot reasonably dispute that under Wyoming substantive law, in order to show "willful" misconduct it is necessary to provide proof of extreme and outrageous misconduct, far in excess of what would be required to prove ordinary negligence. *See Yalowizer v. Husky Oil Co.,* 629 P.2d 465, 469 (Wyo. 1981) (requiring a demonstration showing "a conscious indifference to the consequences amounting to a willingness that they shall

---

[20]   In response to the United States' motion to dismiss, plaintiff presented a number of other theories as to why the WRUA should not apply, in addition to the exception provided in WYO. STAT. ANN. § 34-19-105. (Dkt. #14 at 5-14). This Court rejected all of plaintiff's alternative theories. (Order at 7).

[21]   The United States will limit its argument to the "willful" prong of the exception because, as this Court has previously recognized, "[t]he Plaintiff has made no allegation that the United States acted with the requisite intent to injure implied by the term 'malice.'" (Order at 8).

follow"); *Bryant v. Hornbuckle*, 728 P.2d 1132, 1136 (Wyo. 1986) (requiring plaintiff demonstrate the "actor has intentionally committed an act of unreasonable character in disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow"); *Danculovich v. Brown*, 593 P.2d 187, 191, 193 (Wyo. 1979) ("willful" misconduct is "an extreme departure from ordinary care, in a situation where a high degree of danger is apparent"); *Mitchell v. Walters*, 100 P.2d 102, 107 (Wyo. 1940) ("[w]illful misconduct is the intentional doing of something . . . under circumstances tending to disclose the [actor]'s knowledge, express or implied, that an injury . . . will be a *probable* result of such conduct. It differs from negligence, even gross negligence, although it may include gross negligence, and involves a *distinct positive element* as distinguished from the merely negative element of negligence or carelessness. *It is willfully designed to accomplish a specific result, and is not aimless of purpose or regardless of results.*"). (Emphases added).

With these authorities in mind, this Court held that in order to overcome immunity, the plaintiff would be required to "provide factual content from which a reasonable inference can be made that the government's failure to guard or warn involves intent, not inadvertence, by way of facts showing that the government disregarded a known or obvious risk and that the risk was so great as to make it obvious that harm would follow." (Order at 9).[22]   Plaintiff cannot fulfill this requirement.

---

[22]   The United States maintains its position that under Wyoming law, the proper test for "willful" failure to guard or warn is best understood from the definition of willful and wanton misconduct as found in *Yalowizer*, 629 P.2d 465 and other Wyoming case law cited above. However, the facts of this case demonstrate that the United States is immune from suit even

In denying the United States' initial motion, this Court relied upon (as it was required to) important allegations in the complaint that have now been conclusively refuted. First, this Court was led to believe that that the trap site was near the cabins along the trail. (*See* Compl. ¶65; Order at 10-11). However, site #3 was not on a trail. It was on a decommissioned and obliterated spur, and it was approximately one-half mile off of Forest Service trail 756 (the juncture to which is approximately a mile from the head of the Forest Service trail 756 itself). (Attach. 11 at ¶¶5 & 7); *see also* (Attach. 11, Ex. A).

Second, this Court was led to believe that the United States could have anticipated the public traveling a path to the trap site. (*See* Compl. ¶63; Order at 10-11). However, the USGS team had no knowledge of any human presence anywhere off of Forest Service trail 756 or the parallel decommissioned road.[23] In fact, the USGS team was looking for hiker's tracks throughout the time they were trapping in Kitty Creek and they saw none. (Attach. 10 at 88:25-89:11). Even when the evidence is viewed in the light most favorable to plaintiff, the USGS team would have encountered the Alquists and horsemen only twice each throughout the entire three weeks they travelled back and forth, and these encounters would have been *on* Forest Service trail 756 or the parallel decommissioned road. In addition, the only people regularly

---

under the definition of "willful" as adopted by this Court in its order denying the United States' motion to dismiss.

[23] Human activity can cause the USGS team to close trap sites. *See* Attach. 9 at Bates 000040 (USGS team "pulled" Blackwater trap site shortly after setting it, partly due to the observed human activity there).

present at the cabins were the Everts and one person at the Alquists' cabin,[24] which is consistent with the Shoshone National Forest biologist's understanding that "the Kitty Creek cabins and Forest Service trail 756 do not historically have much use in May and early June." (Attach. 8 at ¶6). Finally, on the day of the incident, it was cold and intermittently snowing. (Attach. 1 at 159:18-159:21; Attach 18 at 14). At approximately 1 p.m. it was still only 35 degrees Fahrenheit, and the wind was gusting up to 34 miles per hour. (Attach. 16).

These facts do not support the theory that the USGS team should have reasonably anticipated someone would be hiking that day half of a mile off of, and uphill from, the trail/decommissioned road in blowing, snowing, cold weather. Yet plaintiff's burden of proof here is much higher than what should have been "reasonably anticipated." The United States is entitled to immunity unless the plaintiff satisfies this Court's requirement that on June 17, 2010, the risk of someone encountering bear #646 at Site #3 was "sufficiently great to make it *obvious* to [the USGS team] that the specific risk and harm of a bear mauling would follow." (Order at 11 (emphasis added)). In light of the remoteness of the trap site, the inclement weather, lack of human presence, and the anticipation that bear #646 would soon be ambulatory, it was far from obvious—indeed, it was highly unlikely—that an encounter and fatal mauling would occur, regardless of whether each cabin owner had been given specific notice of the USGS team's activities. For this reason alone, the United States is immune from suit and entitled to judgment as a matter of law.

---

[24] (Attach. 1 at 175:17-176:4).

## II.    Mr. Evert had knowledge of the USGS team's activities.

Plaintiff's claim fails for a separate reason.  It is undisputed that Mr. Evert had discovered at least one of the trap sites that warned of a "dangerous bear." (Attach. 7 at 48:3-49:4).  There is also no dispute that he was warned by a trusted friend and hiking companion, who literally wrote a book on grizzly bear encounters, to stay away because the "dangerous bear" sign meant the team was either "hair snare trapping or live trapping" and that in either case it would "involve some kind of smelly bait, some kind of odoriferous bait designed to attract to bears[.]" (Attach. 7 at 46:7-47:17).  Third, on the day before his death, Mr. Evert was placed on notice, from USGS personnel, that the grizzly bear study team was indeed trapping. (Attach. 15 at 11:2-12:1).  Accordingly, plaintiff cannot prove another of the required elements—"that the IGBST's bear trap operations were not known . . . to Evert." (Order at 11).

Mr. Evert was not some "unsuspecting, recreating person[.]"  (*Id.* at 10).  In fact, the only reasonable inference that can be made from the evidence of record is that Mr. Evert went to site #3 specifically because the USGS's bear trapping operations *were* known to him.  Despite the information he had gathered and the warnings he received, Mr. Evert set out hiking that windy cold day (with no bear bells, bear spray, or a gun) in the same direction as the previously discovered trap site, with one of his goals being "to stop and ask what [Mr. Dickinson and Mr. Thompson] were doing." (Attach. 3 at 72:21-73:2).  Mr. Evert, who had a "natural curiosity which was part of his personality as a scientist[,]"[25] then followed the trappers' horse tracks off of Forest Service trail 756 up and to the incident site seeking to encounter the team.  *See* Attach.

---

[25]   Attach. 3 at 81:1-81:4.

7 at 57:24-59:2 (Mr. Neal could conjure up no other reason Mr. Evert would have gone to the location of Site #3 "other than wanting to see the men"); *see also* (Attach. 3 at 52:7-52:18 (in all the years of hiking with her father, Ms. Domingue had previously never had a reason to be any closer than approximately one quarter mile from the incident site)).

Mr. Evert had knowledge of the USGS team's activities.   Accordingly, for two independent reasons, the United States is immune from suit and entitled to judgment as a matter of law.

### Conclusion

Plaintiff has failed to establish facts supporting the "important elements" which this Court stated would be required to overcome immunity.   Aside from the question of whether a plausible negligence claim can be maintained at this stage of proceedings, evidence of "willful or malicious" misconduct is entirely lacking in this case.   There being no genuine issue of material fact in dispute, the United States is immune from suit under the provisions of the WRUA. (WYO. STAT. ANN. §§ 34-19-101 through 107).   Accordingly, the United States is entitled to judgment in its favor as a matter of law.

Respectfully submitted this 19th day of September, 2012.

CHRISTOPHER A. CROFTS
United States Attorney

By:

C. LEVI MARTIN
NICHOLAS VASSALLO
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a true and correct copy of the foregoing *Memorandum in Support of Defendant's Motion for Summary Judgment based upon Wyoming's Recreational Use Act* has been served upon the following by the method(s) indicated below on September 19th, 2012.

Emily R. Rankin & Mark Aronowitz       [X] By U.S. Mail - postage prepaid
The Spence Firm                        [ ] By Hand Delivery
P.O. Box 548                           [ ] By Overnight Courier
Jackson, WY 83001                      [ ] By Electronic Filing/Email
307-733-5248
*Attorney for Plaintiff*

Office of the United States Attorney