Emily R. Rankin, #6-3451
Mark L. Aronowitz, #6-4064
THE SPENCE LAW FIRM, LLC
15 South Jackson Street
P.O. Box 548
Jackson, Wyoming 83001
Telephone: (307) 733-7290
Facsimile: (307) 733-5248
rankin@spencelawyers.com
aronowitz@spencelawyers.com

ATTORNEYS FOR PLAINTIFF

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| YOLANDA EVERT, individually and as the Qualified Wrongful Death Representative of Erwin Evert, deceased, | ) ) ) ) | |
| Plaintiff, | ) | Civil No. 11-CV-339-F |
| v. | ) ) | |
| THE UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BASED UPON WYOMING'S RECREATIONAL USE ACT

Plaintiff, by and through counsel, Emily R. Rankin and Mark L. Aronowitz of the Spence Law Firm, LLC, hereby files her Brief in Opposition to Defendant's Motion for Summary Judgment Based Upon Wyoming's Recreational Use Act. Plaintiff requests Defendant's Motion be denied in its entirety pursuant to the following argument and authority.

## PLAINTIFF'S OPPOSITION TO THE GOVERNMENT'S MOTION

The government seeks immunity based on Wyoming's Recreational Use Act, Wyo. Stat. §§ 34-19-101 *et. seq.* (WRUA) and claims there are no genuine issues of material fact surrounding the question of whether its employees acted willfully. To the contrary, reviewing the facts in the light most favorable to the Plaintiff as this Court is required to do, Plaintiff herein demonstrates a strong factual record exists "from which a reasonable inference can be made that the government's failure to guard or warn involves intent, not inadvertence, by way of facts showing that the government disregarded a known or obvious risk and that the risk was so great as to make it obvious that harm would follow." (Exhibit 1, Court Order at 9) To find for defendant, the Court must find the *absence* of a genuine issue of a material fact that defendant acted willfully, and cannot do so.

## STANDARD OF REVIEW – THE GOVERNMENT'S BURDEN

According to Federal Rule of Civil Procedure Rule 56(c), summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The government can meet its burden only by identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1968).  A "genuine" issue exists where "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A "material" issue is determined by the underlying substantive law, and is one that might affect the outcome of the case.  *Id.* at 248.  "[D]isputes over facts that might properly affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.

"On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).  Beyond the initial threshold analysis, the Court's role at this stage is limited.  Determining credibility, weighing evidence and drawing inferences are matters reserved exclusively for the finder of fact, and not on summary judgment. *Anderson*, 477 U.S. at 254-55.  If reasonable minds could differ as to the import of the evidence, summary judgment is not appropriate.  *Id.* at 251.  Indeed, in *Gray v. Snow King*, 889 F. Supp. 1473, 1475-76 (D. Wyo. 1995), the court stated:

> This Court grants summary judgment only when the material facts surrounding a particular claim are sufficiently clear to obviate the need for a trial. Because summary judgment is an extraordinarily powerful declaration based primarily on motion rather than the live presentation of testimony and other evidence, this Court must apply an extra measure of caution in scrutinizing the parties' contentions for an absence of genuine dispute as to the material facts of a claim or contention. The hurdle of summary judgment is further elevated by the requirement that a court examine all evidence in the light most favorable to the nonmoving party.

## FACTS

### Trapping Operations in the Kitty Creek Drainage

The Interagency Grizzly Bear Study Team (IGBST) is administered by the United States Geological Survey (USGS).  The team is comprised of an interdisciplinary group of personnel responsible for long-term monitoring and research efforts on grizzly bears in the Greater Yellowstone ecosystem.  On May 27, 2010, an IGBST field crew consisting of federal employees, Chad Dickinson and Seth Thompson, began grizzly bear capture operations in the Kitty Creek drainage.  (Exhibit 2 at 2-3.)  Mr. Dickinson was the lead trapper.  (Exhibit 3 at pg. 11.)

Kitty Creek is a tributary of the North Fork of the Shoshone River south of U.S. Highway 20 and approximately seven miles from the East Entrance to Yellowstone National Park. (Exhibit 2 at 3.)  At the bottom of the Kitty Creek drainage, there are fourteen private cabins authorized under special Forest Service permits.  *Id.*  The Everts purchased their cabin in 1971 and lived there seasonally for 40 years.  (Exhibit 4. At 10; Exhibit 2 at 4.)

The fourteen Kitty Creek cabins are accessible to vehicles using Forest Service Road 448. (Exhibit 2 at 3.)  Adjacent to the uppermost cabin, which belongs to Dennis and Maryann Alquist, Road #448 ends and Forest Service trail #756 begins.  *Id.* at 3 (Exhibit 5 at 71.)  F.S. Road #448 used to continue up the Kitty Creek drainage, but was decommissioned in the late 1990's and is no longer used for motorized travel.  (Exhibit 2 at 3.)  The decommissioned road (former #448) parallels trail #756.  *Id.*  In addition to trail #756 and the decommissioned road, the Kitty Creek drainage has multiple decommissioned spur roads that were formerly used for logging.  (Declaration of Scott Bragonier at ¶ 3.)  Trail #756 and the decommissioned road and its spurs are public lands within the Shoshone National Forest.   Exhibit A of Scott Bragonier's Declaration contains two color coded maps of F.S. Road #448, F.S. Trail #756 and the two decommissioned spur roads leading to Sites 1, 2 and 3.  Exhibit A of Mr. Bragonier's declaration shows that Sites 1, 2 and 3 are all either on, or immediately adjacent to, two different decommissioned spur roads.  The two decommissioned spur roads are directly accessible from F.S. Trail #756.  *Id.*  Although the parties use different adjectives to describe the various Kitty Creek roads, trails and spurs, Photographs 6, 7, 9 (Spur Road leading to Site 1 and 3), and 11 (Spur Road leading to Site 2), depict obvious routes through an otherwise mature conifer forest.

(Bragonier Declaration, Exhibit C; see also Exhibit 6 at exh.1-3 and Exhibit 2 at 7.)  In 2010, the access route to Site #3, the decommissioned spur road, "became even more obvious over time with the daily use of the trapping crew."  (Exhibit 2 at 6; Exhibit 7. at ¶12; Exhibit 8 at ¶12.) During their seventeen days actively conducting trapping operations in the Kitty Creek drainage, the field crew traveled with three or four horses, depending on how much gear or bait they were carrying or dragging.  (Exhibit 9 at 60; Exhibit 3 at 53 and 80; Exhibit 2 at 10).

Mr. Bragonier, an investigator for the U.S. Forest Service, stated that the spur road leading to Site #3 "did not lead to anything of general or specific interest."  (Bragonier Dec. at ¶ 5)  Contrary to the government's position, Mara has hiked with her father on the prominent peak accessible from either of the spur roads, affectionately renamed Mara Mountain; "the tall mountain right below where Dad was killed."  (Exhibit 11 at 41.)   Ms. Domingue has also hiked with her father on many of the old logging spurs and decommissioned roads.  (Exhibit 11 at 22-24.)  Yolanda Evert hiked with her husband on "all those little trails, all those decommissioned roads" in the Kitty Creek drainage.  (Exhibit 4 at 171.)

From May 27-June 17, the day Erwin Evert was mauled, the IGBST field crew ran three separate trap sites in the Kitty Creek drainage.  (See Bragonier Dec. Exhibits A and B for Map and Images.)  From May 27-June 3, the IGBST field crew conducted trapping operations at Kitty Creek Site #1.  (Exhibit 2 at 10.)  The first period of research ended and the field crew went home to Montana from June 4th-8th.  *Id.*  The field crew resumed trapping operations at Site #1 on June 9th, continuing until June 14th when, having failed to capture any grizzly bears, the crew pulled Site #1 and removed posted warning signs.  *Id.*  From June 9th-17th, the crew conducted trapping operations at a new site known as Site #2.  *Id.*  Additionally, from June 12th-17th, the crew conducted trapping operations at Site #3 – the subject site at issue in this case.  *Id.*  No bears were captured at any site in the Kitty Creek drainage until the day Erwin died.  *Id.* at 3.

Though Sites #1 and #3 were accessible by both the main trail and decommissioned road, the government employees used the decommissioned road the majority of the time when accessing the sites #1 an 3.  (Exhibit 3 at 43.)  Though they claim they were looking for public use of the trails, Mr. Dickinson could only recall that they rode the main trail "once or twice."

(Exhibit 3 at 52.)  Site #3 was 3700' straight line distance from the Alquist's cabin and 1700' straight line distance from Trail #756.  (Exhibit 2 at 6; Bragonier Declaration Exhibit A (maps, not distance)).  As evidence of the close proximity to the cabins, the crew could reach Site #3 from where they parked their trailer, below all 14 cabins, in an average of 45 minutes.  (Exhibit 3 at 52.)

**The IGBST's Mandatory and Specific Duty to Warn**

On July 21, 1997, the Shoshone National Forest instituted a closure order for grizzly bear trapping and collaring areas to minimize human/bear encounters.  (Exhibit 12 at 3.)  The Order mandated that closure areas be marked on the ground with closure signs.  In January of 2010, the IGBST obtained a Chapter 33 permit (#439) from the Wyoming Game and Fish Department.  (Exhibit 13.)  The permit allowed the IGBST "[t]o conduct capture operations in order to monitor grizzly bear population, survival, and occupancy in the greater Yellowstone ecosystem for grizzly bear recovery efforts."  *Id.*  The Chapter 33 permit specifically mandated that, "All trap sites shall occur on public lands and will be signed to alert the public if they inadvertently approach a baited trap site."  On March 30, 2010, the IGBST was issued a "Subpermit for handling research grizzly bears" from the U.S. Fish and Wildlife Service.  (Exhibit 14.) The FWS Permit directed that, "Every possible precaution shall be taken to avoid confrontations between bears and the public, including but not limited to closure or signing of the study sites." *Id.*  Furthermore, the IGBST's own existing protocols clearly state that, "Government and state employees have the obligation to protect people.  The majority of the public assumes that they will be warned if dangerous animals are in the area . . . It all comes down to an issue of 'adequate warning.'  When a researcher or manager can prevent an injury by informing the public, they have the duty to do so . . . Bear researchers and managers must make careful decisions and always warn the public when a trap has been placed in the vicinity or when there is a potential for a confrontation.  Education and communication are the best tools when working with the media and the public."  (Exhibit 2 at 53-56.)

**The IGBST Never Warned Any Kitty Creek Resident of its Trapping Operations**

5

The government's employees conceded that the only steps taken to warn the public of their trapping operations was to place signs immediately around each trap site.  (Exhibit 3, pgs. 31-33)  There were no warning signs at the trailhead or along either the main trail or decommissioned road used to access site #3.  Though they were aware that cabin residents were in the area, and waved to Mr. Evert, the IGBST field crew did not speak to Kitty Creek residents to inquire about their use of the trail system.  (Exhibit 3, pg. 33; Exhibit 9, pg. 50)  As discussed more thoroughly below, the IGBST crew did speak with cabin resident, Dennis Alquist, by happenstance, however the testimony is completely contradictory as to whether they told him they were doing anything more than "research" and it is undisputed that no warnings were given. (Exhibit 8; Exhibit 7 at ¶¶ 5, 8-9; Exhibit 5 at 62-64.)  The field crew never informed anyone that they were with the Interagency Grizzly Bear Study Team; were trapping bears on a trail system within the Kitty Creek drainage; within a mile of the Kitty Creek cabins; using bait to lure bears to their sites including dragging the trails with parts of ungulate carcasses; that if in fact a grizzly bear was captured it could be snared for up to twenty hours; that snared bears are under extreme stress and are dangerous when released; or that snared bears would be released while still under the effects of anesthesia without any warning signs present.   (Exhibit 9, pgs. 38-41.)

Because they were never informed or warned, other cabin residents were surprised, and even felt naïve, when they learned after Erwin's mauling that the IGBST was trapping grizzly bears in the Kitty Creek drainage.  (See Exhibit 15 ¶¶ 3, 5; Exhibit 7 at ¶10; Exhibit 8 at ¶10; Exhibit 5 at 69-70.)

**Chad Dickinson Assumed the Duty to Warn Kitty Creek Residents of the IGBST's Trapping Operations**

Before the IGBST began their grizzly bear capture operations in Kitty Creek, Andy Pils, a wildlife biologist with the Shoshone National Forest, spoke with Anita Harper, a colleague with the Shoshone National Forest in charge of special use permits about how the IGBST should provide trapping information to Kitty Creek cabin residents.  (Exhibit 16 at 2.)  Mr. Pils recommended IGBST trappers inform the residents of their trapping activities *Id.*  Ms. Harper agreed and Mr. Pils accordingly asked Mr. Dickinson "if they would talk to the recreation

residence owners and inform them of their activities.  Chad said he would do that." *Id.*[1]  Mr. Pils documented his discussions with Mr. Dickinson shortly after Erwin was mauled.  (Exhibit 16.) The crew's supervisor and current IGBST leader, Mark Haroldson, testified that "[i]f the Forest Service had a particular request for a specific action, yeah, I would have expected that our guys would have complied with it."  (Exhibit 17, pg. 36.)  However, neither the field crew, nor any IGBST employee, made any attempt to warn any Kitty Creek resident of their trapping operations despite every opportunity to do so.  (Exhibit 9, pgs. 39-41; Exhibit 3, pg. 28.)

**The Public's Use of the Kitty Creek Trails**

Despite the federal employees' characterization, the Kitty Creek trail system is well used. (Exhibit 8. at ¶11; Exhibit 7 at ¶11.)  Beginning in late May of 2010, Lonnie Gambrel was a guest of Kitty Creek cabin owners, Dennis and Maryann Alquist.  (Exhibit 8 at ¶ 2.)  From the porch or through the window of the Alquist cabin, Mr. Gambrel could see adults and children, hiking and on horseback, using the Kitty Creek trail system.  *Id.* at ¶11.)  He also observed boy scouts, who have a camp nearby, using the trail and a local dude ranch often riding the trails a few times a day.  *Id.*; see also Exhibit 4 pg. at 171.  Maryann Alquist witnessed cabin owners and their guests, boy scouts, dude ranches and tourists using the Kitty Creek trail system including the decommissioned roads.  (Exhibit 7 at ¶11.)  Dennis Alquist also testified that he has seen hikers using the Kitty Creek trail system in May and June including the Boy Scouts.  (Exhibit 5, pgs. 73-74.)  Mr. Alquist testified, "the trail is very well traveled."  *Id.* at 82-83.  On June 14, 2011, almost exactly one year later, during his only visit to Kitty Creek, plaintiff's expert Wayne McCrory photographed a small horse group riding on the Kitty Creek trail.  (Exhibit 6 at exh. 5.)

**The IGBST Field Crew's Failure to Warn the Public and Kitty Creek Residents Despite Personal Encounters on the Kitty Creek Trail System**

Despite the limited amount of time the crew spent on the trails, the field crew encountered a dude ride from a nearby ranch, with five or six people on the main decommissioned road.  (Exhibit 3, pg. 37; Exhibit 9, pg. at 53.)  The crew also encountered a

---

[1] Mr. Dickinson testified that he could not recall the conversation though, given ample opportunity to do so, he never denied that the conversation occurred.  (Exhibit 3, pgs. at 16, 17-19.)

different horse party, with at least two riders, near the Kitty Creek trailhead.  (Exhibit 9 at 52.)
Mr. Dickinson had at least three conversations or encounters with Dennis Alquist.  (Exhibit 3 pgs
19-20.)  The first meeting with Mr. Alquist occurred on or around May 31st.  (Exhibit 3. at 19:
20-22; Exhibit 7 at ¶ 4)  Mr. Dickinson testified that Mr. Alquist was "outside his cabin"
however Mr. Alquist testified that he was "hiking up the Kitty Creek, up the old logging trail"
approximately "400 feet [from where the main decommissioned road meets the decommissioned
spur road leading directly to site #3]" (Exhibit 3 at 21:15; Exhibit 5 at 51:5-6, 52: 6-10; *see also*
Exhibit 7 at ¶4: "approximately 400 feet from where the decommissioned road meets the logging
spur road leading directly to what I understand to be Site #3.")  The location that the Alquists
described encountering the field crew is just half a mile from site #3.  (Bragonier Declaration at ¶
7)  Although disputed by Mr. Thompson, Mr. Alquist testified the crew only told him they were
"studying bears."  (Exhibit 5 at 53: 16.)  The crew did not mention the live capture, snaring or
trapping of grizzly bears, and indisputably did not provide the Alquists with any kind of warning.
(Exhibit 7 at ¶¶ 5, 6.)  The field crew's second encounter between the Alquists and Mr. Gambrel
occurred on the main decommissioned road.  (Exhibit 8 at ¶ 6.)   Despite these encounters, at no
time prior to Mr. Evert's mauling did the Alquists or Mr. Gambrel receive any warning or
information from the IGBST field crew regarding their grizzly bear capture activities.  (Exhibit 5
at 68: 16-25; Exhibit 8 at ¶¶ 7, 10; Exhibit 7 at ¶¶ 6, 8, 9.)

**IGBST's Site #3**

On June 12th 2010, the field crew created Site #3 and set 2 snares.  (Dickinson Depo. at
48: 16; Schwartz Depo. Ex. 3 at 6, 10.)  The crew placed five warning/closure signs along "the
obvious access route."  *Id*. at 6.  Three of the five signs were placed along the decommissioned
spur road.  (Dickinson Depo. at 48: 2-7.)  Therefore, had they not been removed, a hiker
traveling up the decommissioned spur road leading to Site #3 would have passed three warning
signs.  *Id*.; see also Thompson Depo. at 65: 16-18, 66: 3-8; Schwartz Depo. Ex. 3 at 104.)  Each
of the five signs at Site #3 warned:

**DANGER!**
**BEAR TRAP IN THE AREA**
**THE AREA BEHIND THIS SIGN IS**

**TEMPORARILY CLOSED.  THE
CLOSURE IS EFFECTIVE FROM
<u>6-11-10</u> TO <u>6-20-10</u>.**

SPECIAL ORDER 97-008
SHOSHONE NATIONAL FOREST

(Dickinson Depo. Ex. 27 at EVERT_0006413.)  Despite intending trapping operations to conclude on June 17th, the IGBST crew designated the closure end date as "6-20-10."  *Id*.; see also Dickinson Depo. at 49: 12-13; 23-25.

On the evening of June 16th, three snares were in place at Site #3.  (Thompson Depo. at 68: 9-11).  The snares were baited in order to lure a grizzly bear to a very specific spot in the forest.  (Thompson Depo. at 77: 5-7.)  Snares, including pail set snares, can cause significant pain and trauma, including physical and physiological injury to captured bears.  (Expert Report of Marc Cattet at 9-10**)**.  The likelihood and severity of certain physical or physiological injuries can increase with the duration of time a bear is restrained by the snare.  *Id*. at 10.  Bear #646 may have been snared for upwards of 18-20 hours before the field crew arrived at Site #3.  (Thompson Depo. at 81: 3-5).  Mr. Thompson agreed that when bears are being trapped, handled and released, the bear is under severe stress and trauma.  (Thompson Depo. at 102: 12-15.)  Dr. Schwartz, IGBST leader, also recognized that being snared is a traumatic event for a grizzly bear and bears can react adversely.  (Schwartz depo pg. 11.

**Erwin Evert**

Erwin Evert hiked extensively in the Greater Yellowstone area and the Kitty Creek drainage.  (Neal Depo. at 22:24-23:5.)  Over the decades, Erwin and his only child, Mara, frequently hiked together.  (Y. Evert Depo. 12:5-7; M. Domingue Depo. 22:11-14).  Mara estimates having hiked with her father in the Kitty Creek drainage approximately 100-150 times.  (M. Domingue Depo. 39:9-12.)  Erwin was an accomplished botanist who published the 751-page "*Vascular Plants of the Greater Yellowstone Area: Annotated Catalog and Atlas"* in 2010, shortly before his death.  Hiking and his and botanical research were almost always intertwined.  (Y. Evert Depo. at 12: 8-13; M. Domingue Depo. at 37: 6-9.)  Erwin hiked throughout the Kitty Creek drainage for exercise and to look for plants and did not hike a regular route or circuit when

9

hiking in the Kitty Creek drainage.  (Y. Evert. Depo. at 95:22 – 96:2.; M. Domingue Depo. at 41:11 - 42: 6.)  While hiking, Erwin was always looking at the plant life.  (Y. Evert Depo. at 12: 12-13.)

Chuck Neal, Erwin's friend, hiked with Erwin "numerous times" over the years including several days each summer.  (Neal Depo. at 17:20-22; 18: 23-24.)  They hiked in many locations within the Greater Yellowstone area including the Kitty Creek drainage.  (Neal Depo. at 17:25-18: 1-22.)  Mr. Neal described Erwin as a superb physical specimen who could walk miles and miles, climb elevations, and take the harder hiking route because he enjoyed the workout and heavy breathing.  (Schwartz Depo. Ex. 3 at 93.)  Mr. Neal recalls seeing bears with Erwin several times over their years hiking together.  (Neal Depo. at 23:6-11.)  Mr. Neal stated that Erwin knew a great deal about how to behave around bears, acted appropriately, did not approach bears, and that Erwin was not that interested in bears.  (Neal Depo. at 26:7-11.)  Mr. Neal believes that Erwin would not have walked an extra 50 feet to see a bear.  (Neal Depo. at 42:8-9.)

**July 17, 2010 – The Day Erwin Evert Was Mauled to Death**

On the morning of June 17th, the IGBST crew traveled to Site #3 with four horses because they were going to pull the remaining trap sites and go home, regardless of whether they caught a bear.  (Dickinson Depo. at 53: 1-10; Thompson Depo. at 61: 1-5.)  As they approached Site #3, they saw a grizzly bear in the snare.  *Id*. at 53: 19-21; Thompson Depo. at 82: 12-14.  Once snared, Bear #646 presented a great risk to humans as evidenced by his attempts to charge the IGBST crew, several hours prior to fatally attacking Mr. Evert.  (Expert Report of Marc Cattet at 24.)  The bear charged the government employees a couple of times and bit on the snare cable a lot, a reaction consistent with what Mr. Dickinson had previously experienced with other bears.  (Dickinson Depo. at 55: 3-8; 63: 10-12; Thompson Depo. at 86: 4-6.)  The bear was an adult male that had never previously been captured or had any human conflict.  (Schwartz Depo. Ex. 3 at 3.)

The field crew immobilized the bear with three separate doses of the anesthesia, Telezol.  (Dickinson Depo. at 55: 15-23.)  The administration of three doses of anesthesia to Bear #646 over a 48 minute period likely extended the recovery period beyond the duration it would have

been if the anesthesia had been administered as a single dose.  (Expert Report of Marc Cattet at 14.)

Once Bear #646 was immobilized, the crew began various tasks including removing a tooth.  (Thompson Depo. at 88: 3-11.)  Mr. Thompson had difficulty removing the bear's tooth, which necessitated additional anesthesia.  *Id*. at 88: 12-13; see also Dickinson Depo. at 57: 14, 58: 5-8.)  In addition to removing the tooth, the field crew tattooed the bear's lips, tagged both ears, drew blood and collared the bear.  (Dickinson Depo. at 64: 1-9.)  The analgesic effect of Telazol is generally poor and inadequate for painful procedures carried out on captured bears including tooth extraction, lip tattoo and application of ear-tags.  (Cattet Expert Report at 19.)

June 17th 2010 was the only day the field crew captured a grizzly bear in the Kitty Creek drainage.  (Schwartz Depo. Ex. 3 at 3.)  Nevertheless, according to a predetermined plan, Mr. Dickinson deliberately removed each warning sign at Site #3 before Bear #646 recovered from anesthesia or gained the ability to stand.  (Dickinson Depo. at 59: 18-19; 60: 2-8; Expert Report of Marc Cattet at 21; Dickinson Depo. at 10-22; Thompson Depo. at 97: 6-13).   The government employee's plan, developed prior to arriving at Site #3 on the morning of June 17th, was to pull all of the signs, regardless of whether a grizzly had been captured.  (Dickinson Depo. at 59: 13-17; Thompson Depo. at 61: 1-5.)  When the IGBST crew left Site #3 and Bear #646, at approximately 12:30 PM, the bear was lying on the ground exactly where the IGBST crew snared and handled him.  (Dickinson Depo. at 67: 3-8.)  After departing Site #3, the government employees rode to Site #2 and discovered that a female bear was captured.  (Dickinson Depo. at 53: 11-13; Depo. Ex. 3 at 3, 10).

The Everts had previously seen two men on horseback come down F.S. Road 448 typically around 12:30 or 1:00 PM.  (Y. Evert Depo. at 113: 13-15.)  Erwin wanted to get some exercise after traveling to Montana for two days, and told his wife and daughter that "hopefully I will see [the two men on horseback] on the road 448 as they come down and I'll ask them what they're up to."  *Id*. at 160: 18 – 161: 6; M. Domingue Depo. at 72: 16 – 73: 2.   Road 448 remains accessible to vehicles and runs alongside the cabins.  At approximately 12:45 P.M., Erwin left his cabin for a hike and told Yolanda he would return no later than 4:00 or 4:30 P.M.

(Y. Evert Depo. at 159-160; Schwartz Depo. Ex. 3 at 4.)  Erwin Evert was fatally mauled by Bear #646 at Site #3.  He received numerous severe bite wounds and the cause of death was a bite to the head.  (Schwartz Depo. Ex. at 9.)  Mr. Evert's body was found approximately 21 yards north of the snare tree where Bear #646 had been captured and left.  *Id.* at 7.  Bear #646 was destroyed on June 19th and subsequent DNA testing confirmed that Bear #646 killed Erwin Evert.  *Id.* at 9.

At approximately 5:00 or 5:30 PM, Yolanda saw Mr. Dickinson and Mr. Thompson, called and waved and asked whether they had seen a man with a grey beard.  (Y. Evert Depo. at 173: 13-17.)  Despite twice a day travel past the Everts' cabin, this is the first time the IGBST crew had any contact Yolanda Evert.  (Dickinson Depo. at 90)  Mr. Dickinson told Yolanda that they had not seen anyone.  (Dickinson Depo. at 84)  During this brief discussion, because she was never informed, Yolanda asked what Mr. Dickinson and Mr. Thompson were doing in the drainage and Mr. Dickinson responded that they had been conducting grizzly bear research.  Yolanda said that Erwin had gone for a hike.  (Dickinson Depo. at 84.)  Mr. Dickinson immediately took off on his horse and rode directly to Site #3.  (Y. Evert Depo. at 173; Dickinson Depo. at 84.)  He saw a boot track on the decommissioned spur road heading directly into Site #3 at a location where a person traveling up that spur road would have seen the warning signs had signs been present.  *Id.* at 88: 3-12.  Mr. Dickinson found Erwin dead.  (Schwartz Depo. Ex. at 1.)  He would later write, "I thought this whole event was my fault."  (Dickinson Depo. Ex. 29 at EVERT_0006024.)

**Post-Fatality Misinformation**

In an effort to blame the victim for their own derelictions of duty and evade responsibility, the government disseminated misinformation about Erwin's death.  Mr. Dickinson never told Yolanda or Mara that he had removed all of the warning signs at the site where Erwin was mauled.  *Id.* at 91: 8-10.  Though he changes his meaning now, Chris Servheen, a member of the Investigative Team and the Fish and Wildlife Service Grizzly Bear Recovery Leader, told the media that it would have been impossible to enter site #3 on June 17, 2010, without noticing signs.  (Servheen Depo., pg. 51)  Following the death of their husband and father, Yolanda and

Mara were led to believe by the government that Erwin was killed at Site #2, a location where he had reportedly seen a "Dangerous Bear" sign on June 9th or 10th.  (M. Domingue Depo. at 112: 4-10. 113:7-13.)   Until a month later when the Investigation Team Report finally described three different trapping sites and the removal of all warning signs at Site #3 at approximately 12:30 P.M. on June 17th, they did not know that Erwin was mauled at a completely different, and unsigned site than he had seen previously.  (M. Domingue Depo. at 113: 3-6.)

At the time of his death, on June 17, 2010, Erwin and Yolanda Evert had been married for 46 years.  Mara Domingue is their only child.

ARGUMENT

Defendant claims immunity for its actions pursuant to the Wyoming Recreation Use Act (WRUA).  The WRUA states, in pertinent part:

> (a)  Except as specifically recognized by or provided in W.S. 34-19-105, an owner of land who either directly or indirectly invites or permits without charge any person to use the land for recreational purposes or a lessee of states lands does not thereby:
>
> (i)      Extend any assurance that the premises are safe for any purpose'
>
> (ii)     Confer upon the person using the land the legal status of an invitee or licensee to whom a duty of care is owned;
>
> (iii)    Assume responsibility for or incur liability for any injury to person or property caused by an act of omission of the person using the land.

Wyo. Stat. § 34-19-102.

> (a)      Nothing in this act limits in any way any liability which otherwise exists:
>
> (i)      For willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity . . . .

In its Memorandum and Order Denying Defendant's Motion to Dismiss, dated February 15, 2012, this Court recognized that the WRUA does not limit liability in every circumstance. "Significantly, the WRUA does not limit liability in cases of injury or death resulting from a landowner's "willful or malicious failure to guard or warn against a dangerous condition, use

structure, or activity." Wyo. Stat. § 34-19-105." Order Denying Defendant's Motion to Dismiss at 8. In its brief, Defendant attempts to inject a willfulness standard that was previously rejected by this Court's in its Memorandum and Order Denying Defendant's Motion to Dismiss. The Court set forth the proper and applicable test for the willful failure to guard or warn under these circumstances:

> The Court is convinced, however, that the Plaintiff must provide factual content from which a reasonable inference can be made that the government's failure to guard or warn involve intent, not inadvertence, by way of facts showing that the government disregarded a known or obvious risk and that the risk was so great as to make it obvious that harm would follow. Finally, applying law from jurisdictions with identical "willful or malicious failure to guard or warn" language, the Court will also require factual content from which a reasonable inference can be made that the risk was neither obvious to those entering the premises nor inherent in the recreational activity. (Citation omitted.)

Order Denying Defendant's Motion to Dismiss at 9-10, dated February 15, 2012. Analyzing that standard, and reviewing the evidence in the light most favorable to plaintiff as this Court is required to do, plaintiff will address each element necessary to prove a reasonable inference exists that the government's employees acted willfully.

**The Government Had Actual Knowledge of the Danger Presented by Bear #646**

The government employees disregarded the known and obvious risk they created when they left bear #646 at site #3 in an extremely dangerous state and deliberately removed each and every closure/warning sign.[2] The sudden aggressive behavior shown by Bear #646 toward Erwin was predictably due to severe stress and trauma. (Cattet Report, pg. 24) Bear #646 had been held by a leg-hold snare for untold hours and had been trying to escape as confirmed by the damage he had done to the snare tree and his swollen right fore-paw. (*Id.* at 9; e.g. Cattet video; McCrory Wildlife Ex. 4). He charged the IGBST crew as they approached him. (*Id.* at 9, 24) "This was a 'fight or flight' response by a restrained, injured, wild animal with no avenue of escape from humans that were approaching closely." *Id.*, at 24. "Then 4 or 5 hours later, Bear #646 was recovering from anesthesia to the point of being able to ambulate, and was approached

---

[2] In satisfaction of the Court's test, Mr. Dickinson admitted he deliberately removed each warning sign. (Dickinson deposition, pg. 59)

again by a human, this time Mr. Evert.  Bear #646 elicited the same stress response, but this time there was no snare to restrain his charge." *Id*.

The dangers surrounding the release of grizzly bears before a bear has recovered and left the area have been well recognized for decades by the scientific community and management agencies.  (Cattet Report, pg. 20)  IGBST employees were fully aware that grizzly bears may charge as a bear recovers from anesthesia and cannot possibly argue otherwise.[3]   For their own personal safety, the IGBST crew watched bears initially recover from capture and anesthesia from horseback.  (Seth Thompson deposition, pgs. 92)  For personal protection, the IGBST crew carried bear spray, a 12 gauge shotgun, a .44 mag pistol and may have also had a .45/70 rifle.  *Id*. at 93.  Mr. Thompson admitted that while watching a bear recover from capture and anesthesia, "we always have to maintain a safe distance, a safe distance from the animal, we always need to keep our eyes on the animal as it recovers." *Id*. at 96.  He acknowledged that a recovering bear "can sometimes pop up quick." *Id*.  The government employees' fear is that as the bear recovers, it will charge. *Id*. at 97.  Mr. Dickinson explained that the crew avoided packing up their gear when a bear is in the further stages of recovery in concern for the safety of the trappers, their horses and the bear.  (Chad Dickinson deposition, pgs. 103-04).  The IGBST leader, Charles Schwartz, confirmed that the trapper's safety is a concern because "you have a large carnivore which is coming out of a drug."  (Charles Schwartz deposition, pg. 88).  He explained that "When you are snaring bears, you don't stay with them until they're ambulatory, for your own safety." *Id*. at 87.  In order "to minimize the chance that the bear might come towards you, you

---

[3] "The Interagency Grizzly Bear Study Team (IGBST) was probably unsurpassed in their knowledge of, and experience with, grizzly bears, being the longest standing grizzly bear project in North American, if not the world."  (Cattet Report, pg. 25)  The IGBST had a visible presence at many regional, national, and international conferences and workshops concerning bears through their oral and poster presentations." *Id*.  "The IGBST hosted a "Bear Handler's Workshop" on a regular basis which brought together bear researchers and managers from far and wide to share knowledge and experiences on how to improve our interactions with bears, including improving capture methods and reducing capture mortality." *Id*.  "Lastly, the IGBST had an operations manual, an animal care protocol, and a U.S. Fish and Wildlife Service sub-permit for handling research that collectively put highest priority on protecting the public while also ensuring the welfare of individual study animals." *Id*.

just quietly leave" and allow the bear to recover.  *Id*. at 88.  In fact, "the safest thing to do is to leave the area before the bear is fully ambulatory, and then you don't take any chances."  *Id*. at 88-89.  Chris Servheen, the government's Grizzly Bear Recovery Coordinator agreed that for safety, trappers should leave the trap site before the bear wakes up.  (Servheen depo., pgs. 23-24) He warned, "You don't want to wait until the bear is fully awake and walking around because then you are within range of the bear and the potential is that you could surprise the bear or he could become somewhat aggressive toward you . . ."  *Id*. at 26.

The IGBST's own "Manual for Handling Bears for Managers and Researchers"[4] warns that "A bear recovering from anesthesia is possibly the most dangerous aspect of handling bears . . ."  USFWS FOIA 001245.  "As soon as the bear is able to pick up its head, start up your truck and leave the area."  *Id*.  "Never become impatient and force a drugged bear to get up.  Too many bear researchers have become restless and approached a sleeping grizzly only to be charged, thus endangering not only their life but also the bear's."  *Id*. at 1361.  "Because of the national attention focused on the grizzly, an accidental bear or human death or injury during a trapping operation could have drastic repercussions."  *Id*. at 1245. "Only approach a bear when it is securely captured in a trap."  *Id*. at 1272.  "Bear researchers and managers must make careful decisions and always warn the public when a trap has been placed in the vicinity or when there is a potential for a confrontation."  *Id*. at 1243.

As this Court stated in its Memorandum and Order Denying Defendant's Motion to Dismiss, "[t]his is not a case where the United States merely knew of a dangerous forest condition or of certain activities that were occurring in the forest."  *Id*. at pg. 10.  "Rather, the United States' policies, permits and warning protocols display actual knowledge by government agents of the specific risk of mauling inherent in baiting, trapping, handling, and releasing grizzly bears."  *Id*.  The permits that the IGBST obtained to trap grizzly bears each recognize the specific danger of the public encountering an IGBST subject bear.  The USFWS Permit states that "Every possible precaution <u>shall</u> be taken to avoid confrontations between bears and the

---

[4] Copies of the manual are provided to the IGBST employees.  (Haroldson depo. pgs. 22-23) The manual is made available to employees during training classes.  *Id*.  Several copies are kept in the IGBST's library.  *Id*.

public, including but not limited to closure or signing of the study sites." (Depo. Ex. 8 at ¶4). The Wyoming Game and Fish Chapter 33 Permit states that "All trap sites shall occur on public lands and will be signed to alert the public if they inadvertently approach a baited trap site." (Schwartz Depo. Ex. 7.)  Moreover, The Shoshone National Forest Area Closure Order that controlled the IGBST's trapping operations in the Kitty Creek drainage states that areas closed in the forest "will be marked on the ground with closure signs" and closure "provides for the protection of the grizzly bear, and the public, by minimizing human/bear encounters." (Schwartz Depo. Ex. 4)  Still further, just a few months prior to Erwin's death, Mr. Dickinson attended a bear handler's workshop where the participants were reminded, for example, that "grizzlies are potentially explosively violent," be "wary of the constant erosion of vigilance," "have a humble attitude," "don't let your guard down," and "lots of responsibility to the public and ourselves." (USFWS 001716)

Defendant effectively concedes its employees disregarded the known and obvious risk they created by now arguing that they just did not think anyone would be in the area.  Therefore the government employees consciously considered and apparently rejected the known and specific risk to the public that they created.  By acknowledging the great risk that would occur to a human if they were to encounter bear #646, defendant admits there was no margin for error in their calculus – and tragically they were correct.

**Danger Was Sufficiently Great To Make It Obvious That The Specific Risk and Harm of a Bear Mauling Would Follow**

Without exception, all IGBST employees conceded in deposition that the danger to the public created by the government's capture, and release of an anesthetized grizzly bear is extreme.  Mr. Thompson testified that mauling is a risk of the public coming into a trap site where a bear has been left to recover from anesthesia.  (Thompson deposition, pgs. 112-13).  He acknowledged that bears are under severe stress and trauma when being released.  After capture, "Usually bears will flee, but occasionally one will attack with intent to harm." *Id*. at 102).  As a result, Mr. Dickinson deemed the trap sites to be unsafe areas for the public and would not want the public to be in proximity to recovering bear.  (Dickinson deposition, pgs. 42, 66).  Mr.

Servheen agreed that the government would never want the public to come into close contact with a bear that is recovering from anesthesia as they can be aggressive and dangerous. (Chris Servheen deposition, pg. 25, 28, 67). Although seemingly elementary, and in support of the idea that you cannot arbitrarily remove warning signs while a bear recovers at a trap site, Mr. Servheen agreed that whether a warning sign is present or not, the dangers associated with a recovering bear still exist. *Id*. at 69. Therefore, "signs are put up to warn the public of trapping operations and the potential dangers and hazards involved." (Schwartz depo, pg. 50) The government recognizes that warning signs are essential to insure the public does not encounter bear traps. Here, the government failed to provide any warning signs. Erwin's horrific death was exactly what the government and its permits anticipated.

Based on their lack of argument to the contrary, presumably the government concedes that the dangers presented by bear #646 were known to the government. As this Court stated in its Memorandum and Order Denying Defendant's Motion to Dismiss, "the United States knew of the permitted cabin sites in the Kitty Creek drainage, and knew that the extensive trail system in this area was used by the public." *Id*. at 10. "Because of this, it is reasonable to infer that the United States knew of the risk and danger presented by the recovering research grizzly bear which caused Evert's death, and the United States could have anticipated use by the public of the trail to the trap site where the grizzly bear was left unattended and without signage." *Id*. While those statements are confirmed by the record, the government seeks to narrow the Court's analysis by claiming they just did not think anyone would be in the area and therefore no actual danger existed. To what extent the risk existed is an issue of foreseeability, and an ultimate issue of fact inappropriate for summary judgment. *Tinkler v. U.S. by F.A.A.*, 982 F.2d 1456, 1469 (10th Cir. 1992). The defendant's claim that its employees had no reason to anticipate someone would be hiking in the area fails credibility for numerous reasons.

First, defendant's argument completely disregards the fact that they actually saw two separate horse parties on the trails and saw the Alquists at least once on the decommissioned road. (Thompson Depo., pg. 36.)

Second, at trial, as the factfinder, this Court can test whether defendant's assertion that they could not have reasonably anticipated someone would be in the area is even credible.  The IGBST's credibility is a question of fact for the factfinder.  *Ulissey v. Shvartsman*, 61 F.3d 805, 808-09 (10th Cir. 1995).  The Alquists claim that they encountered the government employees just 400 feet from the spur road that leads directly into site #3.  The Alquists and Mr. Gambrel additionally encountered the field crew on the decommissioned road.  (Gambrel Declaration at ¶6, M. Alquist Declaration at ¶¶ 4, 7.)  As important, the evidence presented by Dennis Alquist, Maryanne Alquist and Lonnie Gambrel establishes that the public's use of the trails in May and June of 2012 was significant.  (Gambrel Dec. at ¶11; M. Alquist Dec. at ¶11; Alquist depo, pgs. 82-83).

Third, as the factfinder, this Court must determine at trial whether the government employees can reasonably claim ignorance of the public's extensive use of the trails.  Per their own testimony, the IGBST crew solely relied on random encounters to determine the public's use.  Defendant cannot reasonably rely on the crew's claim that nobody was in the area because site #3 was accessible by both the main trail and decommissioned road, and Mr. Dickinson could only recall that they rode down the main trail "once or twice."  (Dickinson Depo. 52: 16-20.)  Therefore, the IGBST crew could not assess the travel routes to its sites.  Additionally, the IGBST crew typically only rode the trails in the mornings and would be done on most days by 1 or 1:30 PM, which means they could not assess a large portion of each day when recreationists would be on the trails.  (Dickinson deposition, pg. 77)(Y. Evert Depo. at 113: 13-15.)  They also went home for five days between their two hitches, and cannot claim that nobody came near their sites.  (Schwartz Depo. Ex. 3 at 10.)  They testified that they looked for tracks, but did so only from horseback.  As proof that their claim that nobody came near their sites is unreliable, Erwin approached site #2 on either June 9-10[th] before turning around and his tracks went unnoticed.  (Y. Evert Depo. at 138: 1-3.)  Furthermore, the IGBST crew took no steps to determine which Kitty Creek residents were in the area.  (Seth Thompson deposition, pg. 48)  They did not even determine what the trail use was for the residents they actually knew to be in the area.  *Id.* at 51.

Finally, Defendant further claims that the weather was bad, and therefore they should not

have expected anyone to be hiking.  However, the IGBST field crew knew that the weather is variable in June, and that people hike in unfavorable conditions all the time.  (Seth Thompson deposition, pgs. 104-06)

Defendant apparently wants this Court to relieve it of liability unless plaintiff proves that the IGBST crew definitively knew a human was going to enter site #3 shortly after they removed the warning signs.  "This Court must assume that the legislature did not intend futile things and that statutes should not be interpreted in a manner producing absurd results." *Corkill v. Knowles*, 955 P.2d 438, 444-45 (Wyo. 1998).  By their own admission, the IGBST crew knew that at any moment someone could begin recreating on the trails and get near their trap site.  (Seth Thompson deposition, pg. 107)  They knew hikers could be anywhere in the drainage and that there was no requirement that hikers stay on the trails in the Shoshone National Forest.  (Seth Thompson deposition, pg. 108)  As a direct result of that knowledge, the IGBST deliberately posted signs for the very purpose of ensuring nobody walked into their trap sites.  (Thompson deposition, pg. 107)  In fact, their permits required the IGBST to post warning signs whether or not they specifically knew people were in the area.  (Thompson deposition, pg. 108) (Dickinson deposition, pg. 74); (Chris Servheen deposition, pg. 30)(Nothing in FWS permit says you only sign when you know people are in the area.)  The government must have expected and foreseen human activity at site #3 as their protocols and permits required posted signs.  Yet on the one day the IGBST knew a dangerous bear was present at their site, they removed all signs.

The IGBST team admitted they removed the warning/closure signs at site #3 before bear #646 recovered from anesthesia or was able to stand.  (Dickinson deposition, pgs. 59-60)  After capture, the handler's goal is that once recovered from anesthesia, a bear will flee the area. Defendant claims that in light of their belief that bear #646 would soon be ambulatory, it was acceptable to remove the warning signs while he recovered.  However, the field team knew there could be long intervals in between recovery signs.  (Thompson depo, pg. 98, 100); (Marc Cattet's report, pgs. 21-22)(127 minutes is average time documented by IGBST for bear recovery from multiple injections of Telazol to progress from pushing up or out with its front feet to standing and/or ambulating).   In fact, it took the female bear that the IGBST crew caught

at site #2 seventy minutes before it could stand after showing the same signs of recovery as bear #646. (Dickinson deposition, pg. 67) Even without three doses of anesthesia, the field team knew that bears can have a prolonged recovery. (Seth Thompson deposition, pg. 100) And it knew that the effect of anesthesia is very dependent on each individual bear. (Seth Thompson deposition, pg. 100) Mr. Dickinson admitted that bear #646 was not showing signs that he was going to get up when they removed the signs. (Dickinson deposition, pg. 60) The field team knew that bears that are not stimulated often go back to sleep to recover. (Seth Thompson deposition, pg. 98) It is therefore not credible for the government to claim that Bear #646 would soon recover, and therefore the warning/closure signs could reasonably be removed.

**Risk of Mauling Was not Obvious To Erwin Evert or Anyone That May have Entered Site #3**

In an attempt to evade responsibility for leaving a still anesthetized bear without warning signs for the public to find, defendant attempts to blame Erwin by arguing that he was not an unsuspecting recreationalist. Defendant asks this Court to draw numerous unreasonable inferences in defendant's favor, contrary to the standard of review. Defendant does so despite the fact it is undisputed that when Erwin approached site #3 there was nothing present to warn or even indicate to a non-member of the trapping team that site #3 existed, let alone that a dangerous and anesthetized grizzly bear recently stressed and traumatized by the government's handling was left at the site.

The life-threatening danger that existed at site #3 when Erwin Evert entered the site was not obvious to anyone other than the IGBST. Mr. Dickinson testified that in June 2010, the only people aware of Site #3's existence, aside from himself, were Mr. Thompson possibly their supervisor Mark Haroldson, and three Wyoming Game and Fish trappers who helped the IGBST crew create Site #3. (Dickinson Depo. at 75: 8-16)(Thompson depo, pg. 111)(Mr. Thompson was not aware of anyone else that knew the location of site #3). Aside from waving once, the IGBST crew never communicated or made an attempt to communicate with Erwin Evert. (Dickinson Depo. at 27: 23 – 28: 8; Thompson Depo. at 49: 18-25; 50:8-9.) Mr. Dickinson confirmed that, "Other than placing signs at our trap sites, we did not contact Kitty Creek residents." (Dickinson Depo. at 33: 2-3.) It is undisputed that when the IGBST field crew left

Site #3 and Bear #646 on June 17th 2010, they removed all closure and warning signs.  (Schwartz Depo. Ex. 3 at 1, 3, 6 and throughout.) There was nothing to indicate to Erwin or the public as they approached site #3, or even in site #3, that a 425 pound grizzly bear had been snared for up to twenty hours, endured multiple painful and stressful procedures, and was left at the site still anesthetized.  As a result, Mr. Evert could not have possibly known of Site #3's existence, let alone the tremendous danger present there.

Defendant attempts to benefit from Erwin's sighting of a completely different warning, one week earlier, over a mile away.  Erwin did encounter a "Dangerous Bear" sign during a hike on either June 9th or 10th, at least a week before he was killed.  The sign Erwin saw at Site #2 said: "Closed Area Behind This Sign Is Closed to Human Travel  Dangerous Bear,  Department of Interior National Park Service."  (Schwartz Depo. Ex. 3 at 6, 100).  As evidence of their attention to public safety, the field crew posted this inappropriate sign at Site #2 because they ran out of copies of the appropriate "Danger-Bear Trap in the Area" sign later posted at Site #3. (Schwartz Depo. Ex. 3 at 6.)  Thus, the sign Mr. Evert encountered at Site #2 did not mention the IGBST or the IGBST's research, and also did not mention that bait was being used to lure grizzly bears to a specific location in the forest where grizzly bears would be trapped, captured and handled as the appropriate sign would have partially communicated.  The only knowledge Mr. Evert could have gained from the dangerous bear sign at site #2 is that the area behind that sign was closed to human travel because of a dangerous bear.  When Erwin saw the sign, he immediately turned around and went home.  (Y. Evert Depo. at 138: 1-3; M. Domingue at 77: 16-18.)

Additionally Site #2 was nowhere close to Site #3 where Erwin was mauled as described by Defendant's investigator: "In order to get to [Site #2], one would have had to continue for approximately one more mile on [F.S. Trail #756], past the spur that led to Site #1, then take another abrupt turn to the west on another decommissioned spur…again up a steep hill, and continuing for approximately two tenths of a mile."  (Bragonier Declaration at ¶6, and Exhibits A and B.)  Even with horses, Mr. Dickinson estimated the travel time between Site #3 and Site #2 to be 40-45 minutes.  (Dickinson depo. pg. 53)

The government seeks to defend it's failure to warn Erwin of its dangerous activities by claiming Erwin was warned by others.  Defendant does so by imputing knowledge to Erwin from an uninformed non-IGBST source, and an uninformed USGS administrator.   First, the government relies heavily on a comment Chuck Neal made to his friend while conceding that it was the only information he received.  Erwin called Chuck Neal on the same day he saw the dangerous bear sign at Site #2 and immediately turned around and headed for home.  (Neal Depo. at 45: 7-9; Y. Evert Depo. at 138: 1-3; M. Domingue at 77: 16-18.)  Mr. Neal remembers "emphasizing I'm not a member of that Team, so I can't tell you specifically what they're doing…"  (Id. at 47: 9-11.)  Mr. Neal's recalls that he said "I suspect what they are doing is either what I refer to as hair snare trapping or live trapping.  And either case will involve some kind of smelly bait, some kind of odoriferous bait designed to attract to bears, and just to stay away from there."  (Neal depo. pg. 47) (Servheen dep. Pg. 58)  As evidence of his lack of knowledge, on July 17, 2010, after Erwin died, Mr. Neal asked Mr. Thompson if the IGBST was hair snaring for DNA analysis in Kitty Creek drainage, and Mr. Thompson had to inform him that they were in fact conducting live captures of grizzly bears.  (Thompson depo, pg. 126)  Mr. Neal considered his comment to only be an "educated guess." (Neal Depo. at 47: 8; 74:9).  Furthermore, Mr. Neal told Erwin "just to stay away from there."  (Id. at 47)  By "there," Mr. Neal specifically meant the area where Erwin saw the 'Dangerous Bear' sign at Site #2.  (Id. at 64)  It is Mr. Neal's understanding, which is entirely supported by all evidence in the case, that Erwin followed Mr. Neal's advice by never again hiking within one mile of Site #2.  Id. at 64.  Still further, Erwin could not possibly have gained any knowledge about Site #3 from Mr. Neal.  Site #3 did not exist on June 9th or 10th, when Erwin and Mr. Neal spoke, because it was not created until June 12th.  (Schwartz Depo. Ex. at 6, 10.)  Thus, though not argued, Mr. Neal could not have provided his friend with any information about what might be taking place at a location/premises that did not yet exist.  Mr. Neal never learned about Site #3 until the Investigation Team Report was released.  Id. at 65: 9-18.  There is no evidence that Erwin had any knowledge of Site #3 as a trapping location prior to his death.  (Neal Depo. at 65: 2-5.)  Drawing all reasonable inferences in the Plaintiff's favor, the only knowledge Mr. Evert could

have gained from speaking with Mr. Neal is his guess that federal employees might be using either hair snares or live traps at the location where Erwin had seen the dangerous bear sign. Following extensive discovery, there is no evidence in the record that Erwin Evert ever went back to that location, and there is no evidence that Erwin even hiked in the Kitty Creek drainage again until the date of his death.  (Y. Evert Depo. Ex. 38 at 2.)

Defendant also wishes to rely on the vague, uninformed and non-specific information Erwin received from Judy O'Dwyer, an employee with the USGS who coordinates business activities for the IGBST.  (Depo. of J. O'Dwyer at 3: 15-17; 6: 22-24.)  Ms. O'Dwyer had a brief conversation with Erwin on June 16, 2010 at the USGS offices in Bozeman, MT.  *Id*. at 9: 1-25. The "primary focus" of this conversation was Mr. Evert attempting to sell his book.  *Id*. at 12: 13.  According to Ms. O'Dwyer, Erwin asked whether the IGBST was located in the Bozeman office building and Ms. O'Dwyer said it was.  *Id*. at 11: 23-24.  Erwin asked if any trapping operations were being conducted and Ms. O'Dwyer said they were.  *Id*. at 11:24-25.  Ms. O'Dwyer did not specify that the IGBST was conducting "grizzly bear" trapping operations.  *Id*. at 12: 23-25.  Mr. Evert did not ask and Ms. O'Dwyer did not tell him where trapping operations were being conducted.  *Id*. at 13:1-3.  In fact, Ms. O'Dwyer was not aware of where the IGBST was trapping and certainly not aware that the IGBST was trapping in the Kitty Creek drainage. *Id*. at 13: 18-24.  Therefore, this discussion that defendant relies on revealed nothing to Erwin other than that the IGBST was generally conducting trapping operations and had offices in a Bozeman building.  Drawing all reasonable inferences in the Plaintiff's favor, Erwin could not have possibly gained any meaningful knowledge about the IGBST's trapping operations in Kitty Creek, and specifically Site #3, from Ms. O'Dwyer.

**Mauling by a Recently Snared, Anesthetized Grizzly Bear is Not Inherent In The Activity of Hiking in a Forest**

Although apparently not contested and not even addressed in defendant's motion, even Mr. Thompson concedes that no hiker expects to come into contact with an anesthetized grizzly bear in the national forest.  (Seth Thompson deposition, pg. 117)  When asked if he was aware of any other time a hiker has come across an anesthetized bear in the forest, Mr. Thompson responded "I'm unaware of a hiker coming across a bear under those circumstances." *Id*.  When

asked if he believed that a hiker should be prepared to come into contact with an anesthetized bear, he agreed that "it's not something that anybody expects to happen." *Id*.

CONCLUSION

Wyoming's Recreational Use Act does not apply to these facts where the government acted willfully. The government disregarded the known and obvious risk that if a foreseeable recreationalist encountered their research bear before it recovered and left their trap site, the result would be catastrophic. Site #3 and the dangerous condition of Bear #646 was known only to the government employees. By prematurely removing the warning signs, the government employees placed their own convenience above the safety of the public. The government's willful acts caused Erwin Evert's death. Plaintiff has presented sufficient evidence that, when viewed in the light most favorable to her, supports a reasonable inference that the government employees acted willfully. Genuine issues of material fact therefore preclude defendant's motion for summary judgment. For all of the reasons set forth above, Plaintiff respectfully requests this Court deny Defendant's Motion for Summary Judgment in its entirety.

DATED this 3rd day of October, 2012.

_____
Emily R. Rankin
Mark L. Aronowitz
THE SPENCE LAW FIRM, LLC

**CERTIFICATE OF SERVICE**

I, Emily R. Rankin, do hereby certify that I have this 3rd day of October 2012, served a true and accurate copy of the above and foregoing responsive motion via electronic service, to the following:

Christopher A. Crofts
Nicholas Vassallo
C. Levi Martin
United States Attorney's Office
Post Office Box 668
Cheyenne, Wyoming 82003-0668
Telephone: 307.772.2124
Facsimile: 307.772.2123

*Attorneys for Defendant United States of America*

_____
Emily R. Rankin