CHRISTOPHER A. CROFTS
United States Attorney
NICHOLAS VASSALLO
C. LEVI MARTIN
Assistant United States Attorneys
Post Office Box 668
Cheyenne, WY 82003-0668
Telephone: 307-772-2124
Facsimile: 307-772-2123

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| YOLANDA EVERT, individually and as the Qualified Wrongful Death Representative Of Erwin Evert, deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 11-CV-339-F |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) | |

## OBJECTIONS TO VARIOUS EXHIBITS SUBMITTED WITH PLAINTIFF'S OPPOSITIONS TO DEFENDANT'S DISPOSITIVE MOTIONS

The United States, by and through the United States Attorney for the District of Wyoming and Assistant United States Attorneys C. Levi Martin and Nicholas Vassallo, hereby objects [1] to several exhibits plaintiff attached to its oppositions to Defendant's dispositive motions.

---

[1]  Under the 2010 amendments to the Federal Rules of Civil Procedure, an objection, as opposed to a separate motion to strike, is the appropriate procedure for challenging inadmissible evidence

Plaintiff seeks, though various submissions, to present inadmissible evidence for this Court's consideration in deciding the dispositive motions filed by the United States. The subject documents are as follows:

I.      Recommendations of Investigative Team

Under the guise of directing this Court to the Shoshone National Forest closure order, plaintiff submits an unredacted version of the Investigative Team Recommendations. (Dkt. #43 at 7, citing Dkt. #43-8 (Pl's Ex. 6)); Dkt. # 47 at 5, citing Dkt. # 47-18 (Pl's Ex. 12)). This submission violates FRE 407. "When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction." FRE 407. There is no purpose in providing the recommendations portion of the exhibit other than in an attempt to prejudice this Court. The United States objects to this patently inadmissible evidence.

II.     Unsworn Reports

A.      McCrory Report

With its opposition to the United States' motion for summary judgment based on Wyoming's recreational use statute, plaintiff submitted the report from Wayne McCrory (Dkt. # 47 at 7 & 14, citing Dkt. #47-9 (Pl's Ex. 6)). There are several objections to the inclusion of this

---

at the summary judgment stage.  Fed.R.Civ.P. 56(c)(2) advisory committee's note ("objection functions much as an objection at trial, adjusted for the pretrial setting" and " [t]here is no need to make a separate motion to strike").

report.   First, it is an unsworn statement.[2]   Further, it contains multiple layers of hearsay. Additionally, its full inclusion is unnecessary for the purposes for which the plaintiff offers it. Plaintiff's only purported use of the report is to show two pictures—(1) a 2011 picture of a small horse group riding on the Kitty Creek trail (not the decommissioned spur-so at least a half a mile from the former research site) (Dkt. #47 at 7, citing Dkt. # 47-9 (Pl's Ex. 6 at 28)); and (2) a 2011 picture of plaintiff's counsel pointing to what McCrory speculates are bear #646's claw marks on a tree (Dkt. #47 at 14, citing Dkt. # 47-9 (Pl's Ex. 6 at 27)).   The inclusion of the full report is another attempt to have this Court review inadmissible evidence.   The United States does not object to this Court's consideration of the two photos actually referenced in plaintiff's opposition, despite their questionable relevance.   However, this Court should not consider the remainder of McCrory's unsworn report.

B.      Cattet Report

    The plaintiff also submitted the report of Dr. Cattet with its opposition to the motion for summary judgment based on Wyoming's recreational use statute.   (Dkt. #47 *passim*, citing Dkt. #47-24).[3]   The United States objects to this submission on the same ground as that lodged regarding the McCrory report—it is an unsworn statement.   *Riggs*, 497 F.3d at 1121 (10th Cir.

---

[2]   "[H]earsay testimony is inadmissible 'in support of, or opposition to, summary judgment.'" *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1121 (10th Cir. 2007), quoting *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1555 (10th Cir.1995) (noting that "[o]ther circuits have held that a court may not consider hearsay evidence in depositions submitted to defeat summary judgment and the Supreme Court impliedly adheres to this rule").

[3]   Plaintiff did not assign Cattet's report an exhibit number, but instead refers to it throughout the opposition as "Cattet Report".

2007) ("[H]earsay testimony is inadmissible 'in support of, or opposition to, summary judgment'").

More importantly, however, Dr. Cattet has, since the creation of his report, disowned the ultimate conclusion upon which the plaintiff heavily relies—that "the recent capture and handling of Bear #646 ma[de] it more likely to attack someone than if it had not been recently handled and captured." (Dkt. #47-24 at 24).  Plaintiff paraphrased Cattet's speculative hypothesis when stating "sudden aggressive behavior shown by Bear #646 toward Erwin was predictably due to severe stress and trauma."  (Dkt. #47 at 14).

At his deposition, however, Dr. Cattet admitted he had no scientific basis to make that statement.

> Q.  (BY MR. MARTIN)  What made it more likely that Bear 646 was going to attack someone as opposed to flee from someone?
>
> A.  I would not know what makes it more likely to attack versus to flee.  What I do know is that based on what the animal had gone through it would be likely to elicit stress response.  But what that stress response is, that immediate response, whether it's fight or flight, I don't know.  I don't know what goes through a bear's mind.  And I don't think there's any scientific knowledge available out there that could say with certainty.

(Attach. 1 (Cattet Depo. 154:21-155:7)).  Dr. Cattet further admitted that his theory of a recently captured and handled bear as being more likely to attack than flee was "the best speculation" he could make.  (Cattet Depo. 157:8-157:21).

As this Court is fully aware, "an expert's scientific testimony must be based on scientific knowledge, which implies a grounding in the methods and procedures of science based on actual

knowledge, not subjective belief or *unsupported speculation*." *U.S. v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006) (citations and internal quotations omitted) (emphasis added). This Court should refuse to consider Dr. Cattet's unsworn report.

III.    Cattet video of other bears in leg hold snares.

The United States objects to video footage, generated by plaintiff's expert, of other bears in leg hold snares. (Dkt. #47 at 14).[4] The exhibit lacks foundation and plaintiff will be unable to meet its burden of demonstrating "the material is admissible as presented or to explain the admissible form that is anticipated." Fed.R.Civ.P. 56(c)(2) advisory committee's note.

The context in which the plaintiff cites to the Cattet video demonstrates it is merely an attempt to prejudice this Court. *See* Dkt. #47 at 14 (asserting bear #646 was attempting to escape the leg hold snare). There has been no dispute that bear #646 attempted to escape the snare and as a likely result had a swollen paw. Indeed, there is admissible evidence upon which plaintiff could rely to establish that fact. Yet, plaintiff seeks to submit evidence of other bears attempting to escape other snares simply to either confuse the issues and/or prejudice this Court against the use of leg hold snares generally. The relevancy is zero, and the prejudice and possibility of confusion is high. *See* F.R.E 403 ("court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice [and] confusing the issues"). Accordingly, this Court should not consider the irrelevant video of other bears in snares.

---

[4]  Plaintiff did not assign Cattet's video an exhibit number, but instead refers to it as "Cattet Video."

For the reasons stated above, in deciding the pending dispositive motions, this Court should not consider the Recommendations of the Investigation Team (Dkt. #43-8 (Pl's Ex. 6) & Dkt. # 47-18 (Pl's Ex. 12)); McCrory's unsworn report (Dkt. # 47-9); Cattet's unsworn report; and Cattet's video.

Respectfully submitted this 18th day of October, 2012.

CHRISTOPHER A. CROFTS
United States Attorney

By:   _____
C. LEVI MARTIN
NICHOLAS VASSALLO
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a true and correct copy of the foregoing **OBJECTIONS TO VARIOUS EXHIBITS SUBMITTED WITH PLAINTIFF'S OPPOSITIONS TO DEFENDANT'S DISPOSITIVE MOTIONS** has been served upon the following by the method(s) indicated below on October 18, 2012.

Emily R. Rankin
Mark Aronowitz
The Spence Firm
P.O. Box 548
Jackson, WY 83001
307-733-5248
*Attorney for Plaintiff*

[ ] By U.S. Mail - postage prepaid
[ ] By Hand Delivery
[ ] By Overnight Courier
[X] By Electronic Filing/Email


Office of the United States Attorney

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

Civil Action No. 11CV00339-F

YOLANDA EVERT, individually and as the
Qualified Wrongful Death Representative
of Erwin Evert, deceased,

Plaintiff,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

------------------------------------------------------------
            DEPOSITION OF MARC CATTET, DVM, Ph.D.
                    October 5, 2012
------------------------------------------------------------

Deposition location:  455 Sherman Street, Suite 250
                      Denver, Colorado 80203

APPEARANCES:

        EMILY ROBERTS RANKIN, ESQ.
        MARK L. ARONOWITZ, ESQ.
        THE SPENCE LAW FIRM
        P.O. Box 548
        Jackson, Wyoming 83001
        Phone: (307) 733-7290
    For the Plaintiff

        C. LEVI MARTIN, ESQ.
        NICHOLAS VASSALLO, ESQ.
        UNITED STATES ATTORNEY'S OFFICE
        DISTRICT OF WYOMING
        2120 Capitol Avenue, Suite 4002
        P.O. Box 668
        Cheyenne, Wyoming 82001
        Phone: (307) 772-2124
    For the Defendant

Page 2

1           The deposition of MARC CATTET, DVM, Ph.D.,

2    called for examination by the Defendant, was taken in

3    the offices of Avery Woods Reporting, 455 Sherman

4    Street, Suite 250, Denver, Colorado, commencing at

5    10:02 a.m. on the 5th day of October, 2012, before

6    Deborah A. Glennon of Avery Woods Reporting Service,

7    Inc., 455 Sherman Street, Suite 250, Denver, Colorado

8    80203, a Registered Professional Reporter and a Notary

9    Public in and for the State of Colorado, pursuant to

10   the Federal Rules of Civil Procedure.

11                    * * * * * * * * * *

12                  INDEX OF EXAMINATION

13                                              PAGE
     EXAMINATION BY MR. MARTIN                    3
14
     EXAMINATION BY MS. RANKIN                   158
15
     FURTHER EXAMINATION BY MR. MARTIN           167
16

17                  INDEX OF EXHIBITS

18   EXHIBIT NO.                                 PAGE

19   Cattet Deposition Exhibit No. 48             83
         (IGBST Bear Tagging Form)
20
     Cattet Deposition Exhibit No. 49            110
21       (Treatment of Hypoxia During Anesthesia Article)

22   Cattet Deposition Exhibit No. 50            123
         (Human Exposures to Immobilizing Agents Article)
23
     Cattet Deposition Exhibit No. 51            166
24       (Thumb Drive of Videos)

25           (Exhibit 51 retained by Ms. Rankin)

1    dosage.  Conversely, five may be a low dosage for a

2    very tolerant -- an animal that's very tolerant to that

3    drug, or a five may be very -- it may be an overdose to

4    an animal that's very sensitive to it.  So the concept

5    of dosages, a fixed number, is a bit misleading.

6            Q.   Okay.  Next I guess I would like to talk

7    a little bit about what appears to be the question you

8    either developed or were asked to answer.  And that

9    was, "Did the recent capture and handling of Bear 646

10   make it more likely to attack someone than if it had

11   not been handled or recently handled and captured?"

12   Was that your hypothesis throwing out there, or was

13   that the question you were asked to answer?

14           A.   That was my -- that was my hypothesis.

15           Q.   Okay.  And it appears in your conclusion

16   section that it says, "The answer to this question is

17   an unequivocal yes based upon the following reason."

18   And I guess I want to explore a little bit about the

19   bases that you used to draw that conclusion.

20           A.   Okay.

21           Q.   All right.  So in Subpart A there you

22   describe the fact that Bear 646 had no known history of

23   interactions or conflicts; is that right?

24           A.   That's correct.

25           Q.   You state that, "As a male bear in the

1    prime of adulthood, Bear 646 likely had a long

2    established home range that encompassed part of the

3    Kitty Creek drainage including the area where he was

4    baited and captured."  Do you see that?

5              A.   I do see that.

6              Q.   Now, what sort of veterinary principles

7    did you use to base that on?

8              A.   I was not using veterinary principles

9    there.  I'm using principles that -- if you recall from

10   my CV, I was also trained as a -- trained as a

11   biologist.

12             Q.   Okay.  And so what do you use as the

13   basis for that statement then?

14             A.   Knowledge on the, you know, life history

15   of grizzly bears.

16             Q.   And that being what?  Please expand.

17             A.   Well, can you tell me what it is you

18   want me to expand on in particular?

19             Q.   That the home range included the Kitty

20   Creek drainage.

21             A.   Okay.  The home range -- now, I say

22   likely.  So that doesn't -- it's a probability thing.

23   But within grizzly bears they're a species that do

24   have -- males and females do have established home

25   ranges by the time they become adults.  Typically,

1    females have smaller home ranges than males.  Males'

2    home ranges encompass multiple females.  So they will

3    travel.  They will travel around, overlap with other

4    females' home ranges.

5                   And based then on the age of that --

6    based on the age of animal, the fact it's a mature

7    adult, I'm speculating based on my knowledge of grizzly

8    bear ecology, bear ecology in general, that that animal

9    probably had a well-established home range, which is in

10   contrast to a juvenile bear that has been -- basically

11   it's been dependent on its mother for two to three

12   years.  And suddenly it's -- you know, it's kicked out

13   of the nest, and it disperses.  It goes out seeking --

14   seeking a place to establish its home range.  So a bear

15   in that case would be a bear that's transient.

16                  Q.   Okay.  And you state that, "Bear 646

17   would likely have had ample opportunity to interact

18   with people and their property."  What do you base that

19   statement on?

20                  A.   If that animal did have its home range

21   that encompassed part of that Kitty Creek drainage,

22   from what I've seen of the maps and the investigation

23   report and that, that there's human activity in that

24   landscape.  There's human activity in the home range of

25   that bear.  So based on its age, based on having an

1    established home range, based on the fact that that

2    home range is also being used by humans and that

3    there's also structures that are built by humans, then

4    I think there would be opportunity for that animal.

5         Q.   And by virtue of the word "interact,"

6    you're not testifying here that interact means that the

7    bear likely would have been within 50 feet of a human

8    prior to June 17th, are you?

9         A.   I'm not saying anything about distance

10   or anything.  When I say interact, it's -- when I say

11   with people and their property -- so when I said

12   people, I'm thinking of, you know -- I mean, if it's a

13   cabin owner and they're out on their porch and they see

14   large adult male traverse the -- traverse the property

15   or damage some of the property or charge towards them.

16        Q.   Okay.  When you state that it's

17   reasonable to assume that Bear Number 646 and Mr. Evert

18   shared the same landscape over a long period without

19   incident, the same qualification would stand there too.

20   Correct?  That is, you're not making the argument that

21   it's likely Mr. Evert had been within 50 feet of Bear

22   646 before June 17th, are you?

23        A.   No, I'm not making that argument.

24        Q.   You're aware, aren't you, that indeed

25   there have been maulings that have occurred with bears

1    that have no known history of interactions or conflicts

2    with humans?

3              A.   Yes, I'm aware of that.

4              Q.   All right.  The second part of the

5    subletter B here of the basis for your conclusion, it

6    discusses how when Mr. Dickenson and Mr. Thompson first

7    interacted with Bear 646 they described it as charging

8    at them at times.  Do you see that?

9              A.   I do see that.

10             Q.   As well as trying to escape.  Do you see

11   that?

12             A.   I do see that.

13             Q.   All right.  And then the next sentence

14   you say, "The likely explanation for this sudden

15   aggressive behavior in an adult bear with no prior

16   history of conflict with humans is severe stress and

17   trauma."

18             A.   I do see that.

19             Q.   Wouldn't you agree that a grizzly bear

20   in close proximity to a human would have that normal

21   response, either fight or flight?

22             A.   I would agree that there is -- that it

23   would have a response to the persons.  But the -- what

24   comes first, fight or flight?  I don't know what.  But

25   I do know if it's flight response -- I mean, the animal

Page 148

1    perceives it has avenues of escape.  And I think in

2    normal circumstances where an animal has not been --

3    has not been captured and restrained for a period of

4    time, that will choose -- it will choose a flight

5    response over a fight response.

6                Q.    And what do you base that on?

7                A.    I base that on again as -- you know, as

8    a biologist, it's not a -- it's not an evolutionary

9    sound strategy to fight every time there's a potential

10   interaction with a -- or an interaction with a

11   potential enemy.  There's a cost to fighting.  Where

12   fleeing there is not -- there is not a cost.  Now, if

13   an animal has an to opportunity to flee, it will flee.

14               Q.    But you just testified that you're aware

15   of instances where there have been maulings that have

16   occurred with bears that have not had any interactions

17   with humans before.

18               A.    That's correct.  I'm aware of that, but

19   what I'm not aware of -- when those happen, what you

20   need to know is you need to know the whole history on

21   the animal.  You need to know what happened before.

22   Just because somebody's written down a few paragraphs

23   say that this animal has never had a conflict with a

24   person before and suddenly attacks a person, that

25   doesn't say much.

1              I mean, you need to do necropsy on the

2    animal, a full necropsy.  Was this a diseased animal?

3    Has it been exposed to porcupines and had quills in it?

4    I mean, there's a lot more that goes into it than just,

5    you know, whether or not an animal attacked or ran

6    away.

7              Q.   Are you saying there's studies out there

8    that discuss other issues that are going on in a bear

9    like porcupine quills that make it more aggressive?

10             A.   No one said anything about other

11   studies.  I'm saying when there's an event like that,

12   we're often limited on the information we have.  Okay?

13   We may not be limited on the information on the person,

14   but we're certainly limited on the information on the

15   animal.  And the best you can do in terms of obtaining

16   information is to do a complete -- complete necropsy,

17   have a board-certified pathologist do it.  Follow up on

18   everything that's found and see if there's a plausible

19   explanation there.  But, you know, even with that,

20   things are missed.

21             Q.   Okay.  I appreciate the expansion there.

22   But more directly to the question, what is it that

23   provides you the basis for the opinion that you've

24   expressed that a bear is more likely to flee than

25   fight?

MARC CATTET, DVM, PH.D - OCTOBER 5, 2012

Page 150

1          A.   Experience.

2          Q.   All right.

3          A.   I have encountered bears.  I've

4    encountered bears at close hand and numerous times,

5    black, grizzly, and polar bears.  And the choice has

6    been -- the choice has been for them to flee as opposed

7    to attack.

8          Q.   And you're aware that other instances

9    have occurred in which they've actually attacked

10   instead of fled.  Correct?

11         A.   Of course I'm aware of that.

12         Q.   All right.  In fact, this bear -- at

13   least in your report here was described as attempting

14   to flee as well?

15         A.   That's correct.

16         Q.   All right.

17              MS. RANKIN:  I'll just object as to

18   time.

19              MR. MARTIN:  Okay.  You can object.

20         Q.   (BY MR. MARTIN)  "Bear 646 had been held

21   by a leg-hold snare for hours."  I think we've

22   established that's not necessarily established in the

23   record.  Correct?

24         A.   Not necessarily established in the

25   record, yeah.

MARC CATTET, DVM, PH.D - OCTOBER 5, 2012

1          Q.   All right.

2          A.   I concede that point.

3          Q.   All right.  You stated that, "It had

4    been trying to escape and that" -- in fact, you used

5    the word, "This was a fight or flight response."

6    Correct?

7          A.   That's correct.

8          Q.   Your I guess last sentence here says,

9    "Then four or five hours later Bear 646 was recovering

10   from anesthesia to the point of being able to ambulate

11   and was approached again by a human, this time

12   Mr. Evert."  All right.  And then you state that, "Bear

13   646 elicited the same stress response, but this time

14   there was no snare to restrain his charge."

15              What is it that provides you the basis

16   for the statement that the Bear 646 was more likely to

17   then charge on attack as opposed to flee this time?

18          A.   The basis for that -- and I mean, you

19   know, in some situations a bear -- I will concede a

20   bear may decide to flee.  But the basis for that is the

21   fact that prior to Chad Dickenson and Seth -- is it

22   Seth Thompson -- approaching the animal, that animal at

23   that point in time had been subjected to a leg-hold

24   snare, had not had any interaction with people.  I

25   don't know.  I mean, this is what -- this is what I'm

1    seeing.  This is based on the understanding I have of

2    bears as a biologist and based on -- some of this stuff

3    obviously is based on being a veterinarian.

4                    So I'm saying okay.  I'm trying to

5    picture what happened.  I'm seeing a bear that as of

6    yet -- it has come up to a site.  There's some

7    attractant there.  It's a pail-set snare.  So it's

8    caught in a snare.  But there's no association at this

9    point with people.  Then along come two people.  The

10   animal then is darted, and then it's subjected to a

11   period of handling which involves sampling, collecting

12   measurements, those sort of things over a couple hours'

13   period.  Then those people leave.

14                   When they're leaving, the animal is

15   showing some signs of recovery.  They both say that the

16   animal is -- was aware of their presence.  They go.

17   The stimulation I think -- I think the stimulus of

18   trying to get up and that is gone.  The animal is there

19   metabolizing -- metabolizing the drugs, slowly

20   recovering.

21                   And at some point another person comes

22   along, and the animal at that time -- okay.  Now, I've

23   got the association not just with being restrained by a

24   trap, but I also have an association with people.  And

25   people do bad things and that people -- that bear --

1    that bear chooses to attack.

2                  Now, do I know this?  Can I say that

3    there's a certain percent chance this is true versus

4    not true?  No.  It's just -- again, it's based on my

5    experience with the animal, and it's based on my

6    experiences with what I see with the animal's response

7    when handling the animals.

8           Q.   Now, you stated that when Mr. Evert

9    arrived his presence elicited the same stress response

10   as the team that had been there earlier.  Correct?

11          A.   That's correct.

12          Q.   That same stress response included an

13   attempt to escape.  Correct?

14          A.   That's correct, fight or flight

15   response, yep.

16          Q.   So my question again to you is:  What is

17   it that leads you to draw the conclusion that the same

18   stress response, which apparently included an attempt

19   to escape previously, was now because of the handling

20   event meant that he was going to attack instead of

21   flee?

22          A.   There's nothing that says to me that --

23   you know, that it's definitely going to attack versus

24   flee.  I mean, the animal could have fled as well.  But

25   I think given the fact that it's now -- now it's not

1    only had the experience of being trapped, restrained by

2    a trap, but it's also had a very negative experience

3    with people.  I think it still -- and I would even say

4    that the animal may not realize that it's free.  And I

5    think it's just whatever, you know.  It's like flipping

6    a coin on its head.  It decides attack, and it attacks.

7               Q.    Well, and I understand that's what you

8    think.  I guess in order for your conclusion to be

9    admissible, what we're looking for is scientific

10   evidence that ties the theory that you have with the

11   conclusion that you make.  Your conclusion was yes,

12   unequivocally that the recent capture and handling of

13   Bear 646 made it more likely to attack someone than if

14   it had not been recently handled and captured.

15              And what I'm looking for is the basis of

16   your statement that yes, that that took place, that he

17   was more likely to attack than flee.

18              MS. RANKIN:  Object to the form.

19              A.    Okay.  So just give me just the

20   questions succinctly, please.

21              Q.    (BY MR. MARTIN)  What made it more likely

22   that Bear 646 was going to attack someone as opposed to

23   flee from someone?

24              A.    I would not know what makes it more

25   likely to attack versus to flee.  What I do know is

1    that based on what the animal had gone through it would

2    be likely to elicit stress response.  But what that

3    stress response is, that immediate response, whether

4    it's fight or flight, I don't know.  I don't know what

5    goes through a bear's mind.  And I don't think there's

6    any scientific knowledge available out there that could

7    say with certainty.

8              Q.    Okay.  That's fair.  And I guess that's

9    my follow-up question, is whether or not the theory or

10   hypothesis -- I don't mean to mince words with the

11   term -- you corrected me on it earlier, and I

12   appreciate it.  But there's no study that you're aware

13   of that demonstrates a recent capture/handling event of

14   a bear would make it more likely to attack someone, is

15   there?

16             A.    There is no -- no, I'm not aware of any

17   scientific study on that.  I'm aware of anecdotal

18   statements that, you know, when this bear was

19   recovering even within the project that the bear

20   attacked the culvert trap.  I actually have some video

21   footage from a project in Europe that shows a

22   recovering bear attacking a vehicle from which it was

23   darted from.  So there are things like that.  But to

24   do -- to my knowledge, nobody's done a scientific study

25   on this.

MARC CATTET, DVM, PH.D - OCTOBER 5, 2012

1         Q.   Sure.  I understand.  But a bear

2    attacking during an event, you've not got any studies

3    that correlate the fact they're being handled is the

4    reason they're attacking?

5         A.   There -- no, I said there are no studies

6    on that, but --

7         Q.   And there's -- go ahead.

8         A.   But I think -- I think, you know, if you

9    want me to give you another scenario.  If one of us had

10   a pet dog in here and I was to go up and pat that pet

11   dog and then go up a couple minutes later and kick that

12   dog and go up a couple minutes later and kick that dog

13   and that dog realizes it has no avenue of escape, in

14   all likelihood at some point that animal is going to

15   attack me to defend itself.

16              So it's that kind of -- it's that kind

17   of thinking that goes behind and then the experience.

18   Like I say, seeing bears in the past that have -- that

19   have gone after -- gone after the helicopter during

20   recovery.  The animals know -- they know what's

21   happened to them.  That's my belief.  But --

22         Q.   Back to the scenario, though.  However,

23   when they do have an avenue for escape, there's nothing

24   that you're aware of that has been studied,

25   peer-reviewed, and published that demonstrates that a

1   bear that's recently captured or handled is more likely

2   to attack than flee, is there?

3          A.    That's correct.  There's nothing that

4   I'm aware of.

5          Q.    And there's no way to establish a known

6   rate of error for that?

7          A.    That's correct.

8          Q.    And so the theory or hypothesis that a

9   recently captured and handled bear is more likely to

10  attack than flee, that's not something that's been

11  accepted in the scientific community, is it?

12         A.    No.   That's correct.  These conclusions

13  here -- these are the conclusions based on putting all

14  my opinions together, trying to understand in my own

15  head what probably happened.  So that's what they are.

16  Now, the opinions are backed up, you know, and are

17  appropriate with references to the scientific

18  literature.  But in putting all these opinions

19  together, no, it's the best speculation I can make

20  based on my -- based on my own experience as well as

21  based on what's in the literature.

22              MR. MARTIN:  Okay.  Give me just a

23  couple minutes.  I think I'm done.

24              MS. RANKIN:  Okay.

25