FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2012 OCT 23  AM 11 13

IN THE UNITED STATES DISTRICT COURT  RIS, CLERK
CHEYENNE

FOR THE DISTRICT OF WYOMING

---

YOLANDA EVERT, individually and as
the Qualified Wrongful Death
Representative of Erwin Evert, deceased,

Plaintiff,

vs.                                          Case No. 11-CV-339

UNITED STATES OF AMERICA,

Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
BASED UPON WYOMING'S RECREATIONAL USE ACT**

---

Plaintiff, Yolanda Evert, the appointed Wrongful Death Representative for her

deceased husband, Erwin F. Evert, sues Defendant United States of America for the negligent

or wrongful acts and omissions of government employees, which Plaintiff claims resulted in

Mr. Evert inadvertently entering a bear trap site on June 17, 2010, leading to his fatal

mauling by an adult male grizzly bear. Document (Doc.) No. 1. The United States argues

for summary judgment under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b),

which provides for a limited waiver of sovereign immunity and requires the claim be for

"circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* The United States argues that a private person in its circumstances would be protected against liability under Wyoming's Recreational Use Act, Wyo. Stat. Ann. §§ 34-19-101 *et seq.* (WRUA), because a landowner, charging no fee for recreational use, owes no duty of care to keep the area safe for entry or recreational use by others, or to give any warning of a dangerous condition, use, structure or activity. Wyo. Stat. Ann. § 34-19-102.

This issue was the subject of an earlier motion to dismiss by the United States. Applying the standards for dismissal, this Court denied the motion on February 15, 2012, concluding Plaintiff's factual allegations from the Complaint contained the important elements of (1) actual knowledge by the government landowner of a danger that is, (2) sufficiently great to make it obvious to the government landowner that the specific risk and harm of a bear mauling would follow, and (3) not known to Evert, nor obvious to those entering the premises, nor inherent in the activity of walking down a forest trail. Doc. No. 18.

Now that additional facts have been developed through discovery, the United States is reasserting its argument for immunity on the basis that evidence of "willful or malicious" misconduct is entirely lacking and that Mr. Evert had knowledge of the danger. For the

reasons that follow, the Court agrees with the United States and will grant summary judgment and dismiss Plaintiff's claims.

## BACKGROUND

Mr. Evert, a local seasonal resident of the Kitty Creek area, was killed by an adult male grizzly bear (designated bear #646) on June 17, 2010. The location of the fatality was a study site where bear #646 was captured, immobilized, handled, and radio collared earlier that day by a 2-man field crew of the Interagency Grizzly Bear Study Team (IGBST) traveling on horses. The field crew left bear #646 as he recovered, and removed the study site closure signs upon leaving. As the field crew returned to the trailhead, they encountered Plaintiff who asked if they had seen her husband who was hiking on foot and was overdue. The field crew leader rode up the trail looking for Mr. Evert, and ultimately found him dead due to a bear mauling at the study site where bear #646 had been captured earlier that day. DNA from bear #646 matched DNA from the bear hair recovered from Mr. Evert's body.

The IGBST is administered by the United States Geological Survey (USGS) and is comprised of an interdisciplinary group of personnel responsible for long-term monitoring and research efforts on grizzly bears in the Greater Yellowstone ecosystem. On May 27, 2010, an IGBST field crew consisting of federal employees, Chad Dickinson and Seth Thompson, began grizzly bear capture operations in the Kitty Creek drainage. At the bottom

of the Kitty Creek drainage there are fourteen private cabins authorized under special use permits issued by Forest Service. Cabin access is available by way of Forest Service road 448 off US 20. Near the last cabin up Kitty Creek, Road 448 is blocked by a locked gate and decommissioned. Kitty Creek Trail (Forest Service trail 756) continues up the drainage running parallel to the decommissioned road. In addition to the decommissioned road and the Kitty Creek Trail, the Kitty Creek drainage has multiple decommissioned spur roads that were formerly used for logging. All spurs have been closed, obliterated, and reseeded.

From May 27-June 17, Dickinson and Thompson placed three trap sites in the Kitty Creek drainage, which consisted of bait (game meat and rumen) in the vicinity of snares. Closure signs were placed at each site during trapping operations. Two different signs were used. The one used for Site #3[1] (where the mauling occurred) stated, "DANGER! BEAR TRAP IN THE AREA. THE AREA BEHIND THIS SIGN IS TEMPORARILY CLOSED. THE CLOSURE IS EFFECTIVE FROM 6-11-10 TO 6-20-10."[2] Five of these signs were

---

[1]Study Site #3 was created on June 12. Doc. No. 40-4, p.6, 66:13-16.

[2]This same sign was used for Study Site #1, which was created on May 27, 2010 and was approximately one half mile past the location for Site #3 on the same decommissioned spur. No grizzlies were captured at Study Site #1.

placed along the access route to Site #3. Doc. No. 47-4, p.16, 48:2-7. Site #2[3] displayed the

sign, "CLOSED. AREA BEHIND THIS SIGN IS CLOSED TO HUMAN TRAVEL-

DANGEROUS BEAR."

No bears were captured from May 27 to June 16. On June 17, bear #646 was captured

at Study Site #3 and an adult female grizzly bear was captured at Study Site #2. Dickinson

and Thompson immobilized bear #646,[4] pulled the bear's tooth, tattoo-stamped its upper lip,

tagged its ears, administered antibiotics, took samples and fitted the bear with a radio collar.

Doc. No. 1, ¶¶ 44-45. The field crew then removed the snare equipment when bear #646

was showing just limited signs of recovery, in order to check Site #2, where the female bear

was captured. *Id.* at ¶¶ 46-47. Upon leaving at approximately 12:30 p.m. to check Site #2,

the crew removed all warning/closure signs from Site #3.

Mr. Evert and his wife purchased their cabin in the Kitty Creek drainage in 1971.

They came to Wyoming yearly to botanize and hike. In fact, Mr. Evert was reported to be

_____

[3]Study Site #2 was created on June 9, 2010 after the team had no success capturing grizzlies at Site #1. Study Site #2 was not on the same decommissioned spur road nor in the same vicinity as Sites #1 and #3.

[4]The field crew immobilized bear #646 with three separate doses of anesthesia, Telezol. Doc. No. 47-4, p.17, 55:13-24.

a strong hiker who hiked regularly up Kitty Creek as well as off-trail, including many of the

old logging spurs and decommissioned roads.  Since early 1990, "grizzly bears have moved

into the North Fork and are so prevalent that the Forest Service has designated the area as

'grizzly bear country.'" Doc. No. 40-2, p.6. Plaintiff reported that it was "not uncommon to

see ten or twelve grizzlies over the summer during the day along the North Fork road and

around [the Evert's cabin area]." *Id.*

On either June 9 or June 10, Mr. Evert encountered Study Site #2.  He reported to his

long time friend Chuck Neal, a self-professed bear expert, that earlier in the day he had seen

a sign saying "Dangerous Bear."  Mr. Evert said he had seen men riding up and down the

trail road for a week or more and asked Mr. Neal why the National Park Service people were

in the National Forest system, and what these people was doing.[5]  Mr. Neal responded that

the previous chief of the IGBST[6] was a Park service employee who would likely use Park

Service equipment.  As to what the men were doing, Mr. Neal offered an "educated guess"

---

[5]Plaintiff confirmed that she and Mr. Evert had seen the IGBST field team passing by
their cabin many times as the team was traveling both in and out. Doc. No. 40-1, p.10,
112:20-114:18.  Plaintiff said she didn't know who they were and at first thought they were just
dudes or someone taking dudes up the road. *Id.* at p.11, 113:5-7.

[6]Mr. Neal commented that Mr. Evert knew what the acronym "IGBST" mean. Doc. No.
40-4, p.22, 51:1-8.

and told Mr. Evert that he suspected what they were doing was either "hair snare trapping or live trapping" and that in either case it would "involve some kind of smelly bait, some kind of odoriferous bait designed to attract to bears, and just to stay away from there." Doc. 40-4, pp. 21-22, 45:4-50:4. Mr. Evert responded by saying "Yes, I understand", or something like that. *Id.* at p.21, 47:19. Mr. Evert then commented that the sign "Dangerous Bear Beyond This Sign" seemed ridiculous, given that all bears beyond any sign were dangerous. In response, Mr. Neal said, "Erv, you know, the rest of us are not quite as particular about the language as you are. It probably means this business of hair snare trapping or live trapping beyond that [sign]. Just don't go in there." *Id.* at pp.21-21, 48:5-49:4.

On June 16, the Everts were in Montana so Mr. Evert could attempt to sell his plant book to various merchants and governmental agencies.[7] Doc. No. 40-1, p.9, 102:6-8. One of the locations Mr. Evert chose was the USGS building in Bozeman. Doc. No. 40-10, p.8, 9:23-10-1. While in the USGS building, Mr. Evert inquired of the USGS Administrative officer, Judy O'Dwyer, whether the IGBST was in the same office and whether the team was

---

[7]As a botanist, Mr. Evert had recently completed a book on vascular plants of Yellowstone.

conducting any trapping operations. *Id.* at p.9, 11:21-25. Ms. O'Dwyer said that the IGBST was in that same building and was conducting trapping operations. *Id.* at p.9, 11:25.

On June 17, the morning of the incident, Mr. Evert talked to his daughter by telephone and said he was planning on taking a hike. Since he had seen the researchers go up the road around 7 or 8 in the morning, he said "that he was hoping possibly, if he saw them, he was going to stop and ask what they were doing." Doc. No. 40-3, pp.5-6, 72:21-73:2. Plaintiff confirmed the fact that Mr. Evert said he was going to go on his hike up the trail, Kitty Creek, and hopefully he would see the researchers on the road 448 as they came down and that he would ask them what they're up to. Doc. No. 40-1, p.14, 161:3-6. Plaintiff said her husband was "all excited" about putting on his coat and wool hat, because it was snowing out, and he put a scarf around his neck so he wouldn't get cold and wore his gloves. *Id.* at p.13, 159:18-21. Mr. Evert left for this hike around 12:30 to 12:45 p.m. Doc. No. 47-6, p.7, 160:20-23.

Shortly after the team left bear #646, Mr. Evert entered Study Site #3 and was tragically killed by the grizzly bear. This case has been brought seeking damages for Mr. Evert's death.

ANALYSIS

Summary Judgment Standard

Under Fed.R.Civ.P. 56(c), summary judgment is only appropriate if the pleadings and admissible evidence produced during discovery, together with any affidavits, show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Western Diversified Services, Inc. v. Hyundai Motor America, Inc.*, 427 F.3d 1269, 1272 (10th Cir. 2005). An issue is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *Id*. The non-moving party is entitled to all reasonable inferences from the factual record, which is viewed in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, to defeat summary judgment, a plaintiff must support the claim with more than conjecture and speculation. *Self v. Crum*, 439 F.3d 1227, 1236 (10th Cir. 2006). The burden of persuasion rests squarely on the moving party. *Trainor v. Apollo Metal Specialities, Inc.*, 318 F.3d 976, 980 (10th Cir. 2002).

ANALYSIS

The United States is seeking immunity against suit under the terms of the WRUA.

This law provides:

(a)    Except as specifically recognized by or provided in W.S. 34-19-105, an owner of land who either directly or indirectly invites or permits without charge any person to use the land for recreational purposes or a lessee of state lands does not thereby:

    (I)    Extend any assurance that the premises are safe for any purpose;

    (ii)    Confer upon the person using the land the legal status of an invitee or licensee to whom a duty of care is owed;

    (iii)    Assume responsibility for or incur liability for any injury to person or property caused by an act of omission of the person using the land.

Wyo. Stat. Ann. § 34-19-102.

(a)    Nothing in this act limits in any way any liability which otherwise exists:

    (I)    For willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity. . . .

Wyo. Stat. Ann. § 34-19-105.

This Court previously considered the WRUA in the context of this case and will not repeat the analysis contained within its earlier decision concerning the applicability of the WRUA and the need to focus on whether there was a willful failure to guard or warn. This

Court will also stand by its earlier analysis of the meaning of "willful" as used in the WRUA. Therefore, for summary judgment purposes, the inquiry is whether the undisputed evidence is such that no reasonable factfinder could find: (1) actual knowledge by the Government of a danger that is, (2) sufficiently great to make it obvious to the Government that the specific harm of a bear mauling would follow, and (3) not known to Mr. Evert, nor obvious to those entering the premises, nor inherent in the activity of walking down a forest trail.

Was There a Known or Obvious Risk of Danger

Notwithstanding the additional factual development that has occurred through discovery, the Court remains convinced that a reasonable factfinder could find that the various policies, permits and manuals display actual knowledge by government agents of the obvious risk of mauling inherent in baiting, trapping, handling, and releasing research grizzly bears where no notice of the capture activities was given either by signage or individual contact.

<u>Was the Risk Sufficiently Great to Make it Obvious to the Government that Harm by a Bear Mauling Would Follow</u>

The United States argues that various facts support the conclusion that the risk was not sufficiently great to make it obvious to the field team that a bear mauling would result from their activities on June 17, 2010.  First, Study Site #3 was not near the Forest Service permitted cabins, and it was not on a trail.  To find Study Site #3, one would be required to travel approximately one mile up Kitty Creek Trail (Forest Service trail 756), then abruptly turn west on a decommissioned spur and follow that spur approximately one-half mile including up a steep hill.  Doc. No. 40-5, p. 27, ¶¶ 5 & 7.  As impediments to the use of this decommissioned spur, there are boulders, dirt berms, trees growing, and deadfall in the middle of the spur.  *Id.*

Second, the field team observed no off-trail[8] hikers throughout their entire three-week trapping effort and no obvious signs of off-trail foot travel.  Doc. No. 40-10, p.20.  The team had only seen the Everts and the Alquists in the general area of the cabins,[9] and the team

_____

[8] By "off-trial", the Court means either off the Kitty Creek Trail (Forest Service trail 756), or off the decommissioned road which parallels the Kitty Creek Trail.  Essentially, "off-trail" means use of one of the decommissioned and reseeded spurs or hiking off all trails and spurs.

[9] There is a dispute as to one encounter with the Alquists.  Mr. Alquist testified the encounter took place on the decommissioned road which parallels the Kitty Creek Trail.  Doc.

encountered two dude rides on either the Kitty Creek Trail or the parallel decommissioned road (not on any decommissioned spur or near a trap site). *Id.* Further, the field team's general understanding was that the Kitty Creek cabins and the Kitty Creek Trail did not historically have much use in May and early June. Doc. No. 8, p.3 at ¶6.

Third, on the day of the incident, it was cold and intermittently snowing[10] which led the team to believe that no one would be hiking in those conditions and in that area, "especially that far back, off the trail, and where there had been multiple closure and warning signs posted for the previous several days." Doc. No. 40-10, p.20.

Finally, the field team anticipated that bear #646 would soon be ambulatory following the team's departure. Doc. No. 40-10, p.19. "Throughout the entire time we were preparing to leave, we observed increasing signs of recovery, including swaying of the head laterally and tongue lolling, his focus on us with his head up, and his pushing up on his front legs in an attempt to stand. We were satisfied bear #646 would soon fully recover. . . ." *Id.*

_____

No. 40-6, p.4, 50:25-52:10.

[10]At approximately 1 p.m. it was 35 degrees Fahrenheit, and the wind was gusting up to 34 miles per hour. Doc. No. 40-10, p. 13.

These various facts are argued by the United States to the effect that it was far from obvious - indeed, it was highly unlikely - that an encounter and fatal mauling would occur at Site #3.

In response, Plaintiff argues that the decommissioned spur which led to Site #3 had become "well defined" by the team's frequent horse travel into the area. Doc. No. 47-11, p.3, ¶12. Plaintiff also points out that the Kitty Creek Trail is popular and well used. *Id.* at ¶11. One guest at a cabin between the end of May and Mr. Evert's death, "observed the area boy scouts using the trail and the local dude ranch taking rides oftentimes a few times a day." *Id.* Further, the IGBST crew typically only rode the trails in the morning and would be done on most days by 1:00 or 1:30 p.m., which means they could not assess a large portion of each day when recreationists would be on the trails. As to the weather, the IGBST field crew knew that people hike in unfavorable conditions. Doc. No. 47-12, p.29, 106:14. As to the view that bear #646 would soon fully recover, Plaintiff points to Thompson's admission that there can be time between each of the signs of recovery, that it is possible a bear can go back to sleep to recover fully from the anesthesia, and that the effects of the anesthesia are very dependent on each individual bear and whether there had been subsequent doses of anesthesia as there had been in this case. *Id.* at p.27, 98:9-22 & 100:7-20.

Plaintiff's arguments concerning the possibility of hikers off-trail shortly after the team left Site #3, during the weather conditions that day, do not change or affect the field team's observations that they had never seen hikers off-trail during the three weeks they had been conducting research in the Kitty Creek area. The issue before the Court is what was obvious, not what was possible or what should have been anticipated under a negligence standard. Inadvertence, carelessness or negligence are not at issue. The issue also is not what was obvious if a hiker encountered bear #646 before it recovered and left Site #3. The issue is whether it was obvious that a hiker would encounter bear #646 at Site #3. On this question, the Court agrees with the United States that, in light of the remoteness of the trap site, the inclement weather, the lack of off-trail human presence during the time at issue, the extended presence of five signs along the access route to Sites #1 and #3, and the anticipation that bear #646 would soon recover, it was not obvious to the Government that a hiker would intentionally follow their tracks into Site #3 shortly following the team's departure, resulting in a bear mauling.

Was the Risk of Danger Known to Mr. Evert or Obvious to the Public or Inherent in the
Activities of Hiking in the Area

As a separate basis for dismissal, the United States argues that Mr. Evert had

knowledge of the IGBST's bear trapping and study activities, making the risk of danger from

a bear mauling known to him. In support of this argument, the United States points out that

Mr. Evert had discovered at least one of the trap sites that warned of a "dangerous bear."

Further, he was warned by Mr. Neal to stay away because the sign likely meant "hair snare

trapping or live trapping." Third, the day before his death, Mr. Evert was told by USGS

personnel that the IGBST was trapping. Finally, Mr. Evert had seen the researchers go in

that morning, and he set out on a hike that windy and cold day with his stated goal being to

ask the men what they were doing.[11] Even though Mr. Evert said he hoped to encounter the

team on the decommissioned road that runs parallel to the Kitty Creek trail, for reasons

unknown, Mr. Evert departed nearly a half a mile from his usual hike, to follow a "well-

beaten trail" made by the field team's horses as they were going in and out of the area. Doc.

No. 40-4, p.23, 57:24-16. If Mr. Evert had been interested in seeing the researchers, that

_____

[11]The record is unclear why Mr. Evert went on the hike to specifically *ask* the field crew
what they were doing when he could have waited at his cabin, as had been typical, and talked to
the field crew when he saw them pass his cabin on their way out of the area.

16

could have been the logical reason for Mr. Evert going to Site #3. *Id.* at 58:17-19. No other reason has been identified.

Plaintiff argues that the risk of bear mauling was not known nor obvious to Mr. Evert under these circumstances. Plaintiff argues there were no warnings to indicate Site #3 existed, let alone that a dangerous, anesthetized grizzly bear was left at the site. Further, Site #2, the site subject to the "Dangerous Bear" warning, was not close to Site #3, and Mr. Evert was only warned by Mr. Neal to stay away from Site #2. Finally, the information Mr. Evert gained from the USGS employee in Bozeman did not inform him where trapping operations were underway.

Viewing the evidence in the light most favorable to Plaintiff, the Court cannot conclude the risk of bear mauling was known by or obvious to Mr. Evert. While Mr. Evert may have known about the "researchers" and known about trapping by the USGS, particularly trapping at a different site (Site #2) than the incident site, the undisputed facts are insufficient to conclude that he knew about, or could appreciate the risk of encountering a recently-released, recovering grizzly bear by simply following the researchers' tracks off the Kitty Creek Trail where no closure signs or warning notice were present. Inadvertence, imprudence, carelessness or even negligence are not the issue here. The issue is disregard

of a known risk.  Viewing the evidence in the light most favorable to Plaintiff, the Court

cannot conclude that Mr. Evert knew about trapping activities at the incident site, and acted

in disregard of that knowledge.

## CONCLUSION

Based upon the foregoing analysis, Plaintiff's claim of failure to warn is barred by

Wyoming's Recreational Use Act, Wyo. Stat. Ann. § 34-19-101 *et seq*.  A landowner (here

the Government) charging no fee for recreational use owes no duty or care to keep the area

safe for entry or recreational use by others, including Mr. Evert, or to give any warning of

a dangerous condition, use, structure or activity.  Further, the acts and omissions by the

United States in this case do not amount to willful or malicious failure to guard or warn

against a dangerous condition, use or activity sufficient to eliminate immunity against suit.

IT IS ORDERED that the Government's Motion for Summary Judgment is hereby

**GRANTED**.


Dated this _23_ day of October, 2012.

NANCY D. FREUDENTHAL
CHIEF UNITED STATES DISTRICT JUDGE