```
 1                 IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF WYOMING
 2
      --------------------------------------------------------------
 3   YOLANDA EVERT, individually and
     as the qualified wrongful death
 4   representative on behalf of
     Erwin Evert,
 5
            Plaintiff,                   DOCKET NO. 11-CV-339-F
 6
            vs.                          CHEYENNE, WYOMING
 7                                       OCTOBER 22, 2012
     UNITED STATES OF AMERICA,           9:00 a.m.
 8
            Defendant.
 9   --------------------------------------------------------------
                    TRANSCRIPT OF HEARING PROCEEDINGS
10                         DISPOSITIVE MOTIONS

11            BEFORE THE HONORABLE NANCY D. FREUDENTHAL
                 CHIEF UNITED STATES DISTRICT JUDGE
12
     APPEARANCES:
13   For the Plaintiff:       MS. EMILY R. RANKIN
                              MR. MARK ARONOWITZ
14                            Attorneys at Law
                              THE SPENCE LAW FIRM
15                            15 South Jackson Street
                              P.O. Box 548
16                            Jackson, Wyoming  83001

17   For the Defendant:       MR. C. LEVI MARTIN
                              MR. NICHOLAS VASSALLO
18                            Assistant United States Attorneys
                              DISTRICT OF WYOMING
19                            2120 Capitol Avenue, Suite 4000
                              P.O. Box 668
20                            Cheyenne, Wyoming  82003

21   Court Reporter:          MRS. JANET DAVIS, RMR, FCRR
                              United States Court Reporter
22                            2120 Capitol Avenue, Room 2228
                              Cheyenne, Wyoming  82001
23                            (307) 635-3884
     Proceedings recorded by mechanical stenography, transcript
24   produced with computer.

25
```

1                          I N D E X

2

   MOTIONS                                           PAGE
3
   MOTION TO DISMISS
4      Mr. Vassallo                                    11
       Ms. Rankin                                      33
5
   MOTION FOR SUMMARY JUDGMENT
6      Mr. Martin                                       4
       Ms. Rankin                                      23
7
   MOTION TO STRIKE
8      Mr. Martin                                       4

9  COMMENTS OF THE COURT
       Motion To Dismiss                               42
10      Motion For Summary Judgment                    44
       Motion To Strike                                46
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced 9:00 a.m., October 22, 2012.)

2          THE CLERK:  In civil matter Case No. 11 CV-339-F,

3     Yolanda Evert versus United States of America, set today for

4     dispositive motions.

5        Counsel, please state your appearances.

6          MS. RANKIN:  Emily Rankin for the plaintiff, Your

7     Honor, as well as Mark Aronowitz and one of the wrongful death

8     beneficiaries, Mara Dominque.

9          MR. MARTIN:  Levi Martin for the United States, and

10    with me today is Nick Vassallo.

11         THE COURT:  Good morning.  I'm sorry, Ms. Rankin.  I

12    did not get -- is it Mark?

13         MS. RANKIN:  Mark Aronowitz.

14         THE COURT:  That's what I thought, Mark Aronowitz.

15         We have three motions:  A motion to dismiss for lack

16    of subject matter jurisdiction under the discretionary function

17    exemption, a motion for summary judgment under the Wyoming

18    Recreational Use Act, and I believe we also have a motion to

19    strike.  All three motions are filed by the Government.

20         What is the Government's pleasure, and what amount of

21    time for oral argument would you request?  I do have more than

22    a half an hour for each side, if you believe that the argument

23    warrants more time.

24         MR. MARTIN:  Your Honor, I think we have constructed

25    our arguments today for the Court under the impression that we

1   would have about 30 minutes to discuss it.  If the Court has

2   further time and questions, we certainly would be happy to

3   entertain them.  The plan as we have it, so to speak, now is I

4   would be arguing the motion on summary judgment under the

5   Recreational Use Act, and Mr. Vassallo would then be arguing

6   the discretionary function.

7           As to the objections that were filed, I guess

8   technically don't look at it really as a motion to strike under

9   the new rules.  It is kind of a different way of going about

10  it, and so we just placed our objection on the record and not

11  even concerned whether or not the Court in advance of our

12  argument rules on those, just wanted to remind the Court that

13  it is out there and ask it to rule on that in due time.

14          THE COURT:  All right.  Thank you.

15          Ms. Rankin.

16          MS. RANKIN:  Your Honor, a half hour is sufficient.

17          THE COURT:  All right.  Thank you very much.

18          Mr. Martin or Mr. Vassallo, however you want to

19  organize your argument, please proceed.

20          MR. MARTIN:  Good morning again, Your Honor.  As

21  stated, I'm here to address the Recreational Use Act.

22  Recreational Use Act was adopted by the Wyoming Legislature

23  with the intent to provide an incentive to landowners to allow

24  people to recreate on their property free of charge, and in

25  exchange the legislature afforded them a level of immunity,

1   akin to what would be considered, I guess, something along the

2   order of a duty that would be owed to a trespasser.

3          It's the sort of conduct for which requires a showing

4   of outrageousness or willfulness.  And as this Court has stated

5   in its standard adopted requires a failure to guard or warn

6   involving an intent, not a mere inadvertence, a disregard of a

7   known or obvious risk, the risk of which is so great to make it

8   obvious that harm would follow.

9          And in response to our motion for summary judgment,

10  the plaintiff seems to focus really on only one component of

11  that issue.  You see, in evaluating the risk of harm, it

12  involves not just the likelihood of harm if that risk is

13  encountered.  It necessarily requires a determination of the

14  likelihood of being exposed to that risk in the first instance.

15  And this, it appears, is what the plaintiff glosses over, that

16  preliminary question.

17         In fact, I think it is best evidenced by looking at

18  their conclusion on page 25.  And I will quote:  "The

19  Government disregarded the known and obvious risk that if a

20  foreseeable recreationalist encountered their research bear

21  before it recovered and left their trap site, the result would

22  be catastrophic."

23         Now, I will take issue with the foregone conclusion

24  which they stated which is saying that the result would be

25  catastrophic, and I will deal with that in a moment.  But the

1    problem is the conclusion assumes that which the plaintiff has

2    not proven, or even shown a likelihood of, and that is that it

3    was obvious that a hiker would encounter Bear 646.

4           Plaintiff has put the cart before the horse.  The

5    probability that someone would be exposed to the risk is the

6    fatal flaw in this case.  And what do we have in support of

7    that?  Several undisputed facts.

8           It was cold.  It was windy.  And it was intermittently

9    snowing.  We have a weather station approximately three miles

10   away that says it was under 40 degrees and blowing 34 miles an

11   hour at the approximate time of the incident.  We have Chad

12   Dickinson describing it as cold, windy with intermittent snow.

13   And we have the plaintiff Yolanda Evert describing it as cold

14   and snowing.  It was an undisputed fact that the weather was

15   not good.

16          And there's a discussion in the plaintiff's brief

17   about how the fact that the trap team knew that somebody could

18   be hiking, that somebody could be out there, regardless of the

19   weather circumstances.  That discussion misses the standard.

20   The possibility of somebody being out there, that's not likely,

21   and it is certainly not obvious.

22          Which leads into the other undisputed fact.  Although

23   they may take issue with the fact that I use the term

24   "remoteness," it was remote.  It is a mile and a half from the

25   nearest cabin.  Not the Everts' cabin, mind you, which is even

1    further, but it is a mile and a half walk.  The plaintiff has,

2    to put it kindly, misnomered the use of it being straight line

3    distance.  The topography does not allow for such.  Everybody

4    to the extent they're using the trail, they use the trail.  And

5    so it is undisputed it is a mile and a half walk to the trap

6    site.

7         But more importantly, the trap site itself -- and I

8    don't know if this is up on the screen yet or not -- the trap

9    site itself, as you can see in our Attachment 11, is a half a

10   mile from even the junction of the decommissioned road, half a

11   mile from the trail itself.

12        Mr. Bragonier's map makes clear that the plaintiff's

13   description of some Kitty Creek trail system just isn't the

14   case.  There's one trail.  It is Trail 756.  There's a

15   decommissioned road which parallels it which has some use, but

16   there's absolutely no evidence -- and this is the third

17   undisputed fact -- there's absolutely no evidence of human

18   presence off of either one of those, off of either the

19   decommissioned road or the trail.  Zero.

20        And the trap team was looking for it.  The trap team

21   was looking for signs of human use at the same time.  In fact,

22   if you recall in our brief we talk about how -- the Black Water

23   Creek site, they had pulled that trap, partly because of the

24   human use.  There hadn't been any.

25        And the discussion of having seen Mr. Ahlquist a

1    couple of times, once approximately here (indicating) -- and I

2    will remind the Court that's a disputed fact, but for purposes

3    of this exercise we will go ahead and agree with it -- once

4    here, and perhaps once there (indicating) -- and I know my blue

5    dot is a little off to the side there, but it would be on that

6    blue line, the decommissioned road.

7          That's it for people off horses.  The other two times

8    in that three-week period they saw two different horse parties.

9    And they were advised.  They were sticking to the trail.

10   Sticking to the trail meant they weren't concerned about them

11   getting off the trail because the trap site is a half a mile

12   away.  It is remote.

13         And finally, even in the light most favorable to the

14   plaintiff, under their expert's determination of the likelihood

15   of how long that bear was going to be sleeping, it was

16   predicted to be up within two hours.  After that bear gets up

17   and walks a hundred yards, those signs are absolutely

18   meaningless.

19         THE COURT:  Where is that in the record, the up in two

20   hours?

21         MR. MARTIN:  The up in two hours?

22         THE COURT:  Yes.

23         MR. MARTIN:  That would be in the Dr. Cattet report.

24         Therefore, the danger is transitory in nature.  And I

25   want to talk -- as I mentioned earlier, the danger is

1    transitory in the sense that the danger as described by the

2    plaintiffs is somewhat of a misnomer too.  They're painting the

3    picture of some sort of drug-crazed bear coming out of

4    anesthesia.  That's not the case.  They're painting it as some

5    sort of mind-altering drug that is going to make this bear more

6    likely to attack than not.  And that's just not the case.

7          As a part of our objections and a part of testimony

8    that we submitted in support of the objections, you will see

9    that Dr. Cattet is now saying that fight or flight was a 50/50

10   proposition.  In fact, I think -- and I'm summarizing, but he

11   talks about flipping a coin in the bear's head whether it is

12   more likely to attack than flee.

13         The same is true of the trap team's testimony.  They

14   talk about not wanting to be in and near the bear when it is

15   recovering, not because it is recovering from Telazol and

16   having been handled; because it is not a good idea to be close

17   to bears generally.  Bears being bears, they can be aggressive;

18   they can also flee.  The concept that the bear is somehow

19   ultra-aggressive is not supported by the record.

20         But be that as it may, the assessment of the

21   situation, the first, the preliminary question with -- which

22   the Court has to address is the likelihood of them being --

23   anybody being exposed to that.  The assessment of the

24   situation, through Chad's and Seth's eyes, the trappers'

25   doesn't show intent, doesn't show obviousness.  In fact, to

1   them it was inconceivable:  The risk of someone encountering

2   Bear 646 at that location in that sort of weather within the

3   next couple of hours was highly unlikely.  It certainly wasn't

4   obvious.  And for this reason, the United States is immune.

5           Additionally, this Court in its order earlier said

6   that there would be required to show a demonstration that the

7   risk wasn't known or obvious to Mr. Evert.  The plaintiff

8   cannot make the showing here either.

9           Mr. Evert, he saw one of the trap sites.  He saw the

10  dangerous bear sign.  And he asked a good friend,

11  self-professed bear expert and hiking companion what that

12  meant.  It is undisputed that Mr. Neal said, "I don't know

13  exactly, but it involves some sort of stinky bait," and he

14  warned him to stay away from there.

15          Now, in the plaintiff's response brief they describe

16  Mr. Neal as he meant to stay away only from that site.  Well,

17  what Mr. Neal meant is irrelevant.  What he communicated is the

18  only important aspect, and he told him to stay away.

19          It is also undisputed Mr. Evert, the day before he

20  died, visited the exact office location where the trappers are

21  located, the USGS Office, and specifically asked if the IGBST

22  was trapping.  Mr. Evert knew what the acronym IGBST stood for,

23  InterAgency Grizzly Bear Study Team.  And the plaintiff

24  attempts to mitigate this important evidence by saying well, he

25  wasn't told that that grizzly bear study team was trapping

1    grizzly bear.  It doesn't pass the straight-face test.

2    Mr. Evert was told indeed that the IGBST was trapping.

3          And so when you consider all of that evidence together

4    and not compartmentally, as the plaintiff's attempted to draw

5    out -- when you consider that together, it is undisputed

6    evidence that leads to only one logical inference, and that is

7    that Mr. Evert knew trapping was occurring and he wanted to

8    find out more.  So despite the warning from his good friend, he

9    left the Kitty Creek Trail and followed the trappers' horse

10   tracks half a mile uphill, doing exactly what he told his wife

11   and daughter he planned on doing, and that was trying to meet

12   up and talk with the trap team.

13         Now, the plaintiff in their brief it is described well

14   he only wanted to talk with them on the road.  Well, his

15   actions speak otherwise, and it is undisputed that he left the

16   trail following those horse tracks and it cost him his life.

17   But he, more than anyone, was aware of that danger and he

18   knowingly encountered it.  Therefore, plaintiff cannot satisfy

19   the Court's order and requirement that Mr. Evert did not know

20   of the trapping activities, and therefore, the second reason

21   the United States is immune.

22         THE COURT:  Thank you, Mr. Martin.

23         Mr. Vassallo.

24         MR. VASSALLO:  Thank you, Your Honor.  I would like to

25   address the motion on the discretionary function exception

1    which is the subject matter jurisdiction issue.  There are two

2    elements to the discretionary function analysis.  The first

3    issue is whether a mandatory and specific directive removed all

4    discretion for government employees to act.

5         The second element is whether the conduct that's being

6    challenged is susceptible to policy analysis.

7         And so the first thing we need to do is to identify

8    the specific conduct that's being challenged.

9         At the complaint stage, the plaintiffs were critical

10   of several aspects of the conduct with regard to the trapping

11   operations, including the removal of signs that contained

12   warning language and implemented a closure of the trap sites to

13   public access, the failure to provide information to residents

14   of seasonal cabins, leaving a released bear before it had

15   become fully ambulatory, and the use of a particular drug to

16   immobilize the bear.

17        The U.S. addressed these four items in its motion to

18   dismiss, and its brief.  Plaintiff did not address, though, the

19   latter two items:  The leaving a released bear before it had

20   become fully ambulatory and the use of the drug.  They didn't

21   address those in their brief, so those have been effectively

22   abandoned and I don't intend to address those in my argument.

23        In looking at whether all discretion had been removed,

24   plaintiffs bring up several documents.  The first I would like

25   to address is the Shoshone Forest Order and the related

1    regulations.  The obvious purpose of that order is to regulate

2    the conduct of the public by prohibiting the public from

3    entering closed areas.  The purpose is not to regulate the

4    conduct of agency employees to close certain areas.  The

5    provision regarding signing is just informing the public that

6    the boundaries of the closure will be marked with signs.  And

7    even if this regulation could be found to regulate the conduct

8    of persons who are implementing closures as opposed to the

9    public, it is not specific enough to remove the discretion

10   that's at issue here.

11        The regulation doesn't specify when in the trap -- or

12   the order, either, doesn't specify when in the trapping

13   operations the closure must begin and end.  It doesn't identify

14   any specific point during the conclusion of trapping operations

15   when signs may be taken down or must be taken down.

16        For example, it doesn't say that an area must be

17   signed until a trapped bear has left that area.  It doesn't

18   contain that kind of specific directive.

19        The next document is the State of Wyoming Chapter 33

20   permit.  The IGBST obtained a permit from the State of Wyoming,

21   and plaintiffs argue that that permit imposed mandatory duties

22   on the federal bear researchers.  We acknowledge that the Fish

23   & Wildlife permit, which is a different permit, states that

24   permittees will obtain and conduct activities in compliance

25   with all appropriate federal and state required permits and

1    licenses for take of listed species.  The Fish & Wildlife

2    permit does have that language in it, but that language raises

3    the question of whether the State of Wyoming can require a

4    permit under these circumstances.

5         The United States has jurisdiction over endangered

6    species and under supremacy principles states don't have

7    authority to impose additional requirements on the United

8    States in the management of endangered species.  And the

9    activities at issue here also occurred on federal land, and it

10   is our position that the state permit was not required and it

11   couldn't be enforced against federal actors.  And therefore,

12   nothing in that permit could remove discretion of federal

13   officials or federal actors.

14        But even if the plaintiffs could overcome that

15   obstacle, Your Honor, the state permit did not remove the

16   trappers' discretion to describe when the signs could be

17   removed.  The state permit says that all trap sites shall occur

18   on public lands and will be signed to alert the public if they

19   inadvertently approach a baited trap site.

20        Here at the time the signs were removed there was no

21   longer a baited trap site.  The traps had been removed; bait

22   had been picked up; trapping operations had been shut down.

23        The permit language doesn't address the period of time

24   after traps are pulled and a site is shut down.  Plaintiff

25   argues there was some residue of bait, and therefore, the site

1   was still baited.  But the permit doesn't say that signs have

2   to remain until all bait residue has dissolved or disappeared.

3   It speaks of a baited trap site which plainly requires the

4   presence of bait and the presence of a trap.

5         Plaintiff states in her brief that we're reading the

6   permits too narrowly because we say for a site to be a trap

7   site it has to have a trap.  We don't think that's a peculiar

8   reading of the language.  We think it is the most reasonable

9   and natural reading of the language.  It just doesn't say what

10  plaintiffs are trying to morph it into.  It doesn't say signs

11  must remain even after traps have been removed or until all

12  residue of bait has been removed or decomposed.  It doesn't say

13  signs must remain in an area which had been a baited trap site.

14        In applying the discretionary function exception for

15  discretion to be removed the mandatory directive has to remove

16  it in specific terms.  And the Chapter 33 permit doesn't remove

17  that discretion here.  It doesn't state specifically or

18  otherwise that signs must remain after trapping has occurred.

19        The next document I will address is the Fish &

20  Wildlife Service permit.  That permit states that every

21  possible precaution shall be taken to avoid confrontations

22  between bears and the public, including, but not limited to,

23  closure or signing of the study sites.  Plaintiff concedes that

24  the term "every possible precaution" is not specific enough to

25  remove discretion.  The permit doesn't state -- excuse me.  The

1    permit does state that sites shall be closed or signed.  And

2    here the site was signed and closed.

3         The permit, though, doesn't identify the specifics

4    regarding the manner or timing of signing.  Particularly the

5    timing of when the signs can be removed or when the closure can

6    be lifted.

7         Like its argument on the state permit, plaintiff would

8    have the Court read more specific terms into the permit than

9    what it actually contains.  It doesn't say that signs have to

10   remain for any specific period of time or until a specific

11   event occurs.  The trappers had to exercise discretion in

12   determining when to remove the signs and when to end closure of

13   public land.

14        And plaintiff may disagree with the decision that the

15   trappers made, and they want to argue that the decision was

16   unreasonable, but that's irrelevant to the discretionary

17   function analysis.  The discretionary function inquiry focuses

18   entirely on whether discretion was specifically removed, not

19   whether the discretion was abused or whether the conduct was

20   unreasonable.  That's related to a negligence inquiry that has

21   no place in discretionary function analysis.

22        The next document I will address is the Jonkel manual.

23   That manual by its own terms states that it is merely a

24   reference work.  Although it was referred to by Mark

25   Harrellson, who was a supervisor over the trappers, as a

 1    protocol, there's no evidence that the USGS or the IGBST

 2    considered the manual's provisions to be a mandatory directive.

 3    The manual contains qualifying language, states that techniques

 4    and methods change over time, hard-and-fast rules are

 5    impossible, every person will do things differently, techniques

 6    are offered only as a reference and an aid to understanding the

 7    problems and dangers involved in bear research and management.

 8         The manual also states that it is difficult to define

 9    the mandatory duty of a bear researcher or a manager.  It says

10    when it doubt, the agency's attorney should be consulted.

11         Your Honor, the very language of this manual compels

12    the conclusion that it is merely a reference work.  It is not a

13    mandatory directive.  And even if it were somehow found to

14    contain mandatory directives, the manual doesn't specifically

15    mandate how long warning signs have to remain posted after

16    capture activities are completed.

17         In our brief, Your Honor, we address another document,

18    the ACUC submission, and that went to the issue that, as I

19    stated earlier, has been abandoned by the plaintiffs.  And in

20    view of what the clock is telling me, I don't want to go into

21    that because I think that issue has been abandoned, and we will

22    rely on our brief for that if the Court thinks it is relevant.

23         And finally, Your Honor, the plaintiffs assert this

24    contractual obligation theory.  We think it is kind of a

25    curious argument.  Plaintiff is asserting that the United

1    States assumed a contractual duty to speak with cabin residents

2    about the IGBST team's activities in the Kitty Creek drainage.

3    And that argument is based on evidence that a Forest Service

4    employee, Andy Pils, verbally requested that Trapper Chad

5    Dickinson speak with cabin residents.  And according to

6    Mr. Pils, Chad Dickinson said he would do that.

7            Plaintiff apparently argues that this constitutes a

8    legally enforceable contract that is enforceable against the

9    United States.  And to put it mildly, Your Honor, that's quite

10   a stretch.  All that occurred was a conversation between two

11   federal government employees.  You don't even have two separate

12   parties involved.  Both individuals are employees of the United

13   States.  It takes more than a casual conversation between two

14   federal employees to create a legally binding contract on

15   behalf of the United States.  So to say that this conversation

16   constitutes a legally enforceable contract is just simply

17   wrong.

18           So, Your Honor, for those reasons that I've gone

19   through, discretion did remain for these employees.  Prong 1 of

20   the Berkovitz test is satisfied.  So then we need to turn to

21   prong 2, and that's called the policy prong.

22           And on that issue, nothing in any of the documents

23   relied upon by the plaintiff prohibited trappers from

24   determining when their operations were complete.  And plaintiff

25   has failed to establish any mandatory specific directive.

1          On the policies, Your Honor, where discretion exists,

2    whether it is expressly conferred or whether it is implied,

3    there's a presumption that the government conduct is grounded

4    in policy.  And we get that from the Gaubert case, United

5    States Supreme Court case cited in our brief.

6          THE COURT:  What do you think of the argument made

7    that that case is distinguishable because, as I understand it,

8    there was a specific regulation that conferred broad discretion

9    and that in this instance the Government hasn't identified such

10   a similar regulation?  Is that case to be read in that kind of

11   light, and has the Tenth Circuit?

12         MR. VASSALLO:  Well, for one thing, Your Honor, we

13   have to keep in mind that we're just talking about a

14   presumption at this point.  We're not talking about a

15   determinative ruling on whether policy existed.

16         But as it relates to the presumption, if you look at

17   the language of that case, it says if the regulation expressly

18   or impliedly allows discretion.  It speaks in terms of

19   implication.  So our position is you don't need a regulation

20   that expressly states that discretion exists or expressly

21   confers discretion.

22         If you look at the regulatory scheme, whether it is a

23   regulation or another mandatory specific directive, if you look

24   in those provisions, and having looked at them you can still

25   make the implication, if you can still imply that discretion is

1   still allowed, that's enough to trigger the presumption, it

2   doesn't have to be expressly conferred.

3         THE COURT:  So the first prong analysis under that

4   reasoning ends up with the Government having the benefit of

5   that presumption in every case if the first prong has been

6   satisfied.  Is that what you're arguing?

7         MR. VASSALLO:  I think that essentially what I'm

8   arguing, Your Honor, that once you meet the first prong, then a

9   presumption applies and that the conduct is grounded in policy

10   or susceptible to policy analysis, to be more precise.

11         THE COURT:  Thank you.

12         MR. VASSALLO:  And that plaintiff has the burden of

13   overcoming the presumption.

14         Regardless of whether the presumption applies, though,

15   Your Honor, there are policy considerations here that bring

16   this case within the discretionary function exception.  And in

17   applying the second prong, it is important to keep in mind that

18   the issue is whether the decision is susceptible to policy

19   analysis.  It is not whether the government employee actually

20   engaged in policy analysis.  The government employee's

21   subjective intent is irrelevant.  The Supreme Court has

22   specifically pointed that out.

23         Here the decision when to take down a closure sign at

24   a trap site implicates policy considerations.  You have

25   considerations of safety of the public versus access.  We're

1   talking about a closure sign.  It is not just a warning sign.

2   It is a closure sign.  It is closing an area of public land to

3   the public.  So you have an access consideration as well as a

4   safety consideration.

5        And there are additional policy considerations.  First

6   of all, going back to access, the longer the signs are up, the

7   less access is being granted.  That is something that can be

8   considered in determining how long these closure signs are

9   going to remain because they affect the closure.

10       Additional policy considerations that come into play

11  on this issue and this decision are preservation of wild areas

12  in their natural state.  Warning signs are conspicuous

13  intrusions on a natural setting.  This was a wild area.  It was

14  not on a trail.  It was about half a mile from the nearest

15  trail.  It is a wild setting, and the presence of five or six

16  or however many signs in an area that's that wild is an

17  intrusion on the wild character of that area.  That's a

18  consideration.  How long are you going to leave them up?  Are

19  you going to leave them up forever?  The longer they're there,

20  the more they're intruding on that setting.

21       And also there's an issue of allocation of government

22  resources that come into play.  If you're going to leave the

23  signs up for a period of time after the operations are complete

24  and after the trap site has been pulled, then you have to

25  figure out how to have someone come back and take the signs

1   down.  And that's a resource allocation issue and that's

2   relevant, too.  So the decision of when to take the signs down

3   is subject to or susceptible to policy analysis.

4          And decisions regarding other warning measures,

5   potential warning measures such as contacting the cabin

6   residents also raise policy considerations.  You have an issue

7   of public safety versus the possibility that the information

8   about trapping might be misused.  It might attract people to

9   the area.

10         This was well developed in the deposition testimony.

11  And if people have that information, it can result possibly in

12  harm to the bears by people entering these sites once they know

13  that trapping is going on.  There's -- there was deposition

14  testimony about bears being killed at trap sites.  There was

15  deposition testimony about other interference with trap sites,

16  and there was -- on that issue, there was testimony about

17  vandalization of trap sites.

18         That raises two issues.  One is the issue of animal

19  welfare.  One is if you have people potentially harming bears

20  at trap sites, that is a consideration that can come into play

21  here.  And also dealing with the issue of interference with

22  trapping operations, there the issue is related to the ability

23  of the agency to accomplish its mission.  Its very mission is

24  to conduct these studies and to gather this data.  And there's

25  a balancing that the IGBST or the trapping team employed or

1     certainly could have employed when we're talking about

2     susceptible policy analysis.  We have to balance the value of

3     the safety information against those other considerations,

4     animal welfare and the integrity and interference with trap

5     sites.

6             Your Honor, it looks like I'm out of time.  I was

7     prepared to talk about some of the case law arguments that

8     plaintiff made.  If the Court thinks that would be beneficial,

9     I would be happy to do that either now or in rebuttal.  If the

10    Court would rather stay with 30 minutes per side, then I will

11    conclude with the argument I've made.  Thank you, Your Honor.

12            THE COURT:  Thank you.  Let's see how the argument

13    goes.  I may permit some limited time for rebuttal.

14            MR. VASSALLO:  Thank you.

15            THE COURT:  Ms. Rankin.

16            MS. RANKIN:  Thank you, Your Honor.  I will start

17    again with the response to the motion for summary judgment, and

18    here it is the defendant's burden to show that there's an

19    absence of a genuine issue of material fact, something they

20    cannot do.

21            Now the Court here has set forth the proper test for

22    the plaintiffs to show willfulness under the Wyoming

23    Recreational Use Act.  And the Court said that the plaintiff

24    must show a reasonable inference for each of the Court's

25    factors.  So let's go through them.

1           First of all, did the government have actual danger --

2    actual knowledge of the danger.  This is undisputed.  As this

3    Court said in its prior memorandum and order, this is not a

4    case where the United States merely knew of a dangerous forest

5    condition or certain activities occurring in the forest.

6    Rather the United States' policies, permits and protocols

7    display actual knowledge of the specific risk of a mauling

8    inherent in their trapping activities.

9           Briefly, the United States Fish & Wildlife Service

10   permit specifically states that every possible precaution shall

11   be taken to avoid confrontations between bears and the public,

12   including warning and closure.  The Wyoming Game & Fish permit

13   also expressly states that trap sites shall be signed to alert

14   the public if they inadvertently approach a baited trap site.

15   The Shoshone National Forest area closure also says it is for

16   the protection of the public and the grizzly bear by minimizing

17   human-bear encounters.

18          Now, their knowledge of the dangers associated with

19   the release of a grizzly bear is well established.  Seth

20   Thompson, one of the trappers, specifically said that bear

21   mauling is a known risk of a human coming into a trap site

22   where the bear has been left to recover from anesthesia.  He

23   admits the bears are under severe stress and trauma when being

24   released.  Usually they will flee but sometimes they will

25   attack with intent to harm.  These guys are out there watching

1    the bear recover from the relative safety of their horses and

2    they do that for their own personal safety.  They are carrying

3    shotgun, long guns, pistols, bear spray.  They're maintaining a

4    safe distance because what they're concerned about the bear is

5    going to recover, it is going to pop up and it is going to

6    charge them.

7         Chad Dickinson, the other trapper, said he would never

8    want the public to be in close proximity to recovering bear.

9    They don't pack up when they're -- when the bear is in further

10   stages of recovery for their own safety.  Chris Servheen, who

11   is the head of the Grizzly Bear Recovery Program, said you

12   would never want the public to come in close contact with a

13   bear that's recovering from anesthesia.  You leave before the

14   bear is ambulatory.  You don't want to be there when the bear

15   wakes up.

16        The IGBST's own leader said you want to leave before

17   the bear is ambulatory because it is safety for the trappers in

18   the sense that you have a large carnivore coming out of a drug.

19        The IGBST's own manual states that a bear recovering

20   from anesthesia is possibly the most dangerous aspect of

21   handling bears.

22        Now, it seems to me from my reading of defendant's

23   brief that they're effectively conceding that there is an

24   obvious and known risk associated with the release of grizzly

25   bears.  What they're saying, Your Honor, is that they just

1    didn't think anyone would be in the area.  Apparently they want

2    to be relieved of liability unless we can definitively prove

3    that somebody was going to enter Site 3 soon after they removed

4    their warning signs.

5          And I would submit to the Court, Your Honor, that if

6    that were, in fact, the standard under the Recreational Use

7    statute that no plaintiff could ever prove their case because

8    it would entirely depend on the defendant's testimony and they

9    could always claim ignorance.

10          So even in this Court's prior order, the Court said

11    that these trappers knew of the cabins, they knew the trail

12    system was being used by the public.  It was reasonable to

13    infer that the government knew of the danger presented by their

14    own research bears, and they could have anticipated the use of

15    the public trails to the site where the grizzly bear was left

16    unattended and without signage.

17          Let's look at what they did know.  They were placing

18    signs at these trap sites because they knew it was foreseeable

19    that people would be in the area.  Why else would they place

20    any warning signs?  The placement of those signs proves

21    foreseeability.  It was obvious enough to the folks at the

22    Shoshone National Forest, Andy Pils and Anita Harper, that

23    somebody could enter these trap sites, and that's why they

24    directly asked Chad Dickinson to communicate with the Kitty

25    Creek residents, and he agreed to do that yet failed to do so.

1          The government certainly must have thought that it was

2     foreseeable that the public could enter one of their trap sites

3     and that's why there was a requirement to close and sign the

4     areas in the specific permits that the IGBST team was operating

5     under.

6          Their own manual says that individuals expect to be

7     warned when there's a potential for a confrontation with a

8     grizzly bear.  The permits that they were operating under

9     required signage whether or not they specifically knew somebody

10    was going to enter their trap site.  They knew that this area

11    was within the zone of foreseeability.  It was an open

12    recreational land.  It was not closed to the public.  There

13    were recreational residences, an entire community at the

14    trailhead to this trail system.

15         Mr. Evert was right where he had been for 40 years.

16    He was right where the government knew he had lived for 40

17    years and where they invited him to be through their lease.

18         They trapped, Your Honor, on a decommissioned road.

19    They did it for their own easy access which they knew also made

20    it easily accessible to hikers.  This was a natural travel

21    route.  They cannot be surprised that somebody would be there.

22    There's testimony in the case, Your Honor, from two different

23    affidavits and from Mr. Ahlquist's deposition testimony.  They

24    all said that at the time this incident occurred this was a

25    well-defined trail.

1          Even the investigative report into this incident terms

2     this area an obvious access route that became more obvious over

3     time.  These trappers were in the area for 22 days minus five

4     days they were on vacation.  They were using three to four

5     horses a day.  That is numerous trips in and out of this very

6     road that they were using, and it became quite obvious as an

7     access route.

8          It was obvious enough that somebody could be in this

9     area that when Yolanda Evert told Chad Dickinson that her

10    husband was long overdue, Chad Dickinson turned around and went

11    immediately to Site 3.  Now, these trappers have admitted that

12    they knew anybody could be in any part of this forest.  At any

13    moment they admitted that somebody could begin recreating on

14    the trails and come into one of their trap sites.  They

15    definitively knew that people were using the trail sites.  They

16    saw two different horse parties.  They saw the Alquists who

17    were neighbors of the Everts.

18         And according to the Alquists, they saw the trappers

19    at the juncture of where the decommissioned spur road takes off

20    to Site No. 3, just a half a mile away from this trap site.

21    The Alquists said in their affidavit and in Dennis Alquist's

22    deposition that the public's use of this trail system was

23    significant.

24         In addition, Your Honor, they want the benefit of

25    saying, "We just didn't see anybody."  But we have to look at

1   what they were doing to determine the use -- the public's use

2   of the trail system.  They only relied on random encounters.

3   They only used the decommissioned road, not the parallel main

4   trail that also gave access to this Site No. 3.  They took 5

5   days off during the 22 days that they were in the area.  They

6   were only using the trails in the morning.  Typically they were

7   done by 1:00 in the afternoon.

8          In fact, we know that Erwin Evert was at one of their

9   trap sites a week prior, Site No. 2, where he saw a dangerous

10  bear sign and turned around.  They didn't ask any of the

11  residents in the Kitty Creek area what their use of the trail

12  system was, nor did they determine who of the residents were

13  actually in the area.

14         We heard again today that they claim that the weather

15  was bad, though the trappers admit that they knew people hiked

16  regardless of the weather.  And the weather on this day, Your

17  Honor, the average wind speed was 15 miles an hour, hardly

18  something that would keep a Wyoming recreationist at home.

19         They also make the argument that this bear was soon

20  going to be ambulatory.  But as you discussed earlier in

21  Mr. Martin's deposition -- his argument, Your Honor, their own

22  documents produced in this case, the IGBST showed that the

23  average period of time that it takes a bear to go from showing

24  limited signs of recovery, as this bear was showing at the time

25  they left it and pulled the warning signs, until the time that

1    it could become ambulatory was 127 minutes.

2         They knew that this drug they were using created

3    prolonged recovery in bears.  They knew that the recovery was

4    individualized to any given bear, and they also knew that bears

5    typically would go off and sleep off the effects of the drug.

6    So for them to say that this bear was going to flee the area is

7    not consistent with their own documents that they have produced

8    in the case.

9         Your Honor, the government had actual knowledge of the

10   danger posed by this bear, and mauling was an obvious risk if

11   the public -- if a member of the public entered Site 3, which

12   is exactly what happened.

13        One of the final issues in your test, Your Honor, is

14   whether the risk of mauling was known or obvious to Mr. Evert.

15   And it seems obvious, but I think we have to go back to the

16   main point which is they removed the warning signs.  There was

17   nothing to indicate to anybody that this was, in fact, a trap

18   site or that there was a grizzly bear recovering from the

19   effects of anesthesia at the very spot where the government

20   left them -- left it.

21        They never did anything to try to warn Mr. Evert.

22   They never tried to talk to him to let them know generally what

23   their trapping operations would entail.  They lured this bear

24   to this precise spot in the forest and they left that bear

25   there, and they pulled the signs deliberately.

1           But you know who didn't know that they were luring

2      bears, that they were dragging the trails?  That was Erwin

3      Evert.  He had no ability to know that.  In fact, the

4      government trappers admitted that the only people that knew

5      about Site 3 were -- in addition to themselves were some Game &

6      Fish trappers that had helped them set a trap and perhaps their

7      own supervisor.  Nobody else knew about the existence of Site

8      3, so how could this risk have been known to Mr. Evert?  There

9      was nothing to indicate to him about what he was about to

10     approach.  The only thing that would have indicated that were

11     signs that they had removed prior to him arriving.

12          Now, the defendant asked this Court to draw numerous

13     unreasonable inferences in their favor, which is exactly what

14     the Court is not permitted to do, only as the fact finder but

15     not at summary judgment.

16          They talk about how he managed to find himself in

17     site 3.  That is not an issue that is appropriate under a

18     motion for summary judgment.

19          They also want to point this Court to warnings that

20     Mr. Evert allegedly received from other folks because it is

21     clear they provided no warnings to him or to any other Kitty

22     Creek resident.

23          It is true that Erwin Evert saw a dangerous bear sign

24     at Site 2, a different trap site 1.2 miles away from where he

25     was mauled at Site 3.  He -- when the -- the undisputed

1    testimony is that when he saw this dangerous bear sign, he

2    turned around and went home.  And he went home and called his

3    friend, Chuck Neal, and said, "What do you think is going on?"

4    Chuck didn't know, but he gave an educated guess and he said

5    they may be hare snare DNA trapping, or they may be doing live

6    traps.  Either way, there's bait involved.  You want to stay

7    out of the area.  And he did just that.  He never went back to

8    that area.  He never went close to that area.

9           Site 3, again, was 1.2 miles away.  Chuck said that he

10   did exactly what he asked him to do, and that is to stay away

11   from that area.  It is a fact that Site 3 wasn't even in

12   existence when Mr. Evert saw the dangerous bear sign at Site

13   No. 2.  Erwin Evert didn't hike again in the drainage until the

14   date of his death.

15          They also want to point to this conversation with the

16   USGS employee in Bozeman, Montana.  Two days before Erwin's

17   death he went to Bozeman to try to sell his book, and he spoke

18   to the USGS employee.  In passing, in casual conversation, he

19   asked if the IGBST was housed in the same office as the USGS.

20   And she confirmed yes, that's true.  She confirmed that the

21   IGBST generally traps bears.  There was no information

22   communicated, however, about the Kitty Creek drainage or

23   certainly not Site 3.

24          Finally, part of your court's test, Your Honor, is

25   that the mauling by a recently ensnared and anesthetized bear

1    not be an inherent risk of hiking in the woods.  Defendant has

2    not argued that either here today or in their brief, but

3    perhaps that's because their own trapper said that when asked

4    if he believed a hiker should be prepared to come into contact

5    with an anesthetized bear, he said that's not something anybody

6    expects to happen.

7            So, Your Honor, for all of these reasons, the

8    defendant has failed to prove an absence of genuine issues of

9    material fact as to the Court's test that you set forth

10   previously.

11           With respect to the motion to dismiss, Congress

12   intended for a broad waiver of sovereign immunity.  The

13   exceptions to immunity are required to be narrowly construed.

14   Now, there are two prongs to the Berkovitz test, and I will

15   jump right into the first one.

16           Whether or not what the trappers did was a matter of

17   choice.  If there is a federal regulation or policy that

18   prescribes a specific course of action, then the discretionary

19   function does not apply and the defendants do not enjoy

20   immunity.

21           First of all, the Fish & Wildlife Service permit

22   specifically says that every possible precaution shall be

23   taken -- shall is mandatory language -- to avoid confrontations

24   between bears and the public, including, but not limited to,

25   closure or signing of the sites.

1          The mandatory language of "shall" and specific

2    inclusion of "closure or signing of the study sites" leaves no

3    room for discretion.  At a minimum the employees had no choice

4    but to either close or sign their study sites.  Now this

5    mandate applied to one singular and very specific danger, and

6    that is the encounter between a research study bear and the

7    public.

8          Now, defendant argues that that is not specific

9    enough.  They say that somehow that the definition of a study

10   site does not include at least the limited period of time and

11   the limited area where an anesthetized grizzly bear has been

12   snared, handled and remains present in an anesthetized state

13   such that it cannot yet leave.

14         What can be more fundamental to a warning than you

15   have to keep it up, you have to keep the warning up until the

16   danger passes?  It is inherent, Your Honor, in the permit that

17   until the danger is eliminated, the danger that is expressly

18   identified in the permit, you have to keep the warning signs

19   up.  Otherwise, the permit would be rendered absolutely

20   meaningless.

21         This was not just a failure to warn case, Your Honor.

22   It was a failure to continue to warn when it mattered most.

23   These folks left up their warning signs for 22 days and when

24   there was no known danger present.  On the one day and at the

25   very period of time when they knew they had a grizzly bear

1    present at their site, that was the period of time when they

2    decided to deliberately remove their warning signs.  That's not

3    in compliance with the mandatory permit and the one and only

4    danger that the permit recognized.

5         The Shoshone National Forest closure order also says

6    that area closed will be marked on the ground with closure

7    signs.  It, again, specifically identifies a specific hazard

8    and that is the protection of the grizzly bear and the public

9    by minimizing human-bear encounters.

10        Now, defendant, incredibly, argues that the area is

11   only closed as long as they choose to place warning signs, and

12   therefore, this area was no longer closed, and therefore, signs

13   were not required.

14        Defendant admits that their trappers opened Site 3

15   when they had anesthetized bear present at their site.  At the

16   time they left, Chad Dickinson admitted that the bear was not

17   showing signs that it was going to get up.  The arbitrary

18   removal of the closure warning signs did nothing to prevent the

19   exact danger addressed in the order.

20        Now, defendant again claims that the order is not

21   specific enough because it does not provide direction as to how

22   many signs there should have been, what they should have said,

23   where they should be placed and how long they should be kept

24   up.  But the order is made pursuant to 36 C.F.R. 261.51 which

25   says, "Posting is accomplished by displaying each prohibition

1    imposed by an order in such locations and manner as to

2    reasonably bring the prohibition to the attention of the

3    public."  I would submit, Your Honor, that for this closure

4    order to have any meaningful effect whatsoever the only way to

5    prevent an encounter between a research bear and the public is

6    to keep the warning signs up until the danger is gone.

7           The Wyoming Game & Fish permit, they now claim it

8    didn't apply, although they admit that the Fish & Wildlife

9    permit, the overarching permit that provides authority for what

10   they were doing, required that they have the permit in their

11   possession.  The Game & Fish permit was specifically directed

12   to the IGBST and even to these two trappers.  The only species

13   that the Game & Fish permit applied to was the grizzly bear,

14   and it says that all trap sites shall occur on the public lands

15   and will be signed to alert the public if they inadvertently

16   approach a baited trap site.

17          We heard today that, again, that they are trying to

18   limit what the definition of baited is.  It is an absolute fact

19   that they left some portions of their bait.  They removed only

20   the obvious bait and the large pieces of bait, but there was

21   bait still remaining at the trap site.

22          They also claim that this was no longer a trap site

23   because they removed the actual traps.  But, Your Honor, the

24   traps were not the danger here.  It was actually the bear that

25   they had left in a stressed and traumatized state.

1          Now, I want to get to the second part of the test on

2   discretionary function, and that is if the government -- the

3   Court somehow finds that the trappers' conduct was

4   discretionary, they still must satisfy the second step of the

5   discretionary function analysis which is that the choice must

6   involve the exercise of political, social or economic judgment.

7   The plaintiff only needs to succeed on one of the two prongs of

8   the Berkovitz test.

9          Now, the defendant has come up with a handful of

10  policy considerations.  And the reason why those don't fit,

11  Your Honor, is because they were created as part of this

12  litigation.  In fact, their own leader said he couldn't think

13  of one reason why they couldn't have left the warning signs up.

14         First of all they argue public access.  Your Honor,

15  they left signs up for 22 days while they were trapping, and

16  then at approximately 12:30 when they decided they wanted to

17  leave the trap site, then they decided that public access

18  considerations prevailed over public safety.

19         The signs were only in a very small area immediately

20  around Site 3.  In fact, they were 50 to a hundred yards from

21  the site.  Defendant has repeatedly characterized this area as

22  remote with an obliterated trial -- trail -- excuse me -- with

23  dirt berms, trees growing up and deadfall in the area.  And yet

24  now they want to say they were concerned about public access.

25  And this is true despite the fact that they argue they didn't

1    see anybody in the area.  They want it both ways.

2         They said they couldn't conceive that anyone would

3    possibly be hiking in this area, yet they were concerned about

4    public access.  The cases that have found that this -- that

5    this is a valid policy consideration involved either major

6    access points such as the Tippet versus United States case

7    where 350 snowmobilers were entering the major access route

8    into Old Faithful or in the Elder case in Zion National Park

9    where 2 million visitors a year went to this specific Emerald

10   Pools scenic attraction.

11        That's not the case here.  They had already placed

12   signs.  They had already said public access was not an

13   important enough issue to overcome public safety.  And now

14   they're claiming that another not even 24 hours would have

15   affected public access to such an extent that they should be

16   immune for their actions.

17        If they didn't come back the next morning, which is

18   what plaintiff says they easily could have done, they had a

19   place to stay, they had horses; it was going to be a necessary

20   travel day for these trappers anyway, they could have left the

21   signs up because the signs had a specified end date three days

22   later of June 20th.  So the public access issues we are talking

23   about are anywhere from so many hours to three days.  That's

24   the extent of their policy consideration, and that just doesn't

25   fit.  It doesn't fit any of the case law in the Tenth Circuit.

1          Very similarly, they also argue they were concerned

2     about the natural condition of the land.  Again, they had

3     already posted signs for 22 days and agreed to affect the

4     condition of this land.  It was a limited area with less than

5     one-day effect.  It was in an area that was a generally

6     nondescript part of the forest.  That's distinct from the cases

7     that we have cited to in our brief where, for example, they're

8     worried about the Emerald Pools in Zion or Indian petroglyph

9     historical site in Keen.

10          Beyond that, Your Honor, they weren't too concerned

11     about the natural condition of the land while they were

12     trapping.  They created tepee sites to lure bears in.  They

13     left bait at the site with rope tied around it which was found

14     later.  They damaged the tree where the bear was snared with

15     their cables in addition to the damage that the bear did, the

16     significant damage that the bear did while he was trapped.

17          Finally, Your Honor, resources.  They make an argument

18     that they were concerned about resources or that that was a

19     valid public policy justification.  And the Courts have said

20     that nearly every decision that the government makes has some

21     impact on the budget, but that's not sufficient to gain

22     immunity.  They admitted they could have returned easily the

23     next morning and removed the signs.  It would have taken 45

24     minutes from where they parked their trailer to get to Site 3.

25     It would have taken two and a half hours to remove the signs at

1    both Site 2 and Site 3.  This was a very minor issue.  They

2    already, as I said, had horses and a place to stay.  And the

3    following day was a necessary travel day for them to get back

4    to Bozeman anyway.  So the concern about resources is hardly

5    something that justifies immunity under the Berkovitz test.

6            In the interests of time, Your Honor, there are

7    numerous cases, and maybe I will just hit a couple of them.

8    But the Tenth Circuit has addressed this failure to warn issue

9    numerous times, and there is no case that the defendants can

10   point to or that exists where you have an instance where the

11   government has warned for a period of time and then at the very

12   moment where the danger exists they have removed the warning

13   signs and somehow justify that under any policy consideration.

14           They can't do that here, and it doesn't fit with any

15   of the cases.  And I will in the interests of time rely on my

16   brief for that.

17           But one last issue, Your Honor.  They claim that this

18   agreement that the trappers made with the national -- the

19   Shoshone National Forest, Andy Pils, to speak to the Kitty

20   Creek residents implicates a policy consideration of not

21   wanting to attract negative attention.  Not only was this an

22   agreement they made with the national forest in order to ensure

23   they could trap on the forest, but it was also part of their

24   own manual that they were supposed to reach out and speak to

25   landowners because they expect to be warned when there's the

1    potential for a confrontation.

2         The problem with this policy consideration that the

3    defendants have suggested is that there is no concern -- and

4    the defendant's employees have admitted this -- there's no

5    concern about informing the public generally about the trapping

6    operations.  The only concern they have is that they not

7    specify the specific location of the trap sites.  That's not

8    what plaintiff is asking that they should have done.  It is

9    only that they comply with the agreement they made with the

10   national forest, and that is to merely talk to the Kitty Creek

11   residents, those that they knew were in the area, those that

12   they knew, because they were recreational residents, were

13   likely using those trails.  So that policy just doesn't fit

14   with what the plaintiff is arguing.

15        So unless the Court has further questions, Your Honor,

16   I will respectfully request that both motions be denied.

17        THE COURT:  Thank you.

18        I appreciate the briefing and argument today.  My

19   tendency, based upon the briefs and the attachments, have a

20   sense of how I'm leaning, absent something new surfacing in

21   oral argument that I feel like I hadn't analyzed, I try to give

22   some feedback on the pending motions.

23        I will preface my feedback with what I think everybody

24   understands and appreciates which is that this was a very

25   tragic incident, and to the members of the Evert family you

1    have my deepest sympathy.

2         As to the -- I will address it by filing date which is

3    the reverse of the arguments presented today, so I will address

4    the Government's motion to dismiss for lack of subject matter

5    jurisdiction, because, of course, this is -- as noted in the

6    title of the motion and the context of the case, this is a

7    jurisdictional matter.

8         Plaintiff's complaint must fall squarely within the

9    jurisdiction of the federal courts.

10        This was a very interesting motion to review and

11   research.  As noted, I think, by the briefs of both parties and

12   by Ms. Rankin's argument, the Tenth Circuit has spoken on this

13   subject many, many times, although sometimes it is difficult to

14   tease out the point of difference in their rulings.

15        As to whether the challenged action is a matter of

16   choice for the acting employees, the Court is inclined to

17   conclude, consistent with the Government's argument, that this

18   was a matter of choice.  Certainly there are a number of

19   factors to consider, from the order to the permit, to the

20   subpermit, to the manual, to the contact communicated by Pils.

21   It is the Court's conclusion a review of those does not remove

22   choice or judgment as to the issue of whether or when to remove

23   the warning signs.

24        And so it is the Court's conclusion that the first

25   prong of the Berkovitz test is satisfied by the Government.

1          As to the second prong, whether the challenged action

2     is a judgment or choice susceptible to policy analysis, the

3     Court is inclined to rule in favor of the plaintiff.

4          In looking at the case law in this area, on surface it

5     appears as though both sides can find a case and argue it

6     competently, as there are cases in which the discretionary

7     function exception has been supported and cases in which the

8     discretionary function exception has been found lacking.

9          From my read of those cases, and again, focusing on

10     the decision to remove the sign when the team left, it is the

11     Court's general conclusion that that decision is not uniquely

12     governmental, as the courts, and particularly the circuit, has

13     discussed this exception.  The issue of scenic -- scenic area,

14     safety versus access, those -- that analysis is present with

15     the decision to post the area as closed.

16          Whether the area is closed six days or nine days as

17     noted in the sign or six days or seven days or six and a half

18     days doesn't seem to this Court to be uniquely governmental

19     from a policy analysis perspective.

20          On the economic consideration, that is noted and

21     without a point of measurement it seems as though that

22     consideration is insignificant, particularly where the specific

23     hazard existed in the form of a recovering bear at a

24     government-baited site.

25          So as to the Government's motion to dismiss on subject

1    matter jurisdiction, I'm inclined to deny that motion.

2         On the Government's motion for summary judgment, as

3    the parties well know, the Court addressed this earlier in a

4    motion to dismiss and set out a three-part test which -- and an

5    analysis of the phrase "willful" which, as noted in the

6    Government's brief, was not consistent with the argument made

7    by the Government or the standard, but that's -- that is

8    presented and remains presented and in the record in terms of

9    the Government's disagreement with the Court's application of

10   the Recreational Use Act.

11        And so I took that same standard, those same three

12   parts that I addressed in the -- I don't know if it is the

13   conclusion, but the tail end of the earlier memorandum and

14   addressed those three parts.

15        On the actual knowledge by the government of a danger,

16   it is the Court's conclusion that notwithstanding the

17   additional factual development that a reasonable fact finder

18   could find that there is a danger known by the government

19   concerning the potential for mauling following the release of

20   an anesthetized but as of yet immobile bear.

21        The second prong, which is where the Court's attention

22   is drawn more specifically by the Government's argument, is

23   whether the risk is sufficiently great.  So we know that there

24   is a risk and that the government knew of the risk.  There's

25   policies and permits and conversations about the risk.  The

1    Court's view as to whether that risk is obvious, from my read

2    of the cases and analysis of the fact, the Court is of the

3    conclusion to support the Government on this prong, that

4    considering all of the factors together and not any individual

5    factor in isolation, that it was not obvious that off-trail

6    hikers or an off-trail hiker would come upon Site No. 3,

7    considering the weather conditions that day, the lack of any

8    evidence in the record of off-trail hikers during that

9    three-week period where research was underway in the Kitty

10   Creek area, the relative remoteness of the trap site in terms

11   of being off of the only maintained trail, the week-long

12   presence of five signs along that access route, and the

13   anticipation that bear would soon recover.

14         It is the Court's conclusion that the second prong

15   supports the Government's motion.

16         As to the third prong, the risk of danger, either

17   known to -- well, known to Mr. Evert or obvious to Mr. Evert or

18   the public, I do not see the need to really analyze the issue

19   as to the public.  The facts in the record concerning

20   Mr. Evert's knowledge, concerning the standard for summary

21   judgment and viewing the evidence in the most favorable light

22   for the plaintiff, one might conclude that Mr. Evert knew about

23   trapping activities.

24         But the Court cannot go the next step to conclude that

25   Mr. Evert knew about trapping activities at the incident site,

1   Site No. 3, and acted in disregard of that knowledge.

2          And so at this stage in the Court's review of the

3   briefs and cases and considering the argument, the Court is

4   inclined to rule in favor of the Government and dismiss the

5   plaintiff's claim under the Wyoming Recreational Use Act.

6          Thank you, Mr. Levi (sic), for clarifying and

7   correcting my confusion concerning the Government's filing.  I,

8   for some reason, had it cast in my mind as a motion as opposed

9   to an objection.

10          So I will take a look at that filing as I continue to

11  consider the admissible evidence in the case and work on the

12  motion for summary judgment.

13          Are there any matters that should come to my

14  attention?  Anything from the plaintiff?

15          MS. RANKIN:  None from plaintiff, Your Honor.

16          THE COURT:  Anything from the Government?

17          MR. MARTIN:  Your Honor, I guess, just for

18  clarification, the Court is saying it is inclined to grant.  We

19  do have some pending filings that are due to be filed.  I guess

20  one of which would be our expert designations.  Is it the

21  Court's pleasure that we then not move forward with that?

22          THE COURT:  When is that deadline?

23          MR. MARTIN:  October 31st.

24          THE COURT:  The decisions will likely be out this

25  week.

1          MR. MARTIN:  Okay.  Thank you.

2          THE COURT:  The one on the Federal Torts Claims Act

3     will likely be today, but that's the denial so that's not the

4     one that probably has you most concerned in terms of the status

5     of the case.  But I'm not in trial this week, and so I should

6     be able to continue to work on the summary judgment motion and

7     get that -- get a final decision.

8          And of course, this is just courtesy to the

9     participants in terms of some feedback.  I know people have

10    traveled to attend to the argument today, and it is always my

11    hope to -- that people will take my remarks in the spirit

12    offered and understand that until a final order is entered,

13    there is no final decision.

14         MR. MARTIN:  Thank you, Judge.

15         THE COURT:  All right.

16         I appreciate, again, the amount of time, attention and

17    work invested in this case.  It is obvious from the briefs

18    filed and the argument today.  Thank you for that.

19         Hearing that there's nothing else that requires my

20    attention, we will stand in recess until 11:00.

21    (Proceedings concluded 10:25 a.m., October 22, 2012.)

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5            I, JANET DAVIS, Federal Official Court Reporter for

6    the United States District Court for the District of Wyoming, a

7    Registered Merit Reporter and Federal Certified Realtime

8    Reporter, do hereby certify that I reported by machine

9    shorthand the foregoing proceedings contained herein on the

10   aforementioned subject on the date herein set forth, and that

11   the foregoing pages constitute a full, true and correct

12   transcript.

13

14           Dated this 25th day of January, 2013.

15

16

17

18                        */s/ Janet Davis*

19           _____

20                       JANET DAVIS
                  United States Court Reporter
21                 Registered Merit Reporter
            Federal Certified Realtime Reporter
22

23

24

25